# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| BELINDA DUPUY, et al, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    No. 97 C 4199 |
| | ) |
| BRYAN SAMUELS, Director, Illinois | )    Judge Rebecca R. Pallmeyer |
| Department of Children & Family Services, | ) |
| in his official capacity, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs represent a class of persons who challenge the constitutionality of certain policies and procedures of the Department of Children and Family Services ("DCFS" or the "Department") relating to the investigation of allegations of child abuse or neglect. In an earlier proceeding, Plaintiffs focused on the Department's procedures for determining whether reports of such abuse or neglect should be "indicated" or "unfounded." On March 30, 2001, the court granted Plaintiffs' motion for a preliminary injunction as to certain of these "core" and "special" DCFS policies. Specifically, the court found that "the relatively low standard of proof required to indicate a finding, combined with the indefensible delays" in the appeal process and the resulting "staggering expungement rate" of indicated reports, violated Plaintiffs' procedural due process rights. *Dupuy v. McDonald*, 141 F. Supp. 2d 1090, 1136 (N.D. Ill. 2001), *aff'd in part and rev'd in part by, Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005). The court noted, further, its suspicion that the agency's lengthy delays not only victimized persons who are innocent of abuse or neglect charges, but might also result in exoneration of persons who are guilty of such charges. 141 F. Supp. 2d at 1130.

In this proceeding, Plaintiffs are challenging DCFS "safety plans," which impose restrictions upon families during the pendency of investigations into allegations of abuse or neglect. Plaintiffs claim that the safety plans are unconstitutional and seek further injunctive relief to prohibit DCFS

from implementing the plans in any form. Resolution of this issue has been complicated the parties' contentious dispute as to the appropriate class definition. The court has now entered an order defining the class, for purposes of this stage of the litigation, as consisting generally of persons under investigation for child abuse or neglect who are the subject of "safety plans," imposed under threat, that prohibit or restrict their contacts with their children. *See* Order of 9/30/03 (amending class definition to include families subject to safety plans involving no contact requirements or removal from the home); Order of 4/16/04 (amending class definition to require a threat of protective custody and to exclude persons without a legal relationship to the children or spouse). For the reasons set forth below, Plaintiffs' second motion for preliminary injunction is granted in part and denied in part as described herein.

## BACKGROUND

The background facts, and a description of the DCFS procedures for investigating allegations of abuse and neglect, are more fully presented in this court's March 30, 2001 Memorandum Opinion and Order. *See Dupuy*, 141 F. Supp. 2d at 1092-1130. This opinion assumes the reader's familiarity with the earlier decision and will summarize those facts here only briefly.

I.    **The Department of Children and Family Services**

DCFS is the state agency charged by statute with the duty of investigating allegations of child abuse and neglect. *Dupuy*, 141 F. Supp. 2d at 1092; 325 ILCS 5/2. The Department is organized into various operational divisions, including the Division of Child Protection ("DCP"). The DCP is responsible for operating a hotline to accept calls regarding allegations of child abuse and neglect (the "DCFS Hotline"), and for investigating those allegations. *Id.* at 1093. Of the more than 350,000 calls placed to the Hotline each year, 65,000 are investigated. Approximately 23,000 (or 1/3) of the investigations result in "indicated" findings, meaning that the investigator has determined

2

that credible evidence of child abuse or neglect exists. The remaining charges are deemed "unfounded," meaning that the investigator has not found credible evidence of abuse or neglect. *Id.*

## II.     The Abuse and Neglect Investigative Process

Any person may make a report of child abuse or neglect by calling the toll-free DCFS Hotline. Certain persons whose employment brings them into frequent contact with children are considered "mandated reporters" and, thus, are required by law to make a Hotline report if they have a reasonable belief that a child may be abused or neglected. *Id.* at 1094; (ILL. ADMIN. CODE tit. 89, § 300.30). If a Hotline call is deemed to be made in good faith and to meet the minimum criteria for further investigation, the Hotline operator completes a Child Abuse and Neglect Tracking System form (the "CANTS 1" form) and submits it to a local DCP office where an investigator is assigned. The investigator is responsible for conducting the investigation and for making a final determination as to whether to "indicate" or "unfound" the report. *Id.* at 1095.

The regulations explain that "[w]hen the investigative worker has completed all required investigative contacts and has secured appropriate physical evidence . . . the investigative worker shall make a finding of Indicated or Unfounded. This determination shall be based upon whether the information gathered during the investigation and from the direct observations made by the investigative worker constitutes credible evidence of child abuse or neglect." (ILL. ADMIN. CODE tit. 89, § 300.110(i)). An investigator's recommended determination is reviewed by his or her supervisor who has the actual authority to "indicate" or "unfound" the investigation. *Dupuy*, 141 F. Supp. 2d at 1097. Once the recommended finding has been approved, the investigator completes a CANTS 2 Final Finding Report form and forwards it to the State Central Register ("SCR"), where it is registered in a computerized listing of information regarding allegations of abuse or neglect. *Id.* at 1093, 1098. DCFS regulations require that an investigation be completed within 60 days,

3

though this time period may be extended for periods of up to 30 days upon a showing of good cause. (ILL. ADMIN. CODE tit. 89, § 300.110(i)(3)C)). Evidence at the first preliminary injunction established, however, that in actual practice, investigations often took far longer. *See Dupuy*, 141 F. Supp. 2d at 1106-1130.

## III.    Safety Plans

In conjunction with investigations into child abuse and neglect, DCFS utilizes a variety of plans aimed at protecting children pending the outcome of an investigation and/or after a report has been indicated.  One such plan is the Child Endangerment Risk Assessment Protocol ("CERAP") "safety plan."  CERAP was developed in response to several high profile incidents in the early 1990s where children were seriously injured or killed shortly after DCFS became involved in their cases.  (Tr. 2243-44.)  In 1994, the Illinois legislature enacted Public Act 88-614, which required DCFS to develop and implement:

(1)    A standardized child endangerment risk assessment protocol.
(2)    Related training procedures.
(3)    A standardized method for demonstration of proficiency in application of the protocol.
(4)    An evaluation of the reliability and validity of the protocol.

20 ILCS 505/21(e).  In response to this legislation, DCFS formed a multidisciplinary committee of external experts to oversee the development of the CERAP process, which is now set forth in Appendix G to Department Rule and Procedure 300, and in the Safety Determination Form, the Safety Plan form, and the Safety Plan Termination Agreement.  (*See* Jt. Ex. 7, Appendix G; Jt. Ex. 5(c), CFS 1441-A; Jt. Ex. 5(e), CFS 1441; Jt. Ex. 5(f), CFS 1441-B).

### A.    The Safety Plan Assessment Process

The CERAP process is designed to "provide workers with a mechanism for quickly assessing the potential for moderate to severe harm immediately or in the near future and for taking quick action to protect children."  (Jt. Ex. 7, Appendix G, at 1.)  A CERAP form must be

4

completed for all children in the home of an alleged perpetrator within 48 hours of DCFS's receipt of a Hotline call, and within 24 hours after a child protection specialist sees the alleged child victim(s). (*Id.* at 3; Jt. Ex. 2, Procedures, § 300.50(c).) The CERAP process requires the child protection specialist to assess whether a child is safe or unsafe, using a four-step analysis: (1) does the case present any one or more of 15 enumerated "safety factors"; (2) how does that factor relate to specific individuals; (3) are there any "family strengths and mitigating circumstances"; and (4) would the child be "safe" or "unsafe" absent implementation of a safety plan. (Jt. Ex. 7, Appendix G, at 7-15.)

### 1. The 15 Enumerated Safety Factors

The first step in the CERAP process is for the child protection specialist to determine whether one of 15 enumerated safety factors is present. The factors include: a household member's behavior is violent and out of control; the caretaker has not, will not, or is unable to provide sufficient supervision to protect the child from harm; the child is fearful of people living in or frequenting the home; child sexual abuse is suspected and circumstances suggest that the child's safety may be an immediate concern; and a paramour is the alleged or indicated perpetrator of physical abuse. There is also a general "other" category to cover safety concerns not expressly listed.[1] The Regulations provide several examples of factors that may fall under the "other"

---

[1]     The complete list of factors is as follows:

1.     Any member of the household's behavior is violent and out of control.
2.     Any member of the household describes or acts toward child in predominantly negative terms or has extremely unrealistic expectations.
3.     There is reasonable cause to suspect that a member of the household caused moderate to severe harm or has made a plausible threat of moderate to severe harm to the child.
4.     There is reason to believe that the family is about to flee or refuse access to the child, and/or the child's whereabouts cannot be ascertained.
5.     Caretaker has not, will not, or is unable to provide sufficient supervision to protect child from potentially moderate to severe harm.
6.     Caretaker has not, or is unable to meet the child's medical care needs that may
                                                                              (continued...)

category, including that a child's behavior is likely to provoke the caretaker to harm the child; that persons in the household have unexplained injuries; or that the caretaker refuses to cooperate or is evasive. (Jt. Ex. 5(e), CFS 1441; Jt. Ex. 7, Appendix G, at 12.) If the investigator determines that there is "clear evidence or other cause for concern" that a factor is present, he must check the factor "yes" on the CERAP Safety Determination Form (CFS 1441); otherwise, he must check the factor "no." (Id.)

DCFS Procedures do not define what constitutes "other cause for concern." John Goad, former Deputy Director of the Department's Division of Child Protection, testified that the investigator is expected to look for "a reasonably extreme version" of a listed safety factor, and must determine a factor's existence using all of the information available from the initial report and the person who made it, as well as any additional information that may be obtained by observing and talking with the children and the family, and by observing the home environment. (Tr. 2259,

---

[1](...continued)
　　　　result in moderate to severe health care problems if left unattended.

7.　　Any member of the household has previously or may have previously abused or neglected a child, and the severity of the maltreatment, or the caretaker's or other adult's response to the prior incident, suggests that child safety may be an urgent and immediate concern.

8.　　Child is fearful of people living in or frequenting the home.

9.　　Caretaker has not, or is unable to meet the child's immediate needs for food, clothing, and/or shelter; the child's physical living conditions are hazardous and may cause moderate to severe harm.

10.　　Child sexual abuse is suspected and circumstances suggest that the child['s] safety may be an immediate concern.

11.　　Any member of the household's alleged or observed drug or alcohol abuse may seriously affect his/her ability to supervise, protect, or care for the child.

12.　　Any member of the household's alleged or observed physical/mental illness or developmental disability may seriously affect his/her ability to supervise, protect or care for the child.

13.　　The presence of domestic violence which affects caretaker's ability to care for and/or protect child from imminent, moderate to severe harm.

14.　　A paramour is the alleged or indicated perpetrator of physical abuse.

15.　　Other (specify).

(Jt. Ex. 5(e), CFS 1441.)

6

2263-64.) It appears that in practice, however, investigators do not always require a "reasonably extreme" showing and that any amount of evidence may be sufficient warrant for the investigator to check a safety factor "yes." Deputy Director Goad conceded, for example, that investigators need neither a certain "level of evidence" nor evidence confirming that it is "more likely than not" that a safety factor is present in order to check a factor "yes." (PX L, Goad Dep., at 27-28.)

Plaintiffs find this low standard significant, particularly because several factors by their terms require only allegations of wrongdoing and/or minimal evidence of any risk of harm to the child. Factors 11, 12, and 14, for example, direct investigators to check "yes" based solely on an allegation of abuse or neglect, even if no investigation has yet occurred or if an investigation suggests that the allegation may be untrue. (See, e.g., Jt. Ex. 5(e), CFS 1441, factor 14) ("[a] paramour is the alleged or indicated perpetrator of physical abuse") (emphasis added); Tr. 200-01). Factors 2, 8, and 14 direct investigators to check "yes" even if there is no or only nominal evidence that the presence of the factor poses any danger of harm to a child. (See, e.g., id., factor 8) ("[c]hild is fearful of people living in or frequenting the home"; no requirement of evidence that the child be in actual danger from those people). In addition, nine of the factors (1, 2, 3, 7, 8, 10, 11, 12, and 14) do not require any evidence that a parent or caretaker (as opposed to some other "member of the household") has engaged in any wrongful conduct. Factor 3, for example, states that "[t]here is reasonable cause to suspect that a member of the household caused moderate to severe harm or has made a plausible threat of moderate to severe harm to the child." (Jt. Ex. 5(e), CFS 1441.) This test is met, presumably, even where there is no evidence that the parent or caretaker is unable to ensure the safety and supervision of his or her children.

For each factor checked "yes," the investigator is expected to explain what led to that determination. (Jt. Ex. 7, Appendix G, at 12; Tr. 2265-66.) DCFS Procedures explain, further, that "[t]he presence of any one of the listed behaviors and/or injuries does not in and of itself mean that a child should be determined to be unsafe." (Id. at 8.) Rather, an investigator must also consider

7

(1) the age and developmental status of the child; (2) the mental, medical, and/or developmental status of the parent(s) or other person(s) responsible for the child's safety (i.e., are they capable of and willing to protect the child's safety?); (3) the type, severity, location, and/or extent of injury to a child; and (4) the intent, severity and/or duration of the behaviors directed toward the child. (*Id.*)

If an investigator does not check any safety factors "yes," the CERAP process is completed without the need for further action. If, on the other hand, the investigator determines that any one of the 15 safety factors is present and checks that box "yes," then he or she must proceed to the next step of the process.

### 2.  Family Strengths and Mitigating Circumstances

At the next step of the CERAP process, the investigator is required to "describe any family strengths or mitigating circumstances which may serve to manage or control the safety factors." (Jt. Ex. 7, Appendix G, at 13.) DCFS Procedures recognize that "[s]ometimes the presence of a safety factor can be partially or fully controlled or eliminated by a family strength or mitigating circumstance." (*Id.*) According to Appendix G, "[r]egular contact with a support person who can assure the safety of the child" is one example of such a family strength or mitigating circumstance. (*Id.*) Deputy Director Goad offered the additional example of a husband's "credibl[e]" assurance that he will remove from the home a "violent and out of control" mother who is "physically small" until she "calm[s] down." (Goad Dep., at 55-56.) DCFS Procedures do not otherwise provide any guidance for determining either the presence of relevant family strengths or mitigating circumstances, or the proper method of balancing them against the cited safety factor(s).

The August 13, 2002 amendments to Appendix G provide that "[f]or the purpose of safety assessment, a protective effort must be made on the family's initiative and not as the result of the worker's suggestion in order for it to constitute mitigation." (Jt. Ex. 7, Appendix G, at 13.) By way

8

of example, the amendments state that in a domestic violence situation, "if the worker initiates the mother's move to [a] shelter, it is the worker's and not the mother's capacity that has controlled the safety threat [so] the child is considered unsafe and the move to the shelter is considered a safety plan." (*Id.*) *See infra* pp. 10-20 for a discussion of safety plans. In other words, a protective measure will not constitute a mitigating circumstance unless the caretaker proposes it without any prompting from a DCFS representative.

Deputy Director Goad testified that there are "probably" potential mitigating factors as to every safety factor, but of the documentation supporting imposition of a safety plan in the 92 sample cases in this litigation, 64 (or 69%) did not identify any family strengths or mitigating circumstances. (Goad Dep., at 56-57; Tr. 2667.)

### 3. The "Safe" or "Unsafe" Determination

If an investigator determines that a safety factor is present but controlled by a family strength or mitigating circumstance, the child must be deemed "safe," meaning that "[t]here are no children likely to be in immediate danger of moderate to severe harm at this time" and no safety plan is necessary. (Jt. Ex. 5(e), CFS 1441.) If, however, the investigator determines that a safety factor is not controlled by a family strength or mitigating circumstance, the child must be deemed "unsafe," meaning that "[a] safety plan must be developed and implemented **or** one or more children must be removed from the home because without the plan they are likely to be in immediate danger of moderate to severe harm." (Jt. Ex. 5(e), CFS 1441) (emphasis in original). As noted, a determination of "unsafe" may be made based on the presence of only one safety factor, some of which require no or only nominal evidence that a child is in danger of harm. In addition, because investigators must complete the CERAP analysis for all children in the home of an alleged perpetrator, children who are not alleged victims of abuse or neglect are nonetheless commonly subject to safety plans. (Jt. Ex. 7, Appendix G, at 5.)

9

## B.    Creation of Safety Plans

Once an investigator finds that a child is "unsafe," the next step is to develop a "safety plan." Deputy Director Goad estimated that as many as 10% of investigations result in safety plans, which translates into as many as 10,000 plans per year. (Tr. 2300-01.) Safety plans are intended to be collaborative efforts between the investigator and the family. According to Deputy Director Goad, the investigator generally talks to the family about the problem that led to the "unsafe" determination and asks family members to suggest possible steps for assuring the safety of the child. (Tr. 2302.) Goad explained that the investigator is then expected to discuss the family's ideas for a safety plan in an effort to work out mutually-agreeable terms. (Tr. 2302-03.) The evidence offered by Plaintiffs suggests, however, that in practice, investigators often make little effort to collaborate with families in implementing safety plans. Nearly every class member witness who signed a safety plan testified that the investigator simply presented a proposed plan for his/her signature with little or no discussion of the plan terms or alternatives. (Tr. 346, 470-71, 556, 562, 715, 719, 795-98, 1165-66, 1304, 1379.)

### 1.    Plan Terms

An effective safety plan includes measures designed to control the safety factors that led to the need for a safety plan; is as minimally disruptive to the family as possible; minimizes any separation issues for family members; and relies on resources that are "immediately and realistically available" to the family. (Tr. 2283 (Goad).) The safety plan must be recorded on the Safety Plan Form (CFS 1441-A) and must include a written description of "what will be done or what actions will be taken to protect the child(ren), who will be responsible for implementing the components of the safety plan and how/who will monitor the safety plan." (Jt. Ex. 7, Appendix G, at 15.) In addition, "[e]very safety plan must specify the conditions under which the plan is to be terminated and an estimated time frame within which this can be expected to occur." (*Id.* at 14.)

10

The plan must "contain a time frame for implementation and continued monitoring and a contingency plan if the primary safety plan is no longer needed." (*Id.*)

The terms of a safety plan vary depending on the particular case. The plans signed by class members in this case either (1) separated children from their parents, guardians, or other close relatives by removing one or more such individuals from the home, or by imposing no-contact requirements preventing children from having any contact with parents, guardians, or other close relatives; or (2) allowed children and family members to have only supervised contact with each other. Class members are individuals who signed these plans under threat that their children would otherwise be taken into protective custody. *See* Order of 4/16/04 (setting forth revised class definition).

Deputy Director Goad issued a directive on March 22, 2002 requiring that "all safety plans in which family members (children or adults) are relocated from their residence must be approved by the respective Child Protection or Field Service Manager." (DCFS Inter-Office Correspondence Regarding Safety Plans dated 3/22/02.) To approve such a plan, the manager must consider (1) whether the child is genuinely unsafe; (2) whether the plan will adequately protect the child(ren) in a manner that is minimally disruptive to all family members; and (3) whether there is a reasonable and timely potential resolution to the plan. (*Id.*) Upon approving a safety plan that relocates a family member, the manager is directed to "track them" (presumably, the plan itself or family members subject to it) to "assure the timely and appropriate resolution of the safety plan according to the directions in Appendix G of Procedure 300." (*Id.*)

### 2. Agreement to a Safety Plan

DCFS views all safety plans as voluntary agreements between the Department and the family. Indeed, the child's primary caregiver and, if different, the person(s) most responsible for carrying out the plan must sign the safety plan form, which states that the person has "discussed

11

the safety plan with the investigator/worker, . . . understand[s] its contents and that it is voluntary, and agree[s] to abide by the terms and conditions of the plan." (Jt. Ex. 5(c), CFS 1441-A.) The investigator must also sign the form attesting that he or she has "discussed the attached Safety Plan and the consequences of non-compliance with the caretaker and all those who are responsible for carrying out the plan" and that he or she has agreed to "abide by the terms and conditions of the plan." (Id.) The form provides contact numbers for both the investigator and his or her supervisor (who must approve the plan) in case a family member wants to communicate with the Department. (Tr. 2287-89.)

August 13, 2002 amendments to Appendix G reinforce the requirement that an investigator must inform a family that safety plans are voluntary:

> The worker who is responsible for implementing the plan must inform the family that their cooperation with the plan is voluntary and – to the extent safely possible – must enlist the family's participation in the development of the plan. When the plan is developed the worker must explain it to the family and must provide the family with information about the potential consequences if the plan is refused or violated. If the family refuses to accept the plan or if the plan is violated, the worker must reassess the situation, consider protective custody and/or referral to the State's Attorney's Office for a court order.

(Jt. Ex. 7, Appendix G, at 14.) The amendments also require investigators to notify all parents or caretakers when a safety plan ends. (Id. at 16.)

Notwithstanding these regulatory provisions, Plaintiffs insist that safety plans are coercive. They note that a stated consequence of rejecting the plan or failing to comply with it is the removal of the children from the home. The signature page of the safety plan form expressly states that "[w]e understand that failure to agree to the plan or to carry out the plan may result in a reassessment of my home and possible protective custody and/or referral to the State's Attorney's Office for a court order to remove my children from my home. I will then have the opportunity to plead my case in court." (Jt. Ex. 5(c), CFS 1441-A.) Most class member witnesses testified that in addition to this written warning, investigators verbally threatened them with removal of their

children if they refused to agree to a safety plan. (Tr. 347-49, 392-93, 470-71, 556, 562, 715, 719, 795-98, 1165-66, 1304, 1379.) Faced with this admittedly "tough decision," virtually every parent or caretaker confronted with a safety plan ends up signing it. (Tr. 2311-12 (Goad); Def. Resp., at 12.)[2] All families do, however, have the option of rejecting the plan.

DCFS procedures require investigators to give the family a copy of their safety plan form, which sets forth the restrictions imposed. There is no requirement, however, that families receive a copy of the CERAP Safety Determination Form, which details the underlying basis for the safety plan as reflected in the investigator's assessment of the 15 safety factors. (Tr. 2290 (Goad) (though giving a CERAP form to families is not prohibited, "there is no policy that guides workers to give it to them either").) There is no evidence that investigators or supervisors have ever given the CERAP form to family members, and none of the plaintiff witnesses in this case ever received one. In Plaintiffs' view, "the resulting [safety plan] agreements are ones in which one of the parties (DCFS) has virtually all the information (i.e., about why the child is considered 'unsafe' and therefore requires a safety plan), and the other party (the 'agreeing' family member) has none." (Pl. Mem., at 20.)[3]

Plaintiffs find this objectionable in part because the safety plan form does not explain the legal standards and procedures DCFS must follow in order to remove a child from the home. See Abused and Neglected Child Reporting Act, 325 ILCS 5/5; Juvenile Court Act, 705 ILCS 405/2-7(1), 405/2-8, 405/2-9. Nor is there any explanation as to the type of evidence required to obtain protective or temporary custody of a child. See infra pp. 18-20. In addition, the language of the safety plan forms implies that DCFS has gathered sufficient information to take custody of a child

---

[2]     Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for a Second Preliminary Injunction is cited as "Def. Resp., at ___."

[3]     Plaintiffs' Post-Trial Memorandum in Support of their Amended Motion for a Second Preliminary Injunction is cited as "Pl. Mem., at ___."

at the time the safety plan is implemented. (See Jt. Ex. 5(c), CFS 1441-A) ("[s]afety plans are to be developed only where a decision of 'unsafe' has been made and workers, with supervisory approval, assess that without the plan the child(ren) must be removed from the home"). Plaintiffs claim that, in reality, such evidence is not required in order to find a child "unsafe" pursuant to the CERAP process. DCFS Child Protection Manager Anne Gold, moreover, acknowledged at the trial that "for the cases that end up getting unfounded in [her] office, the likelihood that [DCFS] would have grounds for protective custody on the first day of the investigation is about zero." (Tr. 2982.)

Plaintiffs also question the voluntariness of safety plans that may be implemented before an investigator has spoken with the alleged perpetrator. For example, though safety plans are generally implemented within 48 hours of a Hotline call, DCFS regulations allow for a delay of up to "7 calendar days of the receipt of the report" before the investigator is required to contact an alleged perpetrator who is "different from the parents or caretakers." (Jt. Ex. 2, Procedures § 300.50(c)(6).) In addition, DCFS Procedures require investigators to notify, and defer to law enforcement authorities in certain types of cases, such as those involving allegations of serious physical or sexual abuse. (Id. § 300.70; Tr. 2218-19.) If the police ask DCFS investigators not to speak with an alleged perpetrator, investigators normally honor the request but, if possible, construct safety plans even without such contact. (Goad Dep., at 174; Tr. 2697 (Goad).) In some cases, moreover, mere action in conformity with a DCFS request may be deemed an "agreement" to a safety plan. Deputy Director Goad testified, for example, that if an allegedly abusive father leaves the home on his own accord, "it certainly meets the standard that we would need to meet in order to consider that an adequate plan for the child's safety." (Goad Dep., at 163-64.) (See also Tr. 2692 ("[t]here are circumstances where . . . it may be impossible . . . for the Department to obtain . . . express agreement to the plan").)

14

### 3. Duration of Safety Plans

Safety plans are intended to be temporary, "usually short-term measures" to control serious and immediate threats to a child's safety. (Jt. Ex. 7, Appendix G, at 14; Tr. 2277 (Goad).) The August 13, 2002 amendments to Appendix G provide that safety plans must be reassessed "every five working days following the determination that any child in a family is **unsafe**." (Jt. Ex. 7, Appendix G, at 4) (emphasis in original.) The assessment

> must continue until either all children are assessed as being safe **or** all unsafe children are removed from the **legal** custody of their parent/caretakers. This assessment should be conducted considering the child's safety status as if there was [sic] no safety plan (i.e., Would the child be safe WITHOUT the safety plan?).

(*Id.*) (emphasis in original). The amendments also instruct that safety plans "must be adequate to assure the child's safety but as minimally disruptive to the child and family as is reasonably possible." (*Id.* at 13.) In addition, "[e]very safety plan must specify the conditions under which the plan is to be terminated and an estimated time frame within which this can be expected to occur." (*Id.*)

DCFS does not keep statistical data showing the actual duration of safety plans. (Tr. 2324 (Goad).) A review of the 92 safety plans in the representative sample cases (which were imposed prior to the 2002 Amendments to DCFS Appendix G) reveals that many plans have indefinite time frames, or fail to state any duration at all. By Plaintiffs' estimation, 31 plans (33.3%) were indefinite in length. (*See, e.g.*, SAI 8, at 28502 (alleged victim's stepfather will move out and have "no contact" with stepdaughter "during the course of this investigation"); SAI 92, at 36157, 36159 (alleged victim's half-brother will move out of the house and have "no unsupervised contact" with his half-sister; plan scheduled to terminate "at the discretion of treatment professional"); SAU 20, at 39869 (mother will not allow daughter "to return to father [a non-household member] until everything is cleared up as to what happened"); SAU 40, at 41317 (alleged victim is not to share a bedroom with his alleged perpetrator brother; the two siblings "must be supervised at all times

by a parent until this investigation is complete"; plan termination date is "undetermined at this time").

Plaintiffs further estimate that 53 plans (57%) did not set forth any duration at all. (*See, e.g.*, SAI 34, at 31134 (mother will not allow son (the alleged perpetrator) to have "any contact" with his sister (the alleged victim) and he is not allowed to return home upon release from police custody; duration unspecified); SAI 81, at 35384 (alleged victim not allowed to have "any contact" with her half-brother "at any time"; duration unspecified); SAI 98, at 36690 (father of alleged victim "agreed to leave the residence"; duration unspecified).) In addition, of the 40 safety plans with stated durations of definite length, only one (.025%) was shorter than five days, and six others (20%) were longer than 20 days. (*See, e.g.*, SAI 49, at 32708 (if alleged perpetrator not detained by police, mother will not allow him to return to the house "pending outcome of this investigation"; estimated plan duration, "2 - 3 months"); SAU 24, at 40137 (father not allowed visitation rights with his daughter "until such time as it is determined that it is safe to have them continue"; plan to be in effect for "at least 60 days").)

Defendant argues that many of the plans chosen by Plaintiffs as representative "are not safety plans at all." (Def. Resp., at 51.) For example, one file included a safety plan requiring no contact between the alleged perpetrator and victim (whose relationship to each other is unclear though they share a last name), but the plan was implemented after the alleged perpetrator had been arrested and taken to jail, and after a court had already imposed a bond order with the same restriction. (*See* SAI 21, at 29793 ("no time frame c[ould] be imposed as court intervention is necessary"); Tr. 1769.) In another file, similarly, there was a safety plan requiring no contact between the alleged victim, who lived with her aunt, and the alleged perpetrator, the aunt's husband, but Defendant says the plan was unnecessary because the perpetrator was arrested and in jail. (SAI 62, at 33872; Tr. 1959; Def. Resp., at 53.) (*See also* Def. Resp., at 52-54.) In still other files, DCFS implemented sexually aggressive children and youth ("SACY") plans which are

16

"used in cases where the child who is the subject of the plan is in foster care, and the child's guardian is the DCFS Guardianship Administrator." (Def. Resp., at 51.) (*See* SAU 2, at 38821.) Several additional files, moreover, did not involve class members. (*See, e.g.*, SAI 12, at 28932 (alleged perpetrator is daughter of woman running an unlicenced day-care service out of her home; alleged victims are children who attended day-care at the home); SAI 38, at 31618 (alleged perpetrator is mother's "live in boyfriend"); SAI 70, at 34522 (alleged perpetrator is mother's paramour).)

Even assuming some of the 92 safety plans are not technically viewed as such by DCFS, it is undisputed that at least some plans are in place throughout the course of an investigation, regardless how long that may take, and that others fail to specify any duration. Indeed, Deputy Director Goad himself testified that many safety plans last at least as long as the underlying investigation into the alleged child abuse or neglect, and that even when a report is "unfounded," a safety plan may remain in effect (presumably in accordance with its stated terms) if there are "safety issues that would make continuation of a safety plan appropriate." (Tr. 2754 (Goad).) Prior to the August 2002 amendments, moreover, DCFS did not have any procedure requiring that families be notified when a plan had been lifted. (Jt. Ex. 7, Appendix G, at 16.)

### 4. Contesting Safety Plans

Once DCFS has implemented a safety plan, family members subject to the plan may ask that it be modified, or an investigator may initiate modification on his or her own. (Goad Dep., at 253-55, 259-60.) There is no formal procedure for requesting a modification, however, nor is an investigator obligated to respond to, or act upon such a request. (*Id.* at 259-60.) In addition, DCFS has no procedure authorizing those subject to a safety plan to contest it in any way, nor does DCFS advise family members that agreeing to the plan may result in a waiver of their right to contest it. (*Id.* at 227, 259; Tr. 2722 (Goad).)

17

### 5. Alternatives to Safety Plans

As noted, a family's failure to agree to a safety plan may result in the children being removed from the home. There are two ways this may occur: (1) DCFS may take protective custody of a child pursuant to the Abused and Neglected Child Reporting Act ("ANCRA"), 325 ILCS 5/5, and the Juvenile Court Act ("JCA"), 705 ILCS 405/2-7(1), 405/2-8, 405/2-9 (discussing "temporary protective custody"); or (2) DCFS may obtain a court order granting it "temporary custody" of a child pursuant to the JCA. To take a child into protective custody without court authorization, DCFS must determine that it: "(1) . . . has reason to believe that the child cannot be cared for at home or in the custody of the person responsible for the child's welfare without endangering the child's health or safety; and (2) there is not time to apply for a court order under the Juvenile Court Act of 1987 for temporary custody of the child." 325 ILCS 5/5.

After taking protective custody of a child, DCFS must "promptly initiate proceedings under the Juvenile Court Act of 1987 for the continued temporary custody of the child." *Id.* Under the JCA, moreover, "a minor . . . taken into temporary protective custody must be brought before a judicial officer within 48 hours, exclusive of Saturdays, Sundays, and court-designated holidays, for a temporary custody hearing to determine whether he shall be further held in custody." 705 ILCS 405/2-9(1). If there is no temporary custody hearing within the prescribed time limitations, protective custody lapses and the child must be returned to his or her home. 705 ILCS 405/2-9(3). Except in emergencies, DCFS Procedures require prior supervisory or management authorization to take a child into protective custody. (Jt. Ex. 2, Procedures § 300.80(f).)

To obtain a temporary custody order, DCFS must file a petition for adjudication of wardship with the State's Attorney in the county in which the child lives. (Tr. 232, 242 (Maganzini).) No such petition may be filed, however, unless the State's Attorney "screens" the case into juvenile court (i.e., accepts the case). (Tr. 232-33.) In Cook County, Illinois, the State's Attorney will not screen

a case into court absent evidence that would, in the view of the attorney screening the case, support a judicial determination that the child should be taken into temporary custody. (Tr. 224, 241, 244.) Such evidence consists of "probable cause to believe that [a child] is abused, neglected or dependent"; that "it is a matter of immediate and urgent necessity for the safety and protection of [the child]" that he be removed from his or her parents' care; and that the state has made "reasonable efforts . . . to prevent or eliminate the necessity of removal of [the child] from his or her home, [unless] no efforts reasonably could be made to prevent or eliminate the necessity of removal." 705 ILCS 405/2-10.

If the State's Attorney finds insufficient evidence to screen a case into court, no petition for adjudication of wardship will be filed at that time. Instead, the State's Attorney will issue a form entitled "Ongoing Investigation," which provides the investigator with specific due dates for updating the State's Attorney about the case and/or bringing it back for further screening review. The Assistant State's Attorney completing the form may also instruct the investigator to implement or maintain a safety plan or a "care plan" while the additional information is being gathered. (See, e.g., Ex. E to Defendant's Additional Declarations and Exhibits ("Def. Supp.") Defendant claims that "care plans" are the same as "safety plans," citing the declaration of Debra Dyer, DCFS's Chief Deputy General Counsel in the Office of Legal Services. (Ex. D to Def. Supp., ¶ 5 (noting that in approximately 40 investigations between December 2003 and October 2004, the State's Attorney decided not to file a petition but requested that DCFS "implement or continue a safety or care plan").) Plaintiffs dispute that safety plans are the same as care plans, but only one of the four sample Ongoing Investigation forms submitted by Defendant mentions a care plan as opposed to a safety plan. That case involved a parent attending a substance abuse treatment program. (Plaintiffs' Response to Defendant's Supplementation of the Record, ¶ 3; Ex. E to Def. Supp.) In any event, neither party disputes that the State's Attorney has an "open door policy" on re-reviewing cases. (Tr. 250 (Maganzini).)

19

A third alternative to safety plans is a juvenile court order requiring cooperation with conditions, short of removing the child from the home, that the court deems necessary for the safety of the child ("§ 2-25 Orders"). 705 ILCS 405/2-25. To secure a § 2-25 Order, DCFS must first file a petition for adjudication of wardship with the State's Attorney to initiate a juvenile court case. 705 ILCS 405/2-13. The court must find probable cause to believe that the child is abused or neglected, at which point the court has broad authority to enter orders requiring parents or responsible caregivers to take various steps to protect the child from harm. 705 ILCS 405/2-10(1), 405/2-25. For example, a § 2-25 Order may require parents to attend therapy or participate in other services; or forbid persons who are allegedly endangering the child, including parents and caregivers, from having any contact or unrestricted contact with the child.

Finally, although the parties do not address the matter in their briefs, the court notes Plaintiffs' suggestion, at the hearing, that DCFS has an obligation to provide supportive services, including counseling or referrals to therapy, for parents and children in need of such services. Presumably services such as these might eliminate the need for restrictive conditions and thus constitute a fourth alternative to the imposition of safety plans.

## IV.    Examples of the Safety Plan Process

The court's hearing on Plaintiffs' second motion for preliminary injunction spanned 22 days between September 4, 2002 and January 17, 2003, and generated 3,357 pages of transcript. The following is a summary of several investigations presented at the hearing which involved the implementation of safety plans.

### A.    James and Susan Redlin

On June 21, 2002, DCFS investigator Patrick Homa was assigned to investigate an allegation that James Redlin was inappropriately touching his son on a Chicago Metra Railroad train. (Tr. 2336.) Specifically, another passenger on the train told Metra police that James had

touched his son's groin area; that the son had put his head in his father's lap and rubbed his father's groin area while the father kissed the back of his neck; and that the father had stated, "Oh, I guess you don't want to be tickled." (PX C, at 71003, 71011.) According to James, he was following a doctor's advice to engage in interactive touching and speech with his son, who suffers from mild autism. (Tr. 688, 690-91, 698-99.)

Homa first contacted the reporter – a Metra police official – for details about the incident, and also attempted (unsuccessfully) to contact the passenger who had witnessed the inappropriate contact. (Tr. 2337-39, 2375-76.) He then went to the Redlin home to see the alleged victim. (Tr. 2339.) Upon arriving at the home, Homa introduced himself to James and his wife Susan, advised them of the allegations against James, and gave them the Notification of a Report of Suspected Child Abuse and/or Neglect (the "CANTS 8 form") explaining the investigative process. (Tr. 2339-40, 2342.) Approximately 15 minutes into the interview, James requested an opportunity to consult with legal counsel. (Tr. 2341.) At that time, Homa brought up the issue of a safety plan but, after the Redlins accused him of being rude, he left the home with the understanding that he would call the Redlins later that day after they had had a chance to speak with an attorney. (Tr. 2343-44, 2368.) Though Homa had observed the Redlins' son during the interview, he did not speak with him at that time because he wanted to "set up an interview at the [Lake County] Children's Advocacy Center." (Tr. 2342-43.)

Homa called Susan around noon to let her know that he would call back with a safety plan that afternoon. (Tr. 795.) At 4:00 p.m., Homa spoke with Susan by telephone about the safety plan, which required that James not act as an independent caretaker for his son or for any other children until the case was resolved, but which did allow him supervised contact with his son. (Tr. 2345, 2359, 2372, 2460.) Susan agreed to the plan even though it effectively left the family "prisoners" in their own home because Susan, the person responsible under the terms of the plan for supervising the son, is confined to a wheelchair. (Tr. 755, 812-13.) Homa delivered a copy

21

of the safety plan to Susan on June 22, 2000. (Tr. 797, 818-19.) The same day, the Redlins retained the law firm of Lehrer & Redleaf (counsel for Plaintiffs in this case) to represent them during the investigation. (Tr. 742, 758.)

The investigation proceeded slowly in part because the Redlins were resistant to their son being interviewed given his mild autism. (Tr. 733-34.) Between June 21 and August 16, 2000, DCFS attempted unsuccessfully to obtain permission from the Redlins to interview their son at the Lake County Children's Advocacy Center. On at least one occasion, Homa and his supervisor went to the Redlin home to discuss the matter accompanied by a Lake County deputy sheriff, but the Redlins refused to let their son be interviewed. (Tr. 731-32.) Finally on August 16, 2000, Homa's supervisor sent a letter to the Redlins' attorney stating that the Division of Child Protection was recommending that the allegation against James be unfounded. (Tr. 2351; PX C, at 71014 (Worker Activity Summary dated 8/12/00, noting "no credible evidence to substantiate the alleged allegation; involved youth due to medical reason unable to be interviewed as a credible witness as described by medical professional"); PX C, at 71109.)[4] Nevertheless, the Redlins' attorneys advised them to continue following the safety plan until they received official notification that the plan was unfounded. (Tr. 746-47.) The State Central Register advised the Redlins on September 26, 2000 that it had unfounded the report. (PX C, at 71000.)

## B. Theresa C.

Theresa C. ran a day care center at her home. On April 3, 2001, Dillon, a child who attended the day care center, fell and suffered a depressed skull fracture while in Theresa's basement, and was taken for emergency surgery at Carl Hospital in Champaign, Illinois. On April 5, 2001, DCFS investigator Lee Boedigheimer was assigned to investigate the incident. (Tr. 591,

---

[4] The court is uncertain why this recommendation was made, but speculates that perhaps the Metra passenger who witnessed the alleged inappropriate touching did not cooperate further with the investigation. It is at least curious that the Redlins' refusal to submit their son for an interview should militate in favor of dismissal of the charges.

22

2468.) The next day, Boedigheimer spoke with Dr. Powell, the attending physician who saw Dillon at the hospital. Dr. Powell told Boedigheimer that Dillon had undergone surgery to relieve the pressure on his brain, to remove some blood clots, and to repair the fracture. (Tr. 2469-70.) Dr. Powell also stated that the explanation Theresa had given for Dillon's injury when she brought him to the hospital – that he had fallen while pulling himself up on a "Diaper Genie" – was highly unlikely, though not 100 percent impossible. (Tr. 2470-71.)

Also on April 6, 2001, Boedigheimer went to Dillon's home and observed that the entire left side of Dillon's face was swollen and that he had a three-inch incision on the top of his head running down behind his ear. (Tr. 2471-72.) Shortly thereafter around 11:50 a.m., Boedigheimer went to Theresa's home along with Detective Roberts of the Pontiac Police Department. (Tr. 2472.) Theresa reiterated that Dillon had fallen while trying to climb up on a Diaper Genie while she was changing her own daughter's diaper. (Tr. 2473.) As part of the interview, Boedigheimer looked at the basement where the injury had occurred and noted a thin layer of carpeting over a cement floor. He also observed 13 or 14 children in the home, many of them under the age of two, which he believed was a violation of DCFS licensing standards for day care homes. (Tr. 2473-74.) Boedigheimer asked Theresa about the possibility of suspending her day care activities pending an investigation into Dillon's injury. Theresa stated that she had a vacation planned in any event so the hiatus would not be a problem. (Tr. 2472-74.)

Boedigheimer went back to his office and worked with his supervisor to create some safety plan options to present to Theresa later that afternoon. When Boedigheimer returned to Theresa's home, he gave her a CANTS 8 letter and told her that the reporting doctor (Dr. Powell) did not believe Dillon's injury matched her explanation for it. (Tr. 593, 2481.) Boedigheimer expressed some safety concerns for Theresa's own child, who was Dillon's age, and discussed implementing a safety plan that would require Theresa's mother or husband to supervise her with her daughter pending the investigation. (Tr. 2482-83, 2485-86.) Theresa did not suggest any alternatives and

23

agreed to the plan proposed by Boedigheimer. At the hearing before this court, Theresa acknowledged that she had an opportunity to read the safety plan forms (excluding the CERAP form), but that she did not in fact review them before signing. (Tr. 560.) She also testified, however, that Boedigheimer told her that "if he left [without a safety plan] and I [Theresa] was alone, they could come back and take [my daughter] S. away from me." (Tr. 562-63.)

Theresa complied with the safety plan in its entirety for about two weeks. As of April 27, 2000, the date she and her family went on vacation to Mexico, however, she no longer adhered to the requirement that she have only supervised contact with her daughter. (Tr. 566-67, 595.) Upon returning home from vacation, moreover, Theresa attempted to resume day care services in her home. When a DCFS representative made an unannounced visit and discovered that Theresa was caring for children in her home again, Theresa closed the day care and took a position as a nanny instead. (Tr. 596-98.) One year later, on May 17, 2001, Theresa learned that the investigation against her was unfounded and that the safety plan was no longer in effect.[5] (Tr. 581, 599.) A May 21, 2001 Family Assessment Factor Worksheet Summary noted that of the three doctors consulted in the case, all reported some possibility that Theresa's story was accurate, and one opined that Dillon's injury was not the result of abuse. The document does not reflect when the doctors made these reports. (PX D, at 43301.) Nor is the court certain whether these reports, or some other factor, were the basis for the "unfounded" determination.

### C.    Stacey and Patrick D.

Patrick D. and his wife Stacey both worked at a day care center. On January 5, 2001, Karen Beckelman, an investigative supervisor with DCFS, began supervising an investigation into an allegation that Patrick had improperly touched a three-year-old child's bottom during nap time

---

[5]    The parties do not indicate how Theresa learned this information on May 17, 2001. On May 21, 2001, however, Boedigheimer sent Theresa a letter notifying her of the unfounded decision. (PX D, at 43400.)

at the center. (Tr. 1509, 1518-19.) Beckelman assigned the case to investigator Andrea Jones and, during an initial meeting, advised her to find out whether Patrick had any biological children; if so, Jones was to look into implementing a safety plan pursuant to Department practice. (Tr. 1525-26.) DCFS insists that Beckelman "did not direct Jones to implement a safety plan" but only to "consider" it. (Def. Resp., at 29-30.) A January 5, 2001 Interview Note signed by Beckelman, however, states: "See the child at the day care. Put in a protection plan with the offender. Make sure he has no children. If he does also put in a plan in his home pending the interview." (PX B, at 44854.)

In any event, Jones spoke with Stacey D. by telephone on January 5, 2001 and, according to Stacey, told her that, due to the Hotline complaint, Patrick had to leave the home or Jones would come and take away their children. (Tr. 470.) Without asking any questions, Stacey denied the allegations on behalf of her husband and said she planned to contact an attorney. (Tr. 472, 838-39.) On January 9, 2001, Forensic Interviewer Kristin Eby conducted a victim sensitive interview ("VSI") of the 4-year-old alleged victim, who reported that Patrick D. had touched her in a sexual manner. (Tr. 1539; PX B, at 45010.) Both Jones, who was present during the VSI, and Beckelman, who was not, found the statement to be credible. (There is no indication whether DCFS officials consulted with Eby herself regarding the victim's credibility.) Beckelman notified Stacey of the DCFS determination during a telephone conversation on January 10, 2001. (Tr. 1451; PX B, at 45010.) Beckelman also asked Stacey to confirm that Patrick was out of the house, and again informed her that if he was not, Beckelman would remove the children from the home. (Tr. 478.) Beckelman advised Stacey that Patrick needed to obtain a sexual "offender assessment"[6] before he could have unsupervised contact with his own children. (Tr. 1542.)

---

[6]    DCFS referred Patrick to Latino Family Services, P.C. for his "psychosexual assessment and follow-up treatment recommendations." (PX B, at 44980.)

On January 15, 2001, Beckelman visited the D. apartment and individually spoke to each of the D. children and to Stacey and Patrick. (Tr. 484-85, 489-90.) Before leaving the apartment, Beckelman advised Stacey that the children could start seeing Patrick at church on Sunday. (Tr. 491.) Shortly thereafter on February 5, 2001, Stacey and Patrick met with Jones at a DCFS office. Jones told them that the investigation against Patrick was going to be "indicated" for "sexual molestation" of a four-year-old child and that he needed to have an offender's assessment in order to return to the D. home. (Tr. 501-02.)

DCFS did not proceed with an administrative hearing on the charges against Patrick D. until August 8 and 15 and September 10, 2001. (PX B, at 70509.) On October 16, 2001, an administrative law judge found that the Department had failed to meet its burden of proving that Patrick had sexually molested a child or that he presented a risk of sexual harm to his own children. (*Id.* at 70520.) The ALJ noted that the victim's statements about the alleged abuse were inconsistent (she first said the touching occurred "one time," then later said it happened "every day" at naptime and lasted for "a couple hours"), and that the statements were not corroborated by any other evidence. (*Id.* at 70518.) Kristin Eby, who had conducted the VSI back in January, testified that the victim's "cheerful affect and volunteering of information about abuse are not common among victims of this age." (*Id.*) In addition, the evidence presented at the hearing showed that Patrick "had neither the inclination nor the opportunity to molest" the victim, given that other adults were often present in the room during naptime. (*Id.* at 70513, 70518.) The ALJ recommended that the indicated finding be expunged, noting that the investigation leading to the indicated report was "at a minimum sloppy, and at worst the result of a pre-ordained conclusion." (*Id.* at 70517.) Plaintiffs suggest that at least some of the exculpatory information on which the ALJ relied was, or should have been, available to the investigation at the onset of the investigation. *See DeLaFont v. Beckelman*, 264 F. Supp. 2d 650, 654 (N.D. Ill. 2003) (noting allegations that during investigation, Patrick D.'s own children and eight children in the day care center denied that he

26

touch them inappropriately; also noting allegation that DCFS failed to interview Patrick D.'s co-teacher who later proved to have pertinent, exculpatory information).

Patrick was cleared of the indicated report on December 4, 2001, and the safety plan which had left him out of his home and unable to have unsupervised contact with his children was officially lifted on December 10, 2001. (*Id.* at 44779.) As a result of this incident, Stacey D. and her family, represented by Lehrer & Redleaf, filed a lawsuit against several DCFS employees seeking compensatory and punitive damages relating to their actions during the investigation. (Tr. 845.)[7]

### D.    Jimmy and Christine Parikh

On July 12, 2001, DCFS investigator Michelle Abernathy was assigned to investigate an allegation that Jimmy Parikh had kissed 11-year-old Deanna K. while she and her siblings were at the Parikh home under the care of Jimmy's wife Christine.[8] (Tr. 2538.) Abernathy spoke with Deanna's father, who stated that though Deanna was temporarily living with him, she had previously lived with his ex-wife, Delta K. Abernathy next contacted Delta K., who advised that her daughter was a liar, that the issue had been resolved at a "family meeting,"[9] and that she did not understand why DCFS was involved. (Tr. 2358-59.)

---

[7]    See *DeLaFont v. Beckelman*, 264 F. Supp. 2d 650 (N.D. Ill. 2003) (dismissing several individual defendants from the case for lack of personal involvement in the alleged deprivations, but denying motion to dismiss claims that remaining three defendants violated plaintiffs' constitutional right to family autonomy and that two defendants deprived Patrick D. of his job without due process); *DeLaFont v. Beckelman*, No. 02 C 5448, 2003 WL 21294741 (N.D. Ill. June 3, 2003) (denying motions to reconsider); *DeLaFont v. Beckelman*, No. 02 C 5448, 2003 WL 22239726 (N.D. Ill. Sept. 29, 2003) (denying plaintiffs' motion to reinstate one of the previously-dismissed defendants).

[8]    It does not appear that there is any family relationship between the Parikhs and the K.'s.

[9]    It is not clear from the record who called the family meeting, who attended it, or when it took place.

Nevertheless, Abernathy went to the Parikh home and advised Jimmy, Christine, and their older daughter Justine (age 25) about the allegation. The Parikhs explained that Christine had been caring for three of the K. children and stated that there had been a "family meeting" during which Deanna had not said anything about the alleged incident. (Tr. 1269, 2540.)[10]After learning that there were two minor children living in the Parikh home, Abernathy told the Parikhs that she "would have to put a safety plan in place." (Tr. 2541 (Abernathy).) The plan required that Christine not babysit for any of the K. children and that Jimmy move out of the home and stay with Justine, who resided outside the Parikh home, during the course of the investigation. According to Christine, who says she was "frantic" at the thought of a safety plan, Abernathy warned that if Jimmy did not move out of the house and cease all contact with the minor children living in his home,[11] the children would be taken into DCFS custody. (Tr. 1304-05, 1309.) Abernathy explained the safety plan process and told the Parikhs that they could contact her supervisor to discuss any concerns they had regarding the plan. (Tr. 2540-42, 2547; PX H, at 44096.) Jimmy, Christine, and Justine all signed the plan and Jimmy packed a bag of clothes and left the house. (Tr. 2544.)

At some point prior to the end of July 2001, Abernathy's supervisor modified the safety plan to allow Jimmy to have supervised contact with his own children. Abernathy learned of this modification during an unannounced visit to the home at the end of July. (Tr. 2553.) Around the same time, the Parikhs retained the law firm of Lehrer & Redleaf to represent them in the investigation. On July 26, 2001, the firm sent a letter to Abernathy's supervisor, John Ott, requesting that the plan be modified or revoked; on August 5, 2001, Jimmy was allowed to return

---

[10]    Presumably this was not the same "family meeting" at which, according to Delta K., the matter has been resolved.

[11]    In addition to Justine, the Parikhs had four other children: Emmie (age 27), Jason (age 22), Elissa (age 6), and George (age 3). (Tr. 1269.) At the time of the alleged incident, only Jason, Elissa, and George were living in the Parikh home. (Tr. 1270, 1272, 1276.)

to the P. home.[12] (*See* PX H, at 44045 ("minor resides with father and no longer goes to [the Parikh] home").) The safety plan remained in effect at that time, however, so Christine could not leave the children alone with Jimmy. (Tr. 1327; PX H, at 730001.) Two days later on August 7, 2001, the Parikhs' attorney notified Christine that Abernathy was recommending that the case be unfounded. Abernathy made the decision after speaking with Detective Larry Marks of the Des Plaines, Illinois police force, who told Abernathy that based on the alleged victim's psychological reports, there might be questions regarding the validity of her statements, and he did not believe that the police department would proceed with the case.[13] The attorney nevertheless recommended that the family continue following the safety plan until it was officially lifted on September 26, 2001. (Tr. 1331; PX H, at 730000.)

### E.    A.S.

A.S. is the biological mother of two sons, N. and P., and the stepmother of an 8-year-old girl, A. DCFS supervisor Linda Conti became involved with A.S. when the Hotline received a report that her older son, N., had sexually abused his younger brother, P., who was living with his maternal grandparents, the H.'s, at the time. (Tr. 1455-56, 1458-60.) Conti called A.S. on August 23, 2000 and notified her of the pending investigation but did not disclose any specific allegations so that A.S. would, in Conti's words, "not to be able to taint the investigation." (Tr. 1463; PX F, at 42900.) Though there were no allegations against A.S., Conti recommended that she not have any contact with P. during the investigation out of concern that A.S. might encourage her son to recant or minimize the allegation. (Tr. 1464-65.) A.S. agreed to the recommendation without mentioning that she had an order from the Circuit Court of Winnebago County granting her the right to have contact with P. following her divorce from P.'s father. Nor did A.S. mention that she was involved

---

[12]    The parties do not indicate who decided that Jimmy could return home or how or when the Parikhs were notified of the decision.

[13]    It is not clear how Detective Marks became involved in the case.

in a custody battle with the H.'s regarding custody of P. (Tr. 1465-66, 1489; PX F, at 43034, 43036.)

On September 29, 2000, DCFS investigator Shalonda Cawthon called A.S. and told her that the investigation was going to be unfounded. (Tr. 1469-70; PX F, at 42923.) The investigator's notes state that the "perp[etrator] seemed more credible than victim . . . Something happened to the victim no proof it was the perp (sib[ling])." (PX F, at 42921.) Cawthon nevertheless recommended that A.S. be allowed only supervised visits with P. "until the Department receives a completed assessment and recommendations from [a] psychologist." (PX F, at 42933, Letter from S. Cawthon to A.S. of 9/29/00.) By letter dated December 18, 2000, Conti notified A.S. that she no longer needed to be supervised during her visits with P. but should resume shared custody as provided by the court custody orders. (PX F, at 43043.) It is not clear whether this decision was in fact based on a psychologist's recommendation.

F.    Debra C.

In June 2000, DCFS received a Hotline report alleging that Debra C.'s minor children were at risk of harm because two of her children had died years previously under suspicious circumstances, and a third child had almost died.[14] (Tr. 884-85, 896.) Debra C. is the mother of Robert (age 22), Thomas (age 21), Joey (born May 28, 1981, died September 1981), Jennifer (age 14), Steven (age 12), Jonathan (age 7), Jessica (age 8), and Katie (born December 20, 1997, died March 1998). (Tr. 1136-39.) Joey and Katie both died of sudden infant death syndrome. DCFS and the police investigated both deaths and determined that they were unfounded for abuse or neglect. (Tr. 1139-40.) In addition, Thomas reportedly stopped breathing and needed to be resuscitated when he was an infant. (PX G, at 43650, 43651.) In 1995, Debra suffered a breakdown and was diagnosed with bipolar disorder and depression. (Tr. 1142.)

---

[14]    It is not clear what event triggered the Hotline call.

DCFS supervisor Kathleen Tate interviewed Debra on June 8, 2000. Debra disclosed that she suffers from bipolar disorder, and Tate observed that she kept various medications together in a single bottle, which Tate found odd. (Tr. 907-08.) Tate determined that Debra's four minor children were unsafe and required that an older sibling come check on them "every day." (Tr. 916-17; PX G, at 43670.) One week later on June 15, 2000, DCFS implemented a new safety plan which provided that Debra's father and his wife would care for Debra's four minor children until the investigation was complete, but that Debra could have supervised visits with them every day. (Tr. 924-25; PX G, at 16731.) That same day, DCFS investigator Eleanor Powell called Debra to notify her of the safety plan. (Tr. 925-26; PX G, at 16593.)

A few days later on June 18, 2000, the children went to visit their non-custodial father, Steven, for Father's Day. Steven did not return the children to Debra's father that night but instead kept them in his custody. Debra notified Powell of the situation during a telephone conversation on June 22, 2000, but Powell indicated that there was nothing she could do because DCFS had not placed the children with Steven. (Tr. 960, 1174-79.)

Toward the end of July 2000, Debra retained the law firm of Lehrer & Redleaf to represent her in the investigation. (Tr. 1229-30.) On July 26, 2000, the Department opened the case for services[15] and attempted to convince Debra to accept assistance from DCFS. (Tr. 946-50.) Specifically, the Department suggested that Debra get a drug and alcohol assessment and a bonding assessment, and that she continue to see her psychiatrist and to take her medication. (Tr. 1213-15.) Debra, however, did not believe that she needed such services and stated that she would only be willing to accept the assistance of a babysitter and a maid. (Tr. 1241-42.) The next day, on July 27, 2000, DCFS attempted to "screen" the case with the State's Attorney's office but

---

[15]     Deputy Director Goad testified that "[i]n more serious cases we open in-home protective services cases, which means that we assign a DCFS worker, sometimes called an intact worker, to work with the family." (Tr. 2234.) Kathleen Tate testified that "once [a] case was opened for services then the intact family worker would go out [to see the family] weekly." (Tr. 917.)

the State's Attorney needed additional information from the investigator in order to proceed, such as Debra's psychiatric records and the medical records regarding the children who had died. (Tr. 936-37, 981; PX G, at 16606.) Also on July 27, DCFS attempted to take protective custody of the C. children, but they were not at the grandfather's home when DCFS arrived with the police. (Tr. 953-55.) Shortly thereafter on August 1, 2000, Kathleen Tate called Daniel Romero, a paralegal with Lehrer & Redleaf working on Debra's case, to inform him that the C. children would be returned (presumably, by their father) to Debra's father by August 7, 2000. (PX G, at 72541.)

For reasons not explained in the record, DCFS voluntarily unfounded the report against Debra on February 28, 2001. (Tr. 976; PX G, at 100257.) According to Tate, in the Department's view, the investigation was not typical because of the nature of the allegations, the past deaths of two of Debra's minor children, the family dynamics, the failure of Debra's psychiatrist to cooperate with the investigation, and the fact that Powell went on medical leave in the middle of the investigation. (Tr. 984-87 (Tate).) Plaintiffs disagree, arguing that "nothing about the handling of the C. case runs contrary to the express and acknowledged policies and practices of DCFS which permit safety plan directives including the loss of custody of children without notice, or any opportunity for a parent to be heard." (Pl. Reply, at 22.)[16]

### G. Drs. S. and M.

On May 12, 2000, DCFS began investigating Dr. S. and his wife Dr. M. based on a report from a neighbor that she had observed through the window that Dr. S was sexually abusing his eight-year-old adopted daughter. DCFS investigator Martin Acevedo went to the family's home but Dr. S. and Dr. M. refused to let him interview the child. (Tr. 331-32, 335-36, PX A, at 70009.) Instead, Acevedo spoke with Dr. S. and Dr. M. for approximately two hours, in part explaining that he and Dr. S. needed to develop a safety plan. Dr. S. ultimately agreed to a safety plan requiring

---

[16]     Plaintiffs' Reply Memorandum in Support of their Amended Motion for a Second Preliminary Injunction is cited as "Pl. Reply, at __."

that he leave the home pending the investigation. Dr. S. understood from Acevedo that if he refused to agree to the plan, DCFS would take his daughter away or go to the police. (Tr. 338, 343, 346-48.)

Dr. S. stayed at a hotel over the weekend and by May 15, 2000 had retained Diane Redleaf of the Lehrer & Redleaf law firm to represent him. (Tr. 357, 371.) Ms. Redleaf wrote a letter to Hebert Bashir, a DCP Supervisor, on May 15, 2000 requesting in part that Dr. S. "may return home and remain home as long as his wife is also present." (PX A, at 70045.) That same day, DCP investigator Andrea Jones spoke with Ms. Redleaf and agreed to modify the safety plan to allow Dr. S. to have supervised visits with his daughter during the day. (Tr. 357, 371; PX A, at 70074.) As a result, Dr. S. was able to shield his daughter from the information that he was not sleeping at home at night; he stayed with her until she went to sleep and then returned to the house in the morning before she woke up. (Tr. 358.)

On May 18, 2000, DCFS conducted a victim sensitive interview of the daughter at the Children's Advocacy Center.[17] (Tr. 418; PX A, at 70022.) The next day on May 19, 2000, Jones spoke with Ms. Redleaf and notified her that the case against Dr. S. was being unfounded. (Tr. 358-59; PX A, at 70055.) Though the official notification did not arrive until June 15, 2000, Dr. S. moved back into his home on May 19, with Ms. Redleaf's approval.[18] (Tr. 359-60, 376; PX A, at 70071.)

H.    E.D.

On January 11, 2001, DCFS received a Hotline call reporting that sixteen-year-old E.D. had molested four-year-old Q.M. while babysitting for him approximately two years earlier. (Tr. 1414-

---

[17]    The name of the person who conducted the interview and the corresponding notes are illegible.

[18]    Dr. S. retained separate counsel to represent him in a criminal investigation into his alleged misconduct. That investigation did not result in any criminal charges being filed. (Tr. 359.)

15.) John Howell was assigned to investigate the allegation on behalf of DCFS. Howell conducted a victim sensitive interview of Q.M. on January 22, 2001. (PX I, at 44140.) Q.M. reported that E.D. "did something bad" to him but then, in Howell's words, "shut down" and refused to continue talking. (*Id.*; Tr. 1417.) Howell next interviewed E.D. and E.D.'s mother, Mrs. D., at the family home on January 25, 2001. According to Howell, E.D. "began to say something which very clearly indicated that he was acknowledging some sort of guilt, some degree of guilt in the allegation," but his mother stopped him and spoke with him privately for a minute. (Tr. 1428.) When E.D. and Mrs. D. returned, they told Howell that they had contacted an attorney; the attorney never authorized Howell to speak with E.D. after that time. (*Id.*)

Before concluding his initial interview, Howell told Mrs. D. that "a safety plan would have to be put in effect removing E.D. from the home for the safety of his [two younger] siblings." (PX I, at 44148 (interview notes); Tr. 1418.) The original plan required that E.D. remain outside the home until he completed a juvenile sex offender evaluation and any treatment recommended pursuant to that evaluation. (Tr. 1421.) Howell told Mrs. D. that if she did not agree to the plan, it was possible that DCFS would take custody of the two younger children. (Tr. 1419.)

On February 22, 2001, Howell conducted victim sensitive interviews of E.D.'s siblings, neither of whom made any significant disclosures. (PX I, at 44154, 44155.) During the interviews, Mrs. D. approached Howell and asked him to modify the safety plan. Howell, Mrs. D., and the D.s' attorney discussed a modification and ultimately agreed that E.D. could return home but could have no contact with younger children. In addition, Mrs. D. was required to remain "awake at night when the rest of the family is sleeping, in order to supervise [E.D.] at night." (Tr. 1422-23; PX I, at 44152, 44171(a).) The modified safety plan remained in effect until July 2002. (PX I, at 44177.) E.D.'s case was ultimately indicated for sexual penetration.[19] (Tr. 1428.)

---

[19]      The record does not reflect when E.D.'s case was indicated.

34

## I.    Additional Cases

Plaintiffs rely on the circumstances of two additional cases in support of their motion for preliminary injunction, but do not provide a detailed summary of either case. Plaintiffs first claim that the March 22, 2002 directive from Deputy Director Goad, requiring that "all safety plans in which family members (children or adults) are relocated from their residence must be approved by the respective Child Protection or Field Service Manager," was ignored in two situations. (Pl. Mem., at 32-33.) In the first case, five-year-old I.W. lived with her mother, who had full custody rights, but visited her father on weekends. (DCFS Inter-Office Correspondence Regarding Safety Plans dated 3/22/02; Tr. 3168, 3170.) When I.W.'s mother was accused of abusing her, I.W. went to live with her father pending a DCFS investigation. DCFS investigator Cassandra Campbell nevertheless testified that I.W.'s October 14, 2002 safety plan did not constitute a "relocat[ion] from [her] residence" as contemplated by the March 22 directive. It is not clear from the record whether Campbell knew that the mother had full custody of I.W. when she implemented the plan. (Tr. 3170, 3181 (DCFS investigator, Cassandra Campbell).)

Plaintiffs also point to the I.W. case as evidence that DCFS investigators are not following the August 13, 2002 amendments to Appendix G requiring that safety plans be reviewed every five days. (Pl. Mem., at 33.) Specifically, there is no evidence that DCFS conducted any five-day reviews of I.W.'s safety plan even though it was scheduled to last "up to 60 days."[20] (Tr. 2989; PX T, at 45373-74.) In this second case, Plaintiffs submit the declaration of J.J., who signed a safety plan requiring that her husband leave their home pending a DCFS investigation into allegations that he had abused J.J.'s children from a previous marriage.[21] (Pl. Mem., at 23; Pl. Supp., at 2.) It is

---

[20]    Plaintiffs do not indicate the actual duration of I.W.'s safety plan.

[21]    Plaintiffs also submit the declaration of S.T., who signed a safety plan requiring that her paramour leave their home while DCFS investigated allegations that he was sexually abusing S.T.'s children from a previous marriage. (Ex. 2 to Plaintiffs' Motion to Supplement Record in
(continued...)

35

not clear whether DCFS conducted re-reviews of the plan every five days, but as of January 2004, the plan had been in effect for more than 75 days. (Ex. 1 to Pl. Supp.)

## DISCUSSION

Plaintiffs raise both substantive and procedural due process challenges to the safety plan process, arguing that DCFS, under threat of seizing class members' children, (1) implements safety plans on the basis of only nominal or no evidence of actual abuse or neglect, and (2) fails to provide any opportunity to contest the plans. Defendant insists that the plans satisfy the compelling public interest in controlling threats to a child's safety during the course of a DCFS investigation, and that all plans constitute voluntary agreements between the families and DCFS. With the limitations described below, the court finds that Plaintiffs are entitled to injunctive relief.

### I.     Preliminary Injunction Standard

Plaintiffs seek a preliminary injunction prohibiting Defendant, a state official, from continuing to implement safety plans absent sufficient evidence of abuse or neglect and an appeal process. To obtain such relief, Plaintiffs must demonstrate (1) a likelihood of success on the merits; (2) irreparable harm if the preliminary injunction is denied; and (3) lack of an adequate remedy at law. See Reid L. v. Illinois State Bd. of Ed., 289 F.3d 1009, 1020-21 (7th Cir. 2002). When these threshold conditions have been met, the court must consider (4) the harm that Defendant will suffer if the injunction is granted, balanced against the irreparable harm to the Plaintiffs if injunctive relief is denied; and (5) the interest of, and harm to persons not directly involved in the dispute (the public interest). Id. at 1021.

### II.     Likelihood of Success on the Merits

---

[21](...continued)
Support of Both their Second Preliminary Injunction Motion and their Motion to Amend the Class Definition (hereinafter "Pl. Supp.")  S.T. is not a member of the class, however, because she has no legal relationship with the man required to leave the home. (See Order of 4/16/04.)

A likelihood of success on the merits of both Plaintiffs' substantive and procedural due process claims requires some showing of a liberty interest. The court thus first considers whether such an interest exists in this case. The court then addresses in turn the specific due process arguments.

## A. Protected Liberty Interest

It is well-established that "[c]hoices about marriage, family life, and the upbringing of children are among associational rights the [Supreme] [C]ourt has ranked as 'of basic importance in our society,' . . . rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 376 (1971)). As the Seventh Circuit noted, "the right of a man and woman to marry, and to bear and raise their children is the most fundamental of all rights – the foundation of not just this country, but of all civilization." *Doe v. Heck*, 327 F.3d 492, 517-18 (7th Cir. 2003) (quoting *Brokaw v. Mercer County*, 235 F.3d 1000, 1018 (7th Cir. 2000)). Similarly, children possess a liberty interest in being raised and nurtured by their parents. *See, e.g., Santosky v. Kramer*, 455 U.S. 745, 760 (1982) ("until the state proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of the natural relationship"); *Heck*, 327 F.3d at 518; *Brokaw*, 235 F.3d at 1018.

The constitutional right to familial integrity, however, is not absolute. *Brokaw*, 235 F.3d at 1019. To the contrary, this liberty interest "is limited by the compelling governmental interest in the protection of children – particularly where the children need to be protected from their own parents." *Id.* (quoting *Croft v. Westmoreland County Children and Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997)). "Thus, a balance must be reached between the fundamental right to the family unit and the state's interest in protecting children from abuse, especially in cases where children are

removed from their homes." *Id.* With these principles in mind, the court considers whether safety plans implicate Plaintiffs' due process rights.

## B. Substantive Due Process

Plaintiffs claim that safety plans violate their right to substantive due process by depriving them of familial relations without sufficient evidence. In Plaintiffs' view, DCFS should not be allowed to implement a safety plan absent "some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Brokaw*, 235 F.3d at 1019 (quoting *Croft*, 103 F.3d at 1126). Defendant insists that all safety plans are voluntary agreements designed to further the public interest in protecting children and, thus, do not require any specific evidentiary showing. As explained below, the court finds neither party's position entirely persuasive.

Plaintiffs cite to several cases which purportedly demonstrate that safety plans are unconstitutional absent "definite and articulable evidence" of abuse or neglect. In *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003), child welfare authorities received a report that a ten-year-old girl had been bruised during a spanking at a private school. The girl told investigators that another student, John Doe, had also been spanked by the school principal. *Id.* at 500-01. Based on that report, the investigators interviewed John at his school without his parents' consent and "target[ed] the plaintiff parents [John Doe's parents] as child abusers." *Id.* at 521. At one point in the investigation, case worker Carla Heck left a voice mail message for the Does stating that "if she did not hear from their attorney within 24 hours, 'the Bureau will take steps to . . . protect the children in your home . . .'" and that she was "'not messing around anymore!'" *Id.* at 505-06. The child welfare authorities never in fact removed any of the Doe children from their home, but the Does claimed that "[t]hroughout . . . the Christmas season," they "lived in constant fear" that the authorities would do so. *Id.* at 506 n.10.

The Does and others filed suit, alleging in part that the defendant child welfare authorities had violated the Does' right to familial relations and their Fourteenth Amendment procedural due process rights. *Id.* at 508. The district court granted summary judgment to the defendants, finding that even if their actions were unconstitutional, they were protected by qualified immunity. *Id.* The Seventh Circuit reversed, however, concluding that the defendants violated the Does' liberty interest in familial relations by targeting them as child abusers without any evidence that the Does themselves had ever abused their children or that their children had ever been injured as a result of a school spanking. *Id.* at 521-22. Despite the absence of any such evidence, the defendants launched an investigation based solely on another child's claim that John had been spanked (not injured) by the school principal (not John's parents).

The court concluded, similarly, that the threat to remove John and his sister from their parents' custody violated the Does' liberty interest in maintenance of the family unit. *Id.* at 524. The court recognized that "child welfare caseworkers are often called upon to make difficult decisions without the benefit of extended deliberation," and that "there is, perhaps, no more worthy object of the public's concern than preventing the most vulnerable members of society, children of tender years, from being physically abused." *Id.* at 525. On the facts presented, however, it was not "difficult to weigh [the] state's interest in investigating an allegation of child abuse against [the] parent or child's right to familial relations" because "the defendants had no basis to suspect the plaintiff parents of child abuse, and thus had no reason to interfere with their familial relationships in the manner described." *Id.*

With one exception, the cases presented at the hearing before this Court are distinguishable from *Heck* because they involve allegations of abuse or neglect on the part of the parent or child under investigation. Thus, unlike in *Heck*, the Plaintiffs' right to familial relations here does not, in each instance presented above, obviously outweigh the state's interest in investigating allegations that Plaintiffs have engaged in child abuse or neglect. The A.S. case does

involve a mother who was not allowed to see her son for approximately one month while DCFS investigated an allegation that the boy had been abused by his older brother. Unlike the Does, however, A.S. was aware of the investigation at all times and did not object to the arrangement. Plaintiffs dispute that A.S.'s agreement was voluntary – an argument the court addresses *infra* pp. 46-54 – but the court notes that she signed the safety plan without advising the investigator about the court order granting her the right to have contact with her son, P.

As noted, Plaintiffs view *Brokaw* as setting forth the requirement of "definite and articulable evidence" of abuse or neglect before a safety plan may be implemented. The plaintiff in *Brokaw* alleged that certain relatives and a deputy sheriff conspired to end his parents' marriage by filing "baseless and scurrilous" claims of child neglect with DCFS that they believed "would cause [the plaintiff] and his sister to be removed from their parents' home, and in turn prompt [the father] to divorce his wife and leave his family." 235 F.3d at 1007. At some point after the relatives made the allegedly baseless claims of neglect, two police officers walked into the plaintiff's home, grabbed him and his three-year-old sister, and carried them crying out of the home. The men did not explain what was happening and the six-year-old plaintiff believed he was being kidnapped and would be killed. *Id.* The children remained in foster care for approximately four months before being returned home. *Id.* at 1008. Upon reaching the age of majority, the plaintiff filed a complaint, alleging in part that his relatives and others had violated his substantive due process right to familial relations. *Id.* at 1017-18. The district court dismissed the claims for failure to state a claim or, alternatively, based on sovereign, absolute, or qualified immunity. *Id.* at 1008.

The Seventh Circuit reversed, finding that the plaintiff had sufficiently alleged a due process claim covering the four-month period during which he was separated from his parents. The court noted that the constitutional right to familial integrity must be balanced against the state's compelling interest in protecting children from abuse, "especially in cases where children are removed from their homes." *Id.* at 1019. "In balancing these interests, courts have recognized that

40

a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id.* On a motion to dismiss, the court lacked sufficient facts to determine whether the government was justified in interfering with the plaintiff's familial relations. The court also lacked sufficient facts to determine whether any of the individual defendants were entitled to qualified immunity. The court noted, however, that in general, "because the balance between a child's liberty interest in familial relations and a state's interest in protecting the child is nebulous at best, social workers and other state actors who cause a child's removal are entitled to qualified immunity because the alleged constitutional violation will rarely – if ever – be clearly established." *Id.* at 1023.

*Brokaw* is not particularly illuminating to the extent it involved children who were forcibly removed from their parents' home by two men who refused to identify themselves. In this case, Plaintiffs, all adults capable of communicating with child welfare authorities, knew that there was an investigation pending against them and agreed at least in form, however reluctantly, to cooperate with the plan by removing themselves or their children from the home. In addition, the children in *Brokaw* were placed in foster care and deemed wards of the state for four months; they did not remain with parents or relatives as in this case. The *Brokaw* court did note that other courts have required "definite and articulable evidence giving rise to a reasonable suspicion" of abuse or neglect, but did not explain what satisfies this requirement, particularly with respect to the imposition of safety plans such as are at issue here.

Plaintiffs also claim that the Supreme Court's decision in *Troxel v. Granville*, 530 U.S. 57 (2000) "reinforces the conclusion that safety plans work significant deprivations, even when the deprivation is less extreme than removal of the child." (Pl. Mem., at 39.) The plaintiffs in *Troxel* sought visitation rights with their grandchildren under a Washington state statute that allowed "any person" to petition for forced visitation of a child. The children's mother wanted to limit the

41

grandparents' visits to once per month, but a Washington Superior Court granted the plaintiffs' request for greater visitation rights as in the best interests of the children. *Id.* at 61-62. The Washington Court of Appeals reversed, however, and the Washington Supreme Court affirmed that decision, reasoning that the Washington statute was unconstitutional because it allowed the State to interfere with the right of parents to rear their children without any threshold showing of harm, and because it allowed "any person" to seek visitation rights without recognizing that "[p]arents have a right to limit visitation of their children with third persons." *Id.* at 61-63. *See* WASH. REV. CODE § 26.10.160(3) ("[a]ny person may petition the court for visitation rights at any time . . . The court may order visitation rights for any person when visitation may serve the best interest of the child").

The United States Supreme Court granted certiorari and affirmed that the Washington statute, as applied, unconstitutionally infringed on the mother's fundamental right to make decisions concerning the care, custody, and control of her children. *Id.* at 66-67. In reaching this conclusion, the Court found it significant that "the [plaintiffs] did not allege, and no court has found, that [the mother] was an unfit parent. That aspect of the case is important, for there is a presumption that fit parents act in the best interests of their children." *Id.* at 68.

Although some of the language of *Troxel* is instructive, its rationale is not directly relevant here, either. In the Supreme Court's view, the problem "[wa]s not that the Washington Superior Court intervened, but that when it did so, it gave no special weight at all to [the mother's] determination of her daughters' best interests." *Id.* at 69. In this case, conversely, safety plans are imposed on parents who are under suspicion of being unfit. Nor are questions regarding visitation rights directly comparable to investigations into allegations of abuse or neglect.

In short, none of these cases supports Plaintiffs' assertion that DCFS violates the Constitution when it implements safety plans absent "definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." (Pl.

42

Mem., at 43) (citing *Brokaw*, 235 F.3d at 1019). Indeed, none addresses the situation presented

here where a parent, legal guardian, or child is directly accused of abuse or neglect, thus calling

into play the state's compelling interest in protecting a child's safety. The court recognizes that

safety plans impose difficult restrictions upon families and, while they are in effect, deprive families

of their right to familial relations. To determine whether such deprivation amounts to a

constitutional violation, however, it must be balanced against the state's interest in protecting

children. That interest is "extraordinarily weighty." *Darryl H. v. Coler*, 801 F.2d 893, 902 (7th Cir.

1986). As the Seventh Circuit explained:

> The state has an obligation to prevent loss of life and serious injury to those
> members of the community to whom it has a very special responsibility, the young.
> As the Supreme Court remarked in *Wyman v. James*, 400 U.S. 309, 318, 91 S.Ct.
> 381, 386, 27 L.E.2d 408 (1971), "There is no more worthy object of the public's
> concern."

*Id.* Safety plans are designed for this very purpose: to protect children from harm during the course

of a DCFS investigation.

Plaintiffs express concern that it is not always clear that a child is in any danger at all, such

as when a child is merely "afraid" of persons who live in or visit the home. In addition, safety plans

are often implemented even when only one of the 15 safety factors is checked "yes." (Pl. Mem.,

at 14 n.8) (arguing that 61 of the 92 safety plans in the representative cases (66%) went into effect

based on the presence of only one safety factor). Defendant insists that "many of these so-called

safety plan cases do not involve safety plans at all," noting, for example, that some plans imposed

no contact requirements only after an alleged perpetrator had been taken to jail and a court had

imposed the same restriction. (Def. Resp., at 52-54.) Defendant cannot escape liability, however,

by imposing conditions on Plaintiffs and then claiming that they did not technically constitute "safety

plans."

The court recognizes that several plans in the sample cases were directed against non-

class members, such as paramours of the alleged victims' mothers. The fact that some of the

43

persons subject to safety plans are not class members does not speak to the proper standard required for implementing such a plan, however. Where an investigator has found even a single safety factor, the court finds that it is not improper for DCFS to err on the side of caution given the significant state interest in protecting children from harm. Under such circumstances, the court is satisfied that the state's interest in protecting children through brief or temporary safety plans outweighs Plaintiffs' right to familial relations, even upon a mere suspicion of abuse or neglect. The opposite conclusion may result in children being further abused or neglected during the course of a DCFS investigation, which is what prompted the CERAP process in the first place. (Tr. 2243-44); 20 ILCS 505/21(e).

In the court's view, the safety plan imposed upon Drs. S. and M. represents the type of brief deprivation that is insufficient to trigger constitutional concerns. That plan went into effect on May 12, 2000 and required Dr. S. to leave the home pending an investigation into a neighbor's allegation that she had seen him through a window abusing his adopted daughter. By May 19, 2000, the case against Dr. S. was unfounded and he moved back into his home. Though it is regrettable that he had to spend a week away from his family, the court concludes that he did not suffer an unconstitutional deprivation of his right to familial relations as a result. On the other hand, Patrick D. was required to leave his home on January 5, 2001 due to an allegation that he had improperly touched another child during nap time at the day care center where he worked. His case was "indicated" for abuse in February 2001 but he did not receive an administrative hearing on the charges until August 8 and 15 and September 10, 2001. On October 16, 2001, relying at least in part on information available to the investigation from the beginning, an ALJ determined that the charges were unfounded and based on a "sloppy" investigation. The safety plan was not officially lifted, however, and he was not permitted to live with his children (none of whom were victims of the alleged abuse) until December 10, 2001 – nearly a year after it forced him out of his home.

44

Even where the initial investigation supports imposition of a safety plan, the court believes such a plan may not remain in place indefinitely; to the contrary, at some point, the deprivation continues long enough to implicate Plaintiffs' liberty interests and substantive due process rights. Neither party has provided useful insight into when this occurs. Plaintiffs insist that a deprivation lasting even a single hour is enough to run afoul of the Constitution. Defendant maintains that there can never be a constitutional deprivation because families always sign the safety plan and thereby agree to its terms. The answer lies somewhere in between, but absent adequate development of this issue by the parties, the court is not prepared to draw the line. The court does find, however, that safety plans lasting only a few hours or days do not implicate substantive due process rights even when coupled with a threat of protective custody. On the other hand, safety plans signed under such a threat do implicate substantive due process rights when they have no stated duration or an indefinite duration (e.g., they are in effect "during the course of this investigation" (SAI 8, at 28502) or until a date "undetermined at this time" (SAU 40, at 41317)), at least where such plans continue for several days.

C.    Procedural Due Process

Plaintiffs next argue that safety plans violate their procedural due process rights because they do not provide any opportunity to contest them. To establish that their procedural due process rights have been violated, Plaintiffs must demonstrate that (1) the Department deprived them of a constitutionally protected liberty or property interest; and (2) the deprivation occurred without due process of law. Heck, 327 F.3d at 526. Plaintiffs note that a "fundamental requirement of due process is the opportunity to be heard." (Pl. Mem., at 44) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965) (internal quotations omitted)). Though Plaintiffs recognize that pre-deprivation process may be excused by exigent circumstances, they also stress that "the only meaningful opportunity to invoke the discretion of the decision maker is likely to be before the [deprivation]

takes effect." (Pl. Mem., at 44-45) (quoting *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 543 (1985).)

The court has already determined that safety plans that separate children and families do deprive class members of familial relations. In addition, it is undisputed that DCFS provides no opportunity to contest safety plans, nor any notice of such an opportunity. Defendant once again argues that no process is due because safety plans are completely voluntary agreements. According to Defendant, "[i]ndividual parents are free to make a choice, albeit a difficult one, between protective custody of their child and the entry of a safety plan to keep the child safe." (Def. Resp., at 45.) While this may be true in a formal sense, for the reasons explained below, the court does not agree that Plaintiffs' formal acquiescence in plan terms extinguishes their procedural due process rights.

### 1. Voluntariness

Defendant relies on *Terry v. Richardson*, 346 F.3d 781 (7th Cir. 2003) and *Doe v. Tullis*, No. 01-2044, slip op. (C.D. Ill. Nov. 25, 2003) in support of his assertion that all safety plans are voluntary. The plaintiff in *Terry* was a non-custodial father with rights to visit his daughter, Jaidah, pursuant to a divorce decree. 346 F.3d at 782. The plaintiff's ex-wife suspected that he was sexually abusing Jaidah and Jaidah confirmed the suspicion, telling her mother that her father had "hurt her, kissed her 'pee-pee,' forced her to swallow a necklace, tried to make her kiss his 'noodle,' and jammed crayons and a pen into her anus." *Id.* Jaidah's mother reported the plaintiff to the DCFS Hotline, and the next day, a DCFS investigator called the plaintiff and left a message on his answering machine stating that he was to "cease all visitation and contact with [Jaidah]." *Id.* at 782-83. When the plaintiff returned the investigator's call, she told him that she could not explain the allegations over the phone and repeated that he was not to contact Jaidah. According to the investigator, the plaintiff responded "okay" or "I understand." *Id.* Two weeks later, the

investigator interviewed the plaintiff at his attorney's office. At that time, she described the allegations against him and explained the investigation process. She also reiterated that the plaintiff was not to have any contact with Jaidah during the investigation. The plaintiff complied because "he had learned from 'news reports and things' that ignoring DCFS instructions could lead to termination of his parental rights or Jaidah's placement in a foster home." *Id.* at 783-84.

After more than a year of proceedings, a court found that Jaidah had been abused, but not by the plaintiff, who was cleared of the allegations. The plaintiff filed suit against the investigator for violating his and Jaidah's due process rights and a jury found in favor of the plaintiff and his daughter. *Id.* at 784. In reversing that decision, the Seventh Circuit first determined that the plaintiff's deprivation, which ultimately amounted to losing just a single day of visitation, was minor compared with the state's substantial interest in protecting children from sexual abuse. *Id.* at 786. The court found it significant that the investigator did not try to sever the plaintiff's parental rights or remove Jaidah from his custody. *Id.* In addition, "a reasonable person with the resources available to [the plaintiff] would not have left [the investigator's] authority unquestioned," and could have refused to comply with the investigator's instruction. *Id.* at 785, 787. "Given the interests at stake, the options available to [the plaintiff] were enough to guard against erroneous interference with his rights." *Id.* at 787.

*Terry* is distinguishable from this case in several respects and does not, in this court's view, establish that safety plans are by definition voluntary. First, the investigator in *Terry* never threatened to put Jaidah in protective custody; rather, the plaintiff merely "heard on television that disobeying DCFS caseworkers could spell the end of his parental rights or lead to foster care for Jaidah." *Id.* at 785. In this case, conversely, all class members were threatened that their children would be placed in protective custody if they refused to accept a safety plan. In addition, the plaintiff in *Terry* lost only a single day of visitation with his daughter, whereas most of the Plaintiffs

in this case lost physical custody of, or contact with children and family members for several months. Significantly, many of the safety plans had indefinite or unstated durations.

Defendant next points to *Doe v. Tullis*, in which DCFS investigated plaintiff John Doe after receiving a Hotline report that he had sexually abused a child while he was babysitting for her one night. Slip op., at 2-3. The investigator interviewed the alleged victim and her sibling; the victim's mother; the hospital pediatrician who examined the victim and reported the abuse; and the pediatric social worker at the hospital. *Id.* at 3. The investigator also interviewed three of the Does' own children and one of their neighbors. Before speaking with John's wife, Jane Doe, the investigator and her supervisor discussed a possible safety plan for the family. After interviewing Jane, the investigator drafted a safety plan that required John to live outside the home and prevented him from having any unsupervised contact with his children "until we were further along in our investigation." *Id.* at 4. The investigator explained that violating the safety plan could result in the children being removed from the home. According to the investigator, Jane agreed to the plan. *Id.* at 4-5.

Five days later, Jane signed a second safety plan with the following terms: "Jane Doe will allow [John Doe] no contact whatsoever with any children who are younger than eighteen; John Doe will not be in the home without approved supervision at any time when younger children are home; and in order for the plan to terminate, John Doe must obtain a sex offender assessment and follow any recommendations, and all safety factors must be resolved as determined by DCFS, with regard to the sexual abuse." *Id.* at 6. After the report against John was indicated, Jane and John signed (in the presence of their attorney) a third safety plan adding, in part, that (1) John could not live in, spend the night in, or be in the home "any time other than approved visiting time," (2) "CPI will continue to monitor the plan until the case is complete," and (3) "violation of the plan will result in protective custody of the Doe children." *Id.* at 6-7. The investigator believed that the plan was to remain in effect until she completed her investigation approximately two months later, but she

did not notify the Does or their attorney that the plan was no longer in effect after that date. *Id.* at 7. John appealed the indicated finding; there is no indication as to whether his request for expungement succeeded. *Id.* at 21.

The Does filed suit against the investigator and her supervisor alleging violations of their constitutional rights. The Does first claimed that the defendants violated their right to familial relations by threatening to remove the Doe children from their parents' custody. *Id.* at 12. The court agreed that "threatening to remove children from their parents' custody violates the right to familial relations when the state has no reason to suspect that the parents are abusing the children." *Id.* at 13 (citing *Heck*, 327 F.3d at 524). The court found no such threat in that case, however, because the investigator merely "provided an alternative to removal when she told Jane Doe that she could take the children to stay with friends or family." In the court's view, "[r]equiring Jane Doe and the Doe children to stay with family and friends is not the equivalent of threatening to remove the children." *Id.* In reaching this conclusion, the court noted that "[a] safety plan is an optional and less disruptive alternative to either removing a child from his home based on a court order or removing a child and then seeking a court order." *Id.* at 14. According to the court, informing parents of the legal alternatives available to the Department, including removal of the children prior to a court order in exigent circumstances or pursuant to a court order, does not automatically constitute a threat sufficient to deprive parents of their constitutional rights. *Id.* The court denied summary judgment on the claim, however, based on a factual dispute as to whether the investigator had "repeatedly threatened to take the children away." *Id.*

The Does also claimed that the defendants violated John Doe's procedural due process rights by separating him from his children for more than seven months without an adequate investigation or a hearing. *Id.* at 15, 19. The court agreed that "[h]ad [the investigator] indeed failed to perform an investigation before instituting the safety plan, her decision would have failed to satisfy the 'reasonable suspicion' standard established in *Brokaw*." *Id.* at 17. Before instituting

49

the first safety plan, however, the investigator "had already performed substantial investigation," including interviewing the alleged victim, her mother and sibling; the pediatrician who reported the alleged abuse; a pediatric social worker; Jane Doe and three of her children; and one of the Does' neighbors. *Id*. at 16-17.

As for the hearing, the court first determined that the Does voluntarily agreed to the conditions and terms of the safety plan. *Id*. at 20. The court rejected the Does' argument that they were forced to sign the plan, finding that "[k]nowing the possible legal consequences of failing to participate in a safety plan [*i.e.*, having your children taken away] does not render involuntary one['s] agreement to participate." *Id*. at 20 n.4. The court distinguished safety plans from the forcible removal of children from the home, noting that safety plans "provide an alternative way, based on the parents' cooperation, for the state to ensure the children's safety while allowing them to remain in their home." *Id*. at 22. The Does "always had the right to contact DCFS to determine when or how the safety plan might be ended . . ., bring a suit in state court, or simply refuse to comply with the safety plan, which would have led to judicial intervention if DCFS intended to continue to keep John Doe separated from his children." *Id*. The Does failed to demonstrate that the hearing John received in seeking to expunge the indicated finding was inadequate, leading the court to conclude that John was not denied procedural due process. *Id*. at 21, 23.

The court is not persuaded that *Tullis*, an unreported decision from another district court, conclusively establishes the voluntariness of all safety plans. Though the *Tullis* court found no automatic threat when DCFS notifies parents that their children may be removed from the home absent a safety plan, it nonetheless denied summary judgment because questions of fact existed as to whether the investigator had "repeatedly threatened to take the children away." *Id*. at 14. All of the class members in this case were in fact threatened explicitly or implicitly with protective custody unless they agreed to a safety plan, which arguably adds a coercive element to the "agreement" process. In addition, unlike in *Tullis*, it is not clear that DCFS "substantially

50

investigated" the allegations against all Plaintiffs in this case prior to implementing a safety plan. In the Stacey and Patrick D. case, for example, the DCFS supervisor advised the assigned investigator to "put in a plan" at Patrick's home if he had small children, before anyone had actually spoken with the D. family or the alleged victim. (Tr. 1525-26; PX B, at 44854.)

Finally, the plaintiffs in *Tullis* failed to show that the expungement hearing provided inadequate process even though the proceeding did not address the conditions of the safety plan. *Id.* at 21, 23. Not all investigations, however, result in an "indicated" report or any opportunity for an expungement hearing. In addition, while the *Tullis* court noted that safety plans require the cooperation of parents and family members, it failed to address how "repeated[] threat[s] to take the children away" may affect a family's decision in that regard.

Both parties ask the court to consider the "totality of the circumstances" in assessing whether safety plans are voluntary, drawing by analogy from the criminal law on consent to a police search. (Pl. Mem., at 49; Def. Resp., at 48) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).) Plaintiffs argue that relevant factors include (1) whether DCFS makes any misrepresentations in securing agreement to the plan; (2) whether agreement to a plan is knowing and voluntary; (3) whether a class member had access to legal counsel or other advice; (4) the circumstances surrounding DCFS' request for agreement, including any time pressure and the state of mind of the class member; and (5) the relative power, authority, knowledge, and sophistication of the parties. (Pl. Mem., at 53-54.) Defendant insists that "knowledge of the right to withhold consent is not a prerequisite to proving that consent to a search was given." (Def. Resp., at 48) (citing *Schneckloth*, 412 U.S. at 227) ("[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.") Defendant also argues that

> under the current DCFS structure, and after administering the CERAP protocol, the "threat" to remove the children unless a safety plan is agreed upon would not be baseless or empty, rather it would be analogous to the Constitutionally permissible

consent search situation in which the police threaten "in good faith" to get a warrant to search.

(*Id.* at 49.)

As noted earlier, the court agrees that there is clearly an element of choice to the safety plan process in that Plaintiffs at all times remain free to reject a plan. Moreover, some families may affirmatively welcome a safety plan.[22] For example, a mother who learns that her spouse may be sexually abusing her child may be relieved that DCFS agrees that her husband should leave the home pending an investigation.[23] Nevertheless, we are faced here with a situation where DCFS investigators threatened to take away Plaintiffs' children if they refused to accept a safety plan, without affording any procedure for contesting that plan or its terms. Plaintiffs claim that the threat is found in the language of the Safety Plan Form itself, which states that "failure to agree to the plan or to carry out the plan may result in a reassessment of my home and possible protective custody and/or referral to the State's Attorney's Office for a court order to remove my children from

---

[22]     Plaintiffs themselves reviewed several cases "in which they thought it likely that the class member's agreement to the plan was not coerced because a class member parent: (1) had agreed with DCFS that the alleged perpetrator class member was likely to be guilty of the alleged abuse; (2) had a concern (independent of any representations by DCFS) as to the merits of the allegations against the alleged perpetrator, regarding the safety of the children in the home if the perpetrator was not subject to restrictive conditions regarding his access to the children; and (3) had already taken the action of removing the perpetrator from the home, prior to and independently of any request an investigator had made as part of a proposed safety plan." (Pl. Mem., at 47 n.22.)

[23]     Plaintiffs insist that this is irrelevant, at least for purposes of substantive due process rights, because "DCFS may not constitutionally effect what would otherwise be an unconstitutional deprivation of one parent's rights simply by gaining the agreement (even the voluntary agreement) to the deprivation by the other parent." (Pl. Mem., at 42) (citing *Stanley v. Illinois*, 405 U.S. 645 (1972) (state denied unwed father equal protection of the law by declaring his children wards of the state upon their mother's death and presuming that he was an unfit parent without first giving him a hearing on the issue); *Wooley v. City of Baton Rouge*, 211 F.3d 913, 923-24 (5th Cir. 2000) ("[w]hen a biological parent com[es] forward to participate in the rearing of [her] child, [her] interest in personal contact with [her] child acquires substantial protection under the due process clause") (internal quotations omitted)). Assuming this is true, as explained earlier, the court concludes that where there is evidence of a safety concern, the state's interest in ensuring the safety of children by imposing a temporary safety plan outweighs a parent's liberty interest in caring for and associating with the child, at least for a brief period.

my home." (Jt. Ex. 5(c), CFS 1441-A; Pl. Mem., at 50-51.) This language may not by itself constitute a threat of actual removal, as it merely notifies Plaintiffs of what "may" or "possibl[y]" will happen should a family choose to reject a plan. Indeed, the same paragraph expressly represents that agreement to a plan is voluntary. (*Id.*) *See also Tullis*, slip. op., at 20 n.4. ("[k]nowing the possible legal consequences of failing to participate in a safety plan [*i.e.*, having your children taken away] does not render involuntary one['s] agreement to participate").

More troubling, however, is the fact that most class member witnesses testified at the hearing that the investigator assigned to their cases did more than just notify them of their options; instead, the investigator affirmatively threatened to take away Plaintiffs' children unless they agreed to a safety plan. When an investigator expressly or implicitly conveys that failure to accept a plan will result in the removal of the children for more than a brief or temporary period of time, it constitutes a threat sufficient to deem the family's agreement coerced, and to implicate due process rights. Significantly, Defendant has not identified a single family that, faced with such an express or implied threat of protective custody, chose to reject the plan.

As for Defendant's suggestion that the threat to remove children from the home is analogous to a police officer's threat to obtain a search warrant, the court is unpersuaded. If a criminal suspect declines to consent to a search, law enforcement officials may well be able to conduct a search in any event without consent, but only after obtaining a warrant from a court. If, however, a family declines to consent to a safety plan, DCFS can take protective custody of their children without first obtaining a court order. The protective custody would then trigger court process and a hearing within 48 hours, but the ability to take the children first and obtain court approval later distinguishes DCFS procedures from those in the criminal context. Moreover, seizure of one's children, even for 48 hours, is arguably more intrusive than searching one's home.

Plaintiffs devote significant attention to arguing that they did not knowingly and intelligently waive their due process rights by signing the safety plans. (Pl. Mem., at 55-62.) The court

53

recognizes that DCFS procedures do not mandate that investigators explain the actual requirements for taking a child into protective custody or the available options for contesting such action. In addition, families faced with the choice between entering a safety plan or losing their children may not be capable of making an informed, rational decision, or seek the advice of an attorney. Nevertheless, the court need not decide whether or to what extent this or the other factors may also figure into the voluntariness assessment. It is sufficient that agreement to the plans at issue here was secured in a coercive manner under the investigator's express or implied threat of protective custody lasting more than a brief or temporary period of time.

### 2.     Process Due

Having determined that safety plans effect a constitutional deprivation when combined with an express or implied threat of protective custody that is more than brief or temporary, the court next considers what process is due to class members who sign such plans. The parties agree that *Mathews v. Eldridge*, 424 U.S. 319 (1976) guides this analysis:

> Our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 334-35.

It is undisputed that Plaintiffs have a "fundamental" liberty interest in familial relations. *Troxel*, 530 U.S. at 65 ("the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court"). It is also undisputed that child safety is an important state interest. *Darryl H.*, 801 F.2d at 902 ("[t]he state has an obligation to prevent loss of life and serious injury to those members of the community to whom it has a very special responsibility, the young"). The relevant inquiry thus turns on the risk

of an erroneous deprivation of Plaintiffs' interest in familial relations under existing DCFS procedures, and the probable value of additional or substitute procedural safeguards. *Mathews*, 424 U.S. at 334-35. On this issue, the balance weighs decidedly in Plaintiffs' favor: DCFS has no procedure whatsoever for families to contest safety plans. Defendant insists that "each circumstance is unique," and that "[t]he case law is clear and the facts are overwhelmingly illustrative of the singularity and distinctiveness of each case." (Def. Resp., at 54.) The fact that individual circumstances are unique does not, however, support the conclusion that no family members are entitled to a procedure to contest safety plans.

To be sure, some cases involving safety plans result in "indicated" reports. Nevertheless, the liberty interest in familial relations is so great that even a small risk of erroneous deprivation must be addressed in some fashion. Indeed, DCFS's own expert, Dr. Mark Testa, agreed that the availability of procedures to contest a safety plan would not alter the effectiveness of the CERAP process. (Tr. 2829-30.) Defense expert Dr. Carl Bell also opined that if DCFS is unable to work out an acceptable safety plan with a family because, for instance, the investigator failed to consider family strengths and mitigating circumstances, "there ought to be – that family should have some sort of a review[,] something in place so that that could be corrected." (Tr. 2021-22.) In the court's view, it would not be difficult for DCFS to develop a simple and inexpensive procedure for Plaintiffs to seek review of safety plans. To the extent DCFS is correct that there is a degree of voluntariness in all of the plans – and some plans are in fact entirely voluntary – there presumably will be no request or need for review in a large proportion of the cases.

Neither party addresses the nature of the procedures required, and the court declines to fashion a remedy unilaterally. Nonetheless, the court offers the following observations. To the extent safety plans serve as less intrusive alternatives to protective custody, it cannot be the case that class members are entitled to equal or greater remedies than those provided under the Abused and Neglected Child Reporting Act and the Juvenile Court Act. Those statutes require a hearing

before a judicial officer within 48 hours of the child's removal from the home, a time frame too restrictive for the safety plan context.[24] In addition, it seems to this court that making families wait an entire month before giving them an opportunity to contest a plan may be excessive. Indeed, the August 2002 amendments (which were not in place during most of the episodes described above) recognize the importance of vigilantly monitoring safety plans by requiring re-review every five days. It is not clear that investigators are complying with this directive, or that any such re-review constitutes a meaningful reconsideration of a plan or its terms. (See, e.g., I.W. case) (Tr. 2989; PX T, at 45373-74) (no evidence that DCFS conducted any five-day reviews of safety plan with a stated duration of "up to 60 days.") In any event, DCFS itself concedes that safety plans are intended to be short-term measures, and that limitation must be considered in determining what constitutes a reasonable time to contest a plan. Finally, though this case addresses only safety plans secured by threat of protective custody, the parties should not overlook the importance of uniformity in the safety plan process, even when a family's agreement to a plan is entirely voluntary.

## III.    Irreparable Harm/Balancing of Harm/Public Interest

Defendant barely addresses the question of irreparable harm, arguing primarily that Plaintiffs are wrong to suggest that the liberty interest in familial relations is "virtually absolute." (Def. Resp., at 54.) In support of this argument, Defendant cites a 1987 case from the Eighth Circuit Court of Appeals, which states that

> parental liberty interest in keeping the family unit intact is not a clearly established right in the context of reasonable suspicion that parents may be abusing their children. If law enforcement personnel who have at least arguable probable cause

---

[24]    Plaintiffs' suggestion, in a footnote, that DCFS should be required to provide a hearing before implementing a safety plan except in exigent circumstances, is not consistent with this opinion. Nor is the court confident that three days is an appropriate length of time within which to conduct a hearing. (Pl. Mem., at 87 n.30) (citing Jordan by Jordan v. Jackson, 15 F.3d 333, 351 (4th Cir. 1994).) The Jordan court merely approved, as an "outer limit," a 65-hour delay between protective custody of a child and a hearing before a judicial officer.

> to believe that adults have been molesting children are not entitled to reasonable belief that the adults may pose a danger to their own children, then the law was (and is) not clearly established on this point.

*Myers v. Morris*, 810 F.2d 1437, 1463 (8th Cir. 1987). The plaintiffs in *Myers* had been charged by the county attorney with criminal sexual activity involving one or more minor children. They alleged, among other things, that the county prosecutor, county sheriff's deputies, and others caused them to suffer loss of liberty and alienation of affection by arresting the plaintiffs without probable cause and then removing minor children from their homes on "police holds" after the arrests. *Id.* at 1444.

The quoted language above appears in the court's discussion of whether the sheriff's deputies were entitled to qualified immunity from suit. The plaintiffs challenged "the summary removal of children before attempts were made to substantiate incriminating statements of other children through normal investigative techniques." *Id.* at 1462. The sheriff's deputies were entitled to qualified immunity on such claims if there was a "legitimate question" as to the legality of summarily separating children from parents who had been accused of criminal acts towards others. *Id.* The court found there was such a legitimate question given that "other children had described abuse by the arrested persons upon their own children." *Id.* at 1463. Thus, the sheriff's deputies were qualifiedly immune from further litigation. *Id.*

The court does not see how *Myers* is instructive in assessing the balance of hardships between the parties. Plaintiffs have presented ample evidence that they suffered emotional and psychological injury as a result of safety plans lasting for more than a brief or temporary period of time. (Pl. Mem., at 62-77.) The court recognizes the importance of the state's interest in protecting children from harm, but concludes that this interest does not outweigh the irreparable harm (1) to individuals whose lives are disrupted by safety plans which require family members to live outside the home or which restrict contact between family members for an indefinite or unstated duration; and (2) to individuals who, under an express or implied threat of protective custody, sign safety

57

plans lasting more than a brief or temporary period of time, but have no available means of contesting those plans.

## IV.    Mandatory or Prohibitory Injunction

Plaintiffs argue that the court should enter an injunction prohibiting DCFS from implementing safety plans that violate their constitutional rights, "not one that imposes or directs defendant to erect a new administrative scheme for putting safety plans into effect, or permitting class members to contest them." (Pl. Mem., at 85) (citing *Association of Community Organizations for Reform Now v. Edgar*, 56 F.3d 791, 798 (7th Cir. 1995)) (affirming injunction requiring state to comply with "motor voter" law, but finding "no occasion for the entry of a complicated decree that treats the state as an outlaw and requires it to do even more than the 'motor voter' law requires"). In Plaintiffs' view, "neither DCFS (nor the state courts, for that matter) need devise or erect any new remedial structures in order to ensure the provision of such protections: the protections are already in the Juvenile Court Act, and class members may avail themselves of these protections in ordinary course." (Pl. Mem., at 86.)  Defendant makes no response to this argument.

The court nevertheless disagrees with Plaintiffs' contention that the appropriate remedy here is simply to enjoin safety plans and mandate compliance with the procedures available under the Juvenile Court Act. The JCA provides for court review only when a child is taken into protective custody, not when DCFS implements a safety plan, and as explained earlier, the court does not believe that all safety plans trigger constitutional concerns as a matter of course.  Nevertheless, Plaintiffs are entitled to some opportunity to review restrictions placed on their contacts with their children.  Further, the court notes its belief that persons subject to safety plans are entitled to immediate notice of the basis on which the investigator has determined such a plan is necessary, as well as notice of the expected duration of such a plan and an explanation of the process and schedule for seeking review of restrictions imposed by the plan.  As for what those procedures

should entail, the court, having found a constitutional violation in this case, now defers to DCFS to fashion an appropriate remedy consistent with this opinion. *See Massey v. Helman*, 35 F. Supp. 2d 1110, 1115 (C.D. Ill. 1999) (citing *Bush v. Lucas*, 462 U.S. 367 (1983)) ("the [Supreme] Court has deferred to the legislature to fashion appropriate remedies for constitutional violations"). The court suggests that in developing these procedures, DCFS consider whether the procedures adopted for child care workers in *Dupuy I* may be altered or enhanced to address the safety plans at issue here. *See Dupuy v. McDonald*, No. 97 C 4199, 2003 WL 21557911 (N.D. Ill. July 10, 2003). DCFS is also invited to explain the degree to which the 2002 amendments may address concerns raised by this opinion.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for a preliminary injunction (Doc. Nos. 488-1, 488-2) is granted in part and denied in part. The court agrees that Plaintiffs are entitled to injunctive relief, but declines to categorically enjoin safety plans. DCFS has sixty (60) days to develop constitutionally adequate procedures consistent with this opinion.

ENTER:

Dated: March 9, 2005

REBECCA R. PALLMEYER
United States District Judge

59