UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BELINDA DUPUY, et al.                    )
                                          )
            Plaintiffs,                   )
                                          )
        v.                                )        No. 97 C 4199
                                          )
BRYAN SAMUELS, DIRECTOR,                  )        Judge Rebecca R. Pallmeyer
ILLINOIS DEPARTMENT OF                    )
CHILDREN & FAMILY SERVICES,               )
                                          )
            Defendant.                    )

## MEMORANDUM OPINION AND ORDER

Plaintiffs, a class of child care workers, won a preliminary injunction on certain due process

claims against the Illinois Department of Children and Family Services ("DCFS"). *See Dupuy v.*

*McDonald,* 141 F. Supp. 2d 1090 (N.D. Ill. 2001) ("*Dupuy I*"), *aff'd in part and rev'd in part, Dupuy*

*v. Samuels,* 397 F.3d 493 (7th Cir. 2005); *Dupuy v. McDonald,* No. 97 C 4199, 2003 WL 21557911,

(N.D. Ill. July 10, 2003) ("July 10 Order") (setting forth terms of the injunctive relief). The Seventh

Circuit largely affirmed this court's decisions but reversed on the issue of whether "career entrants"

should be among those persons entitled to injunctive relief. The Court of Appeals directed this

court, on remand, to develop a workable definition and procedures for career entrants. *See Dupuy v.*

*Samuels,* 397 F.3d at 512.

In this opinion, the court addresses three pending motions: Plaintiffs' Motion for Further

Necessary and Proper Relief, Based Upon *Dupuy I* Declaratory Judgment and Subsequent Relief

Orders ("Further Relief Motion"); Plaintiffs' Motion for Relief Upon Remand, for Related Relief and

for a Single Conference With the Court Pursuant to FED. R. CIV. P. 16 ("Remand Motion"); and

Plaintiffs' Renewed Motion for *Dupuy I* Compliance Relief ("Compliance Motion"). In their Further

Relief Motion, Plaintiffs seek modifications and additions to the injunctive relief ordered in *Dupuy I* and the July 10 Order. In the Remand Motion, Plaintiffs propose terms related to "career entrants" and request certain additional relief. Finally, in the Compliance Motion, Plaintiffs request an order directing DCFS to comply with this court's previous orders in three specific areas. For the reasons explained below, (1) the Further Relief Motion is denied; (2) the Remand Motion is granted in part and denied in part, as the court denies Plaintiffs' demands for further relief but adopts a definition of "career entrants" that draws on the proposals of both parties; and (3) the Compliance Motion is granted in part and denied in part.

## DISCUSSION

### I. Motion for Further Relief

In the Further Relief Motion, Plaintiffs seek four modifications: (1) an order enjoining DCFS from making "indicated" findings against child care employees at the telephonic Administrator's Conference when the investigator has recommended the allegations be unfounded; (2) an order enjoining the enforcement of ILL. ADMIN. CODE tit. 89, Part 336, § 336.110, under which DCFS can stay an expungement (post-deprivation) hearing while criminal or juvenile charges are pending against an indicated perpetrator; (3) an order extending *Dupuy I* expedited injunctive relief to tenured public school teachers; and (4) an order providing for automatic, self-executing expungement of an indicated report concerning any employee whose appeal from that report is not finally decided within 90 days of the employee's notice of appeal, a result Plaintiffs argue is required by the Illinois Supreme Court's decision in *Lyon v. Dept. of Children and Family Servs.*, 209 Ill.2d 264, 807 N.E.2d 423 (2004).

DCFS did not respond initially to the merits of these arguments; rather, DCFS argued that this court was without jurisdiction while *Dupuy I* was pending on appeal. (Defendant's Response to Plaintiffs' Motion for Further Necessary and Proper Relief, Based Upon *Dupuy I* Declaratory Judgment and Subsequent Relief Orders ("Def.'s Relief Response"), at 1-2.) As the case is no longer on appeal, this argument is now moot. Nonetheless, the court is prepared to rule on the Further Relief Motion without requesting a substantive written response from DCFS.

A. **Enjoining Indicated Findings at Administrative Conferences Where the Investigation Recommended a Report be "Unfounded."**

Plaintiffs seek an order enjoining DCFS from indicating findings against child care employees at an Administrator's Conference in cases where the investigator recommended the allegations be unfounded. In support of their argument, Plaintiffs describe a case in which DCFS indicated the owner of a day care center for medical neglect at an Administrator's Conference. (Further Relief Motion, at 4; Exs. 1, 2.) A seven-month-old child at the day care center suffered burns during a bath; after an investigation revealed that it was not the day care operator herself, but her daughter, who was bathing the child, the investigator recommended that the report against the owner be unfounded. (Further Relief Motion, Ex. 1.) Nonetheless, at the Administrator's Conference, DCFS indicated the owner for neglect because of a two-hour delay in obtaining treatment for the burn.[1] (Further Relief Motion, Ex. 2.) Plaintiff argues that this case indicates DCFS's intent to use the

---

[1]     At some point after the Administrator's Conference, the report against the owner was unfounded, and the daughter was indicated instead. (Def.'s Relief Response, at 4.) DCFS does not explain when or why the report was later unfounded. Nor is the court certain of the reasons that the owner sought an Administrator's Conference, when the investigator had recommended that the report be unfounded.

3

Administrator's Conference as an "investigative sword" rather than a "shield" against violations of due process. (Further Relief Motion, at 5.)

At a hearing on May 12, 2005, Plaintiffs indicated that they were no longer seeking an injunction, and that they would rather discuss this issue with DCFS directly. Accordingly, Plaintiffs' request is denied without prejudice. In any event, the court is unwilling to enter the proposed additional injunction based on this limited evidence in a single case. So far as this court is aware, there is no evidence that DCFS routinely indicates subjects at an Administrator's Conference over the contrary recommendations of its investigators. Nor does the court believe that alleged perpetrators will be likely to seek an Administrator's Conference in a case in which the investigator is recommending that no indicated finding be made. Absent evidence to the contrary, the court would not be inclined to grant further injunctive relief on this issue.

**B.    Stay Rule**

Under ILL. ADMIN. CODE tit. 89, § 336.110 (hereinafter "Stay Rule"), DCFS stays an expungement appeal while "a criminal or juvenile court action is pending based on the same facts as the administrative expungement appeal." Plaintiffs argue that the Stay Rule is in direct conflict with this court's order that those child care employees who are entitled to expedited review must have their expungement hearings within 35 days, and with DCFS regulations affording other employees a hearing within 90 days. *See Dupuy v. McDonald*, 2003 WL 21557911, at *9; ILL. ADMIN. CODE tit. 89, § 336.220. (Further Relief Motion, at 6.) Plaintiffs relate the case of F.M., a tenured schoolteacher, who was suspended without pay for three-and-a-half years without an expungement hearing due to the Stay Rule. (Further Relief Motion, at 9.)

4

In support of their position, Plaintiffs point to *Jenkins v. Bowling*, 691 F.2d 1225 (7th Cir. 1982). *Jenkins* was a class action brought against administrators of the Illinois unemployment insurance program, challenging a "held in abeyance" statute that postponed the receipt of any unemployment benefits for persons discharged for committing a felony or theft pending the resolution of legal proceedings arising from the crime. 691 F.2d at 1227. The Court of Appeals noted that federal law required prompt payment of such benefits to eligible recipients, or a prompt hearing if benefits were denied. Thus, denial of immediate benefits triggered the need for a hearing under federal law which the "held in abeyance" rule prevented. *Id.* at 1230. As the Illinois defendants offered no "good reasons" for deferring the hearing, other than the cost savings from relying on the results of a criminal trial hearing, the Seventh Circuit agreed with the district court that the rule was invalid. *Id.* at 1227-28.

Plaintiffs argue that the case against the Stay Rule here is even stronger than against the "held in abeyance" provision in *Jenkins* because the conflicting federal right implicates a constitutionally protected liberty interest, rather than a mere statutory entitlement. (Further Relief Motion, at 8.) Plaintiffs also argue that unlike *Jenkins*, the DCFS expungement hearings are governed by court-ordered time limits; that fewer claimants were affected in *Jenkins* than here; and that unlike child care workers, *Jenkins* claimants could recover damages in the form of retroactive benefits.[2] (*Id.*)

---

[2]    Although it does not affect the court's resolution of this issue, the court notes it is unmoved by Plaintiffs' statistical analysis. Plaintiffs claim that more persons are affected because in *Jenkins*, 39% of the claimants received benefits later, after not being found guilty on their criminal charges, while 74.6% percent of child care employees successfully expunge their indicated findings. All 74.6% were not, however, affected by the Stay Rule; in fact, as the court discusses, Plaintiffs
(continued...)

Plaintiffs' argument is not without merit. The Stay Rule certainly has the potential to deprive a child care worker of his or her due process right to a speedy expungement hearing. Following *Jenkins*, such a deprivation would render the Stay Rule constitutionally problematic. As a practical matter, however, the court cannot envision who, if anyone, would genuinely be adversely affected by the Stay Rule. In *Jenkins*, the entire class of plaintiffs challenged the "held in abeyance" provision; indeed, that issue was the whole point of the litigation. 691 F.2d at 1227. Here, in contrast, Plaintiffs identify only one individual, F.M., as having been harmed by the Stay Rule. DCFS indicated F.M., a public high school teacher, for sexual molestation, and disclosed the indicated finding to the school that employed F.M. on October 13, 2000. (Declaration of [F.M.]; Further Relief Motion, Ex. 6.) On November 1, 2000, the high school's superintendent recommended to the school board that F.M. be suspended; the board suspended F.M. on November 14, 2000 "based on criminal proceedings related to the DCFS allegations." (*Id.*) F.M. "started proceedings on [his] DCFS expungement appeal, but after [he] was charged criminally, the appeal was stayed."[3] (*Id.*) The criminal charges were "nolle prossed" on July 14, 2003, after which F.M. proceeded with his expungement appeal and succeeded in obtaining a decision expunging the report. (*Id.*)

What is missing from this account is any declaration by F.M that he sought or would have benefitted from an expungement hearing while the criminal charges remained pending. Individuals are, of course, free to make their own litigation decisions, but the court suspects that most persons

---

[2](...continued)
identify only one class member affected. Moreover, the court would expect that persons against whom criminal charges are pending (and against when probable cause presumably has been found) would be less likely than other class members to have indicated findings overturned on appeal.

[3]     The record does not identify when the criminal charges were filed.

facing criminal charges would be reluctant to make statements at an administrative proceeding that could be used against them in a criminal prosecution. More significantly, if a litigant elected to proceed and were successful at the expungement hearing, the court believes it is unlikely he would avoid the harm addressed in this litigation. A child care facility that refuses to employ a worker due to an indicated report of sexual molestation is likely to be equally unwilling to employ that individual while he is facing criminal charges.[4] Indeed, F.M. himself avers that his school suspended his employment because of the criminal proceedings, not because of the DCFS indication. (Declaration of F.M.; Further Relief Motion, Ex. 6.)

Assuming that F.M. desired a prompt expungement hearing and would have had one, but for the operation of the Stay Rule, Plaintiffs have not satisfied the court that F.M. is an appropriate representative of a class. First, there is no evidence that any other Plaintiffs have been affected by the Stay Rule in this way, nor even any basis for the assumption that F.M. himself remained unemployed as a result of it. The fact that potentially very few persons would seek to proceed with their expungement hearing while facing criminal charges arguably means that the requested injunction would place no heavy burden on DCFS in providing such a hearing. The court is not prepared, however, to find a provision of state law unconstitutional or order any remedy without evidence that the challenged provision has caused, or will imminently cause, injury to class members.

---

[4]     At oral argument on May 12, 2005, Plaintiffs argued that unlike an indicated report, a criminal charge is not automatically disclosed to an employer; thus, after expungement of an indicated report, an employee might regain employment if the employer remained ignorant of the criminal charges. Again, as a practical matter, this is unlikely. Criminal prosecutions are a matter of public record, and criminal allegations of child abuse are often highly publicized. It is unlikely that an employer would fail to learn of the charges, and Plaintiffs have not offered evidence of any such case.

7

*Cf. Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)

(citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) ("[T]o satisfy Article III's standing

requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and

particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly

traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision.")

Plaintiffs' request that the court enjoin the Stay Rule is denied without prejudice.

## C.    Extending the Expedited Process to Schoolteachers

In the July 10 Order, this court declined to extend the expedited review procedures to

tenured schoolteachers. *See Dupuy v. McDonald*, 2003 WL 21557911, at *2. The court reasoned

that Illinois law already provides due process to such employees in the form of a hearing, conducted

by the teacher's school board, prior to termination. *See* 105 ILL. COMP. STAT. 5/24-12 (describing

the process for pre-termination hearings). The Court of Appeals noted this court's determinations

with respect to teachers, *Dupuy v. Samuels*, 397 F.3d at 501, but did not address the matter, and this

court assumes that Plaintiffs did not raise it specifically on appeal.

Plaintiffs claim now to have discovered that some school districts provide inadequate due

process protection because they do not provide a hearing when a teacher is suspended without pay.

(Further Relief Motion, at 13-14.) Plaintiffs again point to F.M., who was suspended without pay

after an indicated finding, without any due process hearing being conducted by the Evergreen Park

school board. (*Id.* at 13-14.) Plaintiffs also claim that the Chicago Public Schools provide

inadequate due process because teachers are not permitted to call witnesses at a suspension hearing;

that the Indian Prairie School District fails to specify in enough detail what process is due; and that

8

Steger Public Schools do not allow a teacher to subpoena witnesses nor provide for appellate review of a suspension decision. (*Id.* at 14.) Because these districts fail to provide adequate due process protection themselves, Plaintiffs argue, this court should step in and provide the teachers with the same expedited due process relief afforded other child care employees. (*Id.* at 15.)

Once again, however, Plaintiffs have not established a widespread problem that the court should address in this case against DCFS. Plaintiffs have cited a mere handful of school districts that may or may not be in violation of due process requirements.[5] Of these, an order for expedited relief would not even cure the alleged problem. For example, Plaintiff finds fault with Chicago Public Schools and Steger Public Schools for not allowing a teacher to call or subpoena witnesses; however, even those child care employees who are entitled to expedited review under *Dupuy I* cannot call or subpoena witnesses at an Administrator's Conference. *See Dupuy v. McDonald*, 2003 WL 21557911, at *7. Moreover, to the extent these districts fail to provide due process to their employees, or fail to comply with 105 ILL. COMP. STAT. 5/24-12, the appropriate remedial avenue is against these particular school districts. If, for example, Evergreen Park had attempted to avoid the required pre-termination hearing by suspending F.M. indefinitely instead of firing him, then F.M. could have sued the school board. *See, e.g., Ceko v. Martin*, 753 F. Supp. 1418, 1423 (N.D. Ill. 1990) (placement of police dispatcher on involuntary unpaid medical leave constitutes deprivation of protected property interest); *Bauschard v. Martin*, No. 91 C 7839, 1993 WL 79259, at *4 (N.D. Ill. Mar. 16, 1993)

---

[5] At the May 12, 2005 hearing, Plaintiffs claimed to have found a total of seven school districts (one of which was unidentified) that deprive tenured teachers of their due process rights by providing for suspensions without pay and without a review hearing. Upon examining Plaintiffs' submission of the written policies of several districts, the court found that most of these school districts do in fact explicitly provide a review hearing for a teacher who is suspended without pay.

(placement of police officer on involuntary unpaid medical leave constituted deprivation of protected property interest though officer had neither been fired nor resigned); *Dargis v. Sheahan*, No. 02 C 6872, 2005 WL 946909 (N.D. Ill. Mar. 25, 2005). Similarly, if Indian Prairie Schools fail to specify in satisfactory detail what process is due, then the appropriate action is against that school board, not DCFS.

### D.    Automatic Expungement Past 90 Days

Plaintiffs urge the court to order DCFS to expunge any indicated report against an employee whose appeal from that report is not finally decided within 90 days of the employee's notice of appeal. (Further Relief Motion, at 1-2.) In *Dupuy I*, the court expressed its concern about the "inexcusable delays experienced by Plaintiffs in attempting to appeal, and seek expungement of, the indicated findings against them." 141 F. Supp. 2d at 1138. Plaintiffs then proposed an order requiring self-executing expungement after ten months. *See Dupuy v. McDonald*, 2003 WL 21557911, at *9-10. The court declined to impose such a rule, however, in the hope that the injunctive relief, combined with DCFS's own new regulations, would result in most appeals being decided within 90 days. *Id.* at *10. The court added this caveat: "[s]hould history demonstrate a pattern of non-compliance . . . the court will entertain a renewed motion for imposition of some form of self-executing sanction." *Id.* As no mention of this request appears in the Seventh Circuit's opinion, this court presumes Plaintiffs did not raise the matter on appeal.

Plaintiffs have not offered evidence demonstrating such a pattern of non-compliance on the part of DCFS. Rather, Plaintiffs argue that the court should now impose a 90-day self-executing expungement rule as a consequence of the Illinois Supreme Court's recent decision in *Lyon*, 209 Ill.2d 264, 807 N.E.2d 423. In that case, the court ordered DCFS to expunge an indicated report

where DCFS had missed the 90-day deadline for the Director's issuance of a final decision by 27 days. *Lyon*, 209 Ill.2d at 276, 807 N.E.2d at 433. In Plaintiffs' view, *Lyon* establishes that any non-compliance on the part of DCFS with the 90-day rule constitutes a due process violation; hence, automatic expungement of any unreviewed indicated finding after 90 days is appropriate. (Further Relief Motion, at 16-20.)

As this court reads *Lyon*, the Illinois Supreme Court did not find a due process violation only because DCFS missed the deadline by 27 days; rather, it was the delay in the appeal, combined with the fact that the indicated report was based upon a "credible evidence" standard, rather than a preponderance standard, that violated due process. *Lyon*, 209 Ill.2d at 283, 807 N.E.2d at 436 ("[W]e . . . hold that a subject's due process rights are violated by the use of the credible-evidence standard to indicate a report and to resolve a first-stage appeal when combined with delays in the final resolution of the administrative appeal.") Just as this court did, the *Lyon* court found fault with the "credible evidence" standard because it failed to require the consideration of contrary evidence. 209 Ill.2d at 280-81, 807 N.E.2d at 435. This court addressed this issue by directing DCFS to consider both inculpatory and exculpatory evidence before determining whether a charge should be indicated. *See Dupuy v. McDonald*, 2003 WL 21557911, at *4. Given the more stringent evidentiary procedure required by this court's remedial order, one of the two factors that led the *Lyon* court to find a due process violation should be eliminated.

More significantly, *Lyon* does not define the parameters of due process as a matter of federal law. State court interpretations of federal constitutional principles, even those of the state's highest court, do not control construction of those principles by federal courts. *See Pigee v. Israel*, 670 F.2d 690, 694-95 (7th Cir. 1982) (federal court was not bound by the Wisconsin Supreme Court's

11

determination of whether a jury instruction violated due process); *Industrial Consultants, Inc. v. H. S. Equities, Inc.*, 646 F.2d 746, 749 (2d Cir. 1981) ("[T]he district court was not bound to adopt the Oklahoma court's interpretation of federal constitutional principles, even as applied to Oklahoma statutes.") Although state court precedent such as *Lyon* is binding upon this court regarding issues of state law, it is only persuasive authority on matters of federal law such as federal due process. *See RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997).

In considering the question of whether any delay of an expungement hearing in excess of 90 days constitutes a violation of federal due process, the court is not charged with applying Illinois law. The court must determine what is required of DCFS by federal due process, and neither Illinois law nor decisions by Illinois courts controls that determination. Federal due process requires the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). If Illinois wishes to set specific and stringent time limits that go beyond what is minimally required of DCFS, Illinois is of course free to do so. It does not follow, however, that Illinois's determination is then reverse-incorporated into what is required by federal due process. *Lyon* thus does not mandate the imposition of a self-executing expungement rule by this court.

In its 2003 decision, this court concluded that due process does not require a self-executing expungement of an indicated finding after ten months in light of amended DCFS regulations requiring appeal decisions within 90 days. *See Dupuy v. McDonald*, 2003 WL 21557911, at *9-10. Plaintiffs have shown no history of systematic non-compliance with those regulations. In any event, the court presumes that a class member who wishes to seek expungement after 90 days has an available remedy in a state court, which, of course, would be bound by *Lyon*. The court thus denies Plaintiffs' request for an automatic self-expungement rule.

## II.  Remand Motion

As described earlier, in *Dupuy v. Samuels*, the Seventh Circuit directed this court to establish a workable definition of "career entrants" and extend the expedited review procedures to these persons, as well as the remaining class members.  397 F.3d at 512.  In addition to their proposals concerning career entrants, Plaintiffs' Remand Motion seeks certain additional rulings which Plaintiffs characterize as "related" relief, including, again, a request for an extension of expedited relief to tenured public schoolteachers, and in addition, a demand that DCFS cease using the term "credible evidence" as an evidentiary standard. (Remand Motion, at 1-3.) For the reasons discussed above, the court denies Plaintiffs' request that expedited review procedures be extended to tenured school teachers.  Before addressing their "career entrants" proposal, the court will address Plaintiffs' renewed request that the court order DCFS to change its terminology.

### A.  "Credible Evidence" Terminology

At the lengthy hearing on Plaintiffs' initial motion for preliminary injunction, the parties devoted substantial attention to the "credible evidence" standard of proof that DCFS investigators employ at the investigatory stage. (Remand Motion, at 12.)  Plaintiffs have argued that, in practice, such a standard permits DCFS investigators to make indicated findings of abuse or neglect upon a "practically nominal" amount of evidence.  (*Id.*)  Plaintiffs urge the court to require DCFS to abandon the term "credible evidence" in favor of the expression "full consideration," a term they believe would require that exculpatory evidence be given more weight. (*Id.* at 21.) In the July 10 Order, this court acknowledged Plaintiffs' concerns and observed that "the prudent course might well be for DCFS managers to adopt language that emphasizes the full consideration that its new regulations mandate." *See Dupuy v. McDonald*, 2003 WL 21557911, at *4. The court nonetheless

13

declined to order DCFS to strike the language, noting that "substantive changes to the investigation procedures are far more important than terminology." *Id.* To that end, the court directed that DCFS "adopt and maintain a standard that entails consideration of all available evidence, both inculpatory and exculpatory, for its child abuse and neglect investigations." *Id.*

Plaintiffs are correct that the Seventh Circuit decision affirming *Dupuy I* and the July 10 Order acknowledged this court's "unease" with the term "credible evidence." *See Dupuy v. Samuels,* 397 F.3d at 506. The Seventh Circuit noted that this court "would be on solid ground in requiring abolition of the term" if faced with direct evidence that the "credible evidence" standard was resulting in an unconstitutional course of conduct. *Id.* Nonetheless, that court affirmed this court's decision to allow DCFS to continue using the term, noting that it was "appropriate" for this court to refrain from interfering with the State program any more than is necessary to remedy the constitutional violation. *Id.*

This court's views on the matter have not changed. The court continues to believe that a change in the language used by investigators would be wise, but is not constitutionally mandated. What is required is a change in DCFS's investigatory procedures to ensure that investigators consider both exculpatory as well as inculpatory evidence. Since the entry of the court's earlier order, Plaintiffs have offered no direct evidence of systematic constitutional violations as a result of the "credible evidence" standard, and the court is unwilling to revisit this issue in the absence of such evidence. Accordingly, although the court continues to prefer a "full consideration" standard, the court again declines to order DCFS to change its terminology.

14

## B. Definition of "Career Entrants"

In *Dupuy v. Samuels*, the Seventh Circuit instructed this court to "delineate with more precision exactly who ought to qualify as a 'career entrant.'" 397 F.3d at 512 n.12. The Court of Appeals suggested that persons "actively engaged in the job placement process" and those "enrolled in academic programs aimed specifically at a profession dealing with an aspect of child care" should be included in the class of those entitled to relief, but not those with "more remote aspirations." *Id.* In their Remand Motion, Plaintiffs propose that "career entrants" include child care license applicants, persons who intend actively to engage in a search for child care employment, and students enrolled in child care academic programs. (Remand Motion, at 4-5.) At an April 29, 2005 hearing, this court asked both parties to submit a more precise proposed definition of "career entrants." The two most recent proposals are discussed below.

### 1. Defendant's Proposal

Defendant proposes the following definition of "career entrant":

A career entrant is a person actively engaged in the job placement process as a child care worker, a person currently enrolled in an academic program which leads to a position as a child care worker, or a person who has applied for a license required for a child care worker position. A person shall qualify as a "career entrant" only if that person is within 180 days of applying for a position as a child care worker, is enrolled in or is within 180 days of commencing an academic program which leads to a position as a child care worker, or has applied for a license as a child care worker.

A person who is enrolled in or is within 180 days of enrolling in an academic program which leads to certification as a teacher is not a "career entrant."

The person seeking to be treated as a "career entrant" bears the burden of self-identification. A person seeking to be treated as a "career entrant" must show through documentation that she/he is actively engaged in the job placement process, is enrolled in or is within 180 days of beginning an academic program specifically aimed at a profession which leads to a position as a child care worker, or has applied for a license required for a child care worker position.

15

(Def.'s Submission, at 1-2.) Defendant does not define "child care worker" in its proposal, noting that "child care worker" has already been defined by this court, and is defined on the CANTS 8 form used to provide notice of an investigation (CANTS 8 form, Ex. to Defendant's Submission on Remand to the District Court Concerning "Career Entrants" ("CANTS 8"), at 3.)

## 2. Plaintiffs' Proposal

Plaintiffs begin by proposing that "persons who work in positions requiring frequent contact with children who are investigated in their personal capacities, and persons who are career entrants have the right to designate themselves as 'child care employees'," and are thus entitled to *Dupuy I* expedited relief. (Pl.'s Submission, at 12.) Plaintiffs then define "career entrant" as follows:

> A career entrant includes: (1) any person who has sought employment in a position requiring frequent contact with children in the 120 days prior to the date on which notice of an investigation issues; (2) any person who has an application for child care licensure or certification pending at the time notice of an investigation issues, or who has completed training or other requirements for an application for licensure or certification within the 120 days prior to the notice of investigation; (3) any person with a child care degree, license or certification or past experience of full-time frequent child contact employment, or who is a student in a child care education or training program, and who also plans actively to search for a child care position within 120 days after the notice of investigation issues; and (4) any student in a child care education or training program, provided however, that such person shall be afforded an Administrator's Conference regardless of the completion date of the education or training program but shall be provided an expedited appeal only if the education or training program in which the student is enrolled will be completed within 180 days after the notice of investigation issues.

(*Id.*.) Plaintiffs then make two arguments relating to self-identification. First, Plaintiffs propose that the CANTS 8 form (or other notice of investigation) include a post card or tear-off form in which a subject can indicate she is a "career entrant," as defined above. (*Id.*, at 13.) Second, Plaintiffs

16

argue that no further documentation should be required; the subject's statement that she is a "career entrant" should be "taken at face value." (*Id.*, at 14.)[6]

### 3. Analysis

The court prefers Defendant's proposal, with some modification. The court's responsibility, pursuant to the Seventh Circuit's remand instructions, is simply to define who is a "career entrant." Defendant has, for the most part, done so. Plaintiffs, however, propose that all persons in a "position requiring frequent contact with children," *as well as* "career entrants," be included in the class of those entitled to expedited relief. Plaintiffs then include the "position requiring frequent contact with children" language in their definition of "career entrants" who are applying for a job. Thus, instead of merely defining "career entrant," Plaintiffs' language would appear to define, quite expansively, the class of those persons entitled to expedited relief.[7] The court is unwilling to grant such a broad expansion. In addition, the court agrees with Defendant that, as "child care worker" has been previously defined, the more effective approach is to define who aspires to a position as a "child care worker," rather than to attempt to redefine the position itself.

For the same reason, however, the language in Defendant's proposal specifically excluding teachers from being "career entrants" is unnecessary. As the proposal defines "career entrant" as

---

[6]     Plaintiffs have proposed language reflecting these two proposals, to be added to their definition of "career entrants," that the court has not reproduced here due to its length. (Pl.'s Submission, at 14-15.)

[7]     The court can identify a number of positions "requiring frequent contact with children" that cannot fairly be understood as "child care" positions—for example, a sales clerk at a discount toy store; a person who scoops ice cream; the operator of rides at an amusement park. Under Plaintiffs' proposal, each such person would presumably be characterized as a "career entrant," a result that this court believes is inconsistent with the spirit of the Court of Appeals' opinion.

those persons seeking ultimate employment as a "child care worker," the court is unwilling to use the definition of "career entrant" as a vehicle to either include or exclude teachers. Again, the court's task is simply to add "career entrants" to persons who are considered "child care workers," and not to redefine the latter.

Defendant's proposal appears to address Plaintiffs' main concerns, and in fact in several respects goes beyond what Plaintiffs seek. The definition includes anyone who has ever applied for a child care license, without a time limit. It includes anyone who is enrolled in an academic program leading to a position as a child care worker, regardless of how far the student is from completion of the program; in fact, even those who are not yet enrolled in a program, but who will be within 180 days, are covered. Finally, the 180-day time limit proposed by DCFS on those seeking a child care position is longer than the 120-day limit proposed by Plaintiffs. In short, Defendant's more expansive substantive definition of "career entrant" is appropriate and appears to satisfy both parties' concerns.

The remaining differences are procedural. Plaintiffs argue that the point from which any time period is measured must be clear, (Pl.'s Submission, at 3), and that the most logical starting point is the date on which notice of an investigation is issued. (Id., at 6.) For example, for a person seeking employment to qualify as a "career entrant," Plaintiffs would start at the date of notice of investigation and look both backwards 120 days and forward 120 days for employment-seeking activity. (Id., at 12.) Under Defendant's definition, on the other hand, the person must be "within 180 days of applying for a position." Defendant's definition does not identify a starting point, and although it seems to imply looking forward, it could cover past activity as well.

18

The court agrees with Plaintiffs that the date of notice of investigation is the best point from which to measure any time period. The court will thus add "at the time of notice of investigation" to the Defendant's definition, as set forth below. In addition, to clarify whether the 180-day period operates both prospectively and retrospectively, the court will add "has applied or will apply" to the definition regarding those seeking employment. The court will make a similar modification for those planning to begin an academic program.

Turning to the issue of self-identification, the court agrees with Plaintiffs that DCFS should provide persons under investigation with a post card or a tear-off form by which the subject can identify herself as a "career entrant." Notably, the current CANTS 8 form, given to a subject as notice of an investigation, provides information and instructions to a subject who wishes to identify herself as a "child care worker." (CANTS 8 form, Ex. to Defendant's Submission on Remand to the District Court Concerning "Career Entrants", at 3-4.) The court presumes that DCFS will add similar instructions for "career entrants" to the CANTS 8 form, or to its equivalent, and that DCFS will provide an effective process in which both "child care workers" and "career entrants" can indicate their status.

The court agrees with Defendant that a person seeking to be treated as a "career entrant" bears the burden of self-identification. The court agrees with Plaintiffs, however, that such a person need not offer documentation to prove that he/she is a "career entrant" at the time of self-identification. In the vast majority of cases, the subject's status will not be in dispute. If DCFS has reason to believe that a subject is not, in fact, a "career entrant," then DCFS may require the subject to produce documentation to establish that the subject falls within the definition (copies of employment applications, license applications, or proof of academic enrollment, for example). If a

19

self-identified "career entrant" fails to provide any documentation upon request, DCFS may deny the subject's status as a "career entrant." The court expects that DCFS will recognize that the threshold for satisfying "reasonable documentation" is a low one, and that a variety of documents may be sufficient to establish that a subject falls within the definition of "career entrant."

The court thus directs DCFS to adopt the following definition and procedures for adding "career entrants" to the class of persons entitled to *Dupuy I* expedited relief:

> A career entrant is a person actively engaged in the job placement process as a child care worker, a person currently enrolled in an academic program which leads to a position as a child care worker, or a person who has applied for a license required for a child care worker position. A person shall qualify as a career entrant only if, at the time of notice of investigation, that person (1) has applied or will apply, within 180 days, for a position as a child care worker; (2) is enrolled in or will commence, within 180 days, an academic program which leads to a position as a child care worker; or (3) has applied for a license as a child care worker.

> The person seeking to be treated as a career entrant bears the burden of self-identification. DCFS may require, from any person who has identified herself as a career entrant, reasonable documentation showing that she qualifies as a career entrant as defined above. If that person fails to provide reasonable documentation upon request, DCFS may deny that person's status as a career entrant, provided that DCFS issues its denial in writing and states the basis for its decision.

## III.  Plaintiffs' Compliance Motion

In the Compliance Motion, Plaintiffs argue that DCFS has not complied with the terms of the injunctive relief set forth in *Dupuy I* and the July 10 Order.[8]  Plaintiffs' main concern is their contention that DCFS routinely fails to consider both inculpatory and exculpatory evidence when

---

[8]  Plaintiffs filed an initial motion seeking compliance on July 7, 2004. (Plaintiffs' Motion for Dupuy I Compliance and Reporting Relief.) The motion was renewed on September 9, 2004. (Compliance Motion.) The first motion was withdrawn without prejudice pursuant to this court's Minute Order of January 10, 2005. The court has granted numerous motions to supplement the record from both parties, and the parties submitted further evidence at hearings held on April 29, 2005, May 5, 2005, and May 12, 2005.

making an indicated finding. (Plaintiffs' Reply Memorandum in Support of Their Renewed Motion for Compliance Relief ("Pl.'s Reply"), at 2-3.) To address this concern, Plaintiffs seek an order directing DCFS to (1) reinstate the "matrix" form, or an equivalent form, used by DCFS investigators when evaluating evidence in making an indicated finding; (2) promulgate rules and policy directives encompassing the terms of *Dupuy I* relief; and (3) implement "prompt and comprehensive training of DCFS investigate staff" as to the requirements of *Dupuy I* relief, including the training of DCFS attorneys. (Pl.'s Reply, at 1-2.)

Defendant asserts that DCFS has "expended considerable time, resources, and funds in its efforts to comply" with this court's orders. (Defendant's Compliance Submission ("Def.'s Comp. Submission"), at 3.) In support of its position, Defendant submits statistics, which suggest that the class of child care workers affected by *Dupuy I* represent only a small fraction of the total indicated reports made by DCFS from September 2003 to December 2004, (Total Indicated Investigations Compared to Indicated Dupuy Child Care Workers, Ex. I to Def.'s Comp. Submission), and that the 74.6% reversal rate for indicated findings has been "nearly reversed." (Def.'s Comp. Submission, at 3.) In addition, Defendant asserts that 80% of indicated findings were upheld at an Administrator's Conference in 2004, proving that DCFS investigations were "thorough and complete." (*Id.* at 7.)

Plaintiffs take issue with Defendant's use of statistics, calling Defendant's analysis "multiply flawed." (Plaintiff's Response to Defendant's May 12, 2005 Compliance Submission ("Pl.'s Comp. Response"), at 2.) According to Plaintiffs, the reduction in the "reversal rate" is not nearly so dramatic as DCFS suggests, with the real reversal rate now between 48% and 50%. (*Id.*) In any event, Plaintiffs find it "very questionable" that any reduction in the reversal rate, whatever the number, demonstrates DCFS's compliance with this court's orders. (*Id.* at 3.) Nor are Plaintiffs

impressed with Defendant's claim that 80% of indicated findings were upheld at an Administrator's Conference; Plaintiffs maintain that even a low "overturning rate" fails to demonstrate that DCFS investigators adequately consider exculpatory evidence. (*Id.* at 8.)

The correct numbers likely lie somewhere in between Plaintiffs' and Defendant's assertions. The court is unwilling, however, to be drawn into a battle over statistics. While the court appreciates the time and effort involved in both parties' statistical analyses, the statistics are relevant mostly to the extent that they demonstrate the efficacy of *Dupuy I* injunctive relief in redressing the constitutional violation. The issue here, however, is not how well *Dupuy I* is working or not working, but whether DCFS is *complying* with *Dupuy I*. Certainly any reduction in the number of indicated findings that are later overturned—whatever the actual number—suggests that DCFS investigators are indeed considering exculpatory evidence more than they have in the past, and Plaintiffs themselves do not dispute that there has been at least some improvement. As Plaintiffs point out, however, such statistics are not conclusive. Accordingly, while Defendant's statistical argument may be somewhat suggestive of compliance, it will not be a decisive factor in the court's determination. For purposes of this motion, the court limits itself to consideration of whether Plaintiffs' three specific requests for compliance relief are warranted.

## A. "Matrix" investigative form

Before this court issued its July 10 Order, DCFS had developed new draft procedures that directed investigators to list evidence in a "matrix" having two columns, one for recording evidence that abuse or neglect did not occur, and a second for recording evidence in support of a finding of abuse or neglect. *See Dupuy v. McDonald*, 2003 WL 21557911, at *6. While the court did not order the use of such a form, the court noted that the use of a "matrix" was an appropriate step, one that

22

facilitated the consideration of both exculpatory and inculpatory evidence. *Id.* The paper form used by DCFS investigators, called CANTS 35, included a "matrix" which in addition to the two columns described above, directed DCFS investigators to consider "credibility factors" and the "importance" of each piece of evidence listed on the form. (CANTS 35, MJR Ex. 2.)

On December 10, 2002, however, DCFS switched to the Statewide Automated Child Welfare Information System ("SACWIS"), which replaced the paper CANTS 35 forms with a computerized data-entry system.[9] (Defendants' Submission to Clarify Use of the Investigative Summary to Gather Exculpatory and Inculpatory Evidence ("Def.'s I.S. Submission"), at 2.) DCFS maintains that the side-by-side column approach of the matrix form could not be replicated in the SACWIS system. (*Id.*). DCFS thus developed an "Investigative Summary" form in which investigators enter information about alleged acts of abuse or neglect into a series of computer screens. (DCFS Investigation Screens, Ex. III to Def.'s I.S. Submission.) For each specific allegation against each alleged perpetrator, investigators enter evidence into one of two boxes: "List all evidence that suggests an incident occurred" and "List all evidence that suggests an incident did not occur." (*Id.* at 6.) A third box is titled "Rationale." (*Id.*) The screen itself contains no elaboration or instructions concerning the "rationale" box, but Defendant asserts that in that box, investigators are instructed to give reasons for indicating or not indicating the allegation, including assessments of credibility and reliability. (Announcement, Special SACWIS Enhancement, Ex. 1 to Def.'s I.S.

---

[9] According to Defendant, "SACWIS is a federally mandated system which is designed to automate numerous aspects of the child welfare system and provide for enhanced reporting to the federal government." (Def.'s Comp. Submission, at 9.) At the May 5, 2005 hearing, two witnesses, Michael J. Ruzicka and Toni Washington, testified that DCFS was forced to change to SACWIS as the result of a federal mandate. Plaintiff does not dispute that DCFS was required to adopt the SACWIS system.

Submission.) Defendant maintains that this Investigative Summary form is not only equivalent to the old "matrix" form, but a significant improvement. (Def.'s I.S. Submission, at 3.)

Plaintiffs emphasize that they "are not wedded to the particular format the matrix uses . . . as long as the system clearly commands investigators fully to consider all relevant evidence—exculpatory as well as inculpatory—in deciding whether to indicate or recommend indicating a report of child abuse or neglect." (Plaintiffs' Response to Defendant's Submission to Clarify Use of the Investigative Summary to Gather Exculpatory and Inculpatory Evidence ("Pl.'s I.S. Response"), at 3.) Plaintiffs argue, however, that the SACWIS Investigative Summary form is inadequate because it drops the "importance" and "credibility" instructions from the old CANTS 35 form, and because it "does not provide the same visual representation of the evidence as the matrix system provides." (Id.) Plaintiffs suggest that the three boxes in the SACWIS screen contain the following instructions: "List all evidence that suggests that abuse or neglect occurred, and that the alleged perpetrator is responsible for the abuse or neglect," "List all evidence that suggests that abuse or neglect did not occur, or that the alleged perpetrator is not responsible for the abuse or neglect," and "Rationale, including assessment of the evidence for credibility, reliability, and importance." (Id., at 4-5.)

Defendant vigorously defends the SACWIS Investigative Summary form, and objects to any change to the language in the three boxes. First, Defendant maintains that the new form is a marked improvement over the CANTS 35 form because it generates a separate screen for each allegation against a specific perpetrator, thus "preventing a commingling of evidence with various potential perpetrators and multiple allegations." (Def.'s I.S. Submission, at 3.) Second, Defendant argues that changes are unnecessary because DCFS has extensively trained its investigators on how to use the

24

Investigative Summary form. (*Id.* at 4.) Defendant asserts that investigators have been trained to seek out the existence of exculpatory evidence, and to consider credibility factors when filling out the "rationale" box. (Declaration of Michael J. Ruzicka, Ex. II to Def.'s I.S. Submission, ¶¶ 19-20.) Third, Defendant insists that any change to the language in the form would involve expensive changes to the SACWIS program, and would require a massive retraining of investigators. (Def.'s I.S. Submission, at 5.) In short, Defendant objects that Plaintiffs' proposed changes are unjustified and amount to mere "tinkering with words." (*Id.* at 6.)

Both this court and the Court of Appeals have held that the "credible evidence" standard used by DCFS investigators when gathering and evaluating evidence must be understood to require the weighing of both inculpatory and exculpatory evidence. *See Dupuy v. Samuels*, 397 F.3d at 505-06; *Dupuy v. McDonald*, 2003 WL 21557911, at *6-7. The court does not share Plaintiffs' view that the SACWIS Investigative Summary form completely fails to fulfill this requirement. While the form does not include the words "exculpatory" or "inculpatory," the plain English phrases "did occur" and "did not occur" have a similar, and quite possibly clearer, import. Plaintiffs' proposed changes, for the most part, appear to complicate the procedure. For instance, Plaintiffs' proposed language directing investigators to list "all evidence that suggests that abuse or neglect" did or did not occur, invites investigators to immediately evaluate each piece of evidence in light of whether it suggests that an incident rises to the level of "abuse or neglect," rather than simply listing the facts. The current SACWIS form is sounder in that the investigator first lists the evidence, both for and against, as to whether an incident actually occurred; only then does the investigator subjectively evaluate the nature of the incident.

25

One proposed change has merit, however: Plaintiffs' addition of language directing an investigator to list evidence that "the alleged perpetrator is responsible." In many cases brought to the attention of the court since the beginning of this litigation, an incident did indeed occur, but the subject of the investigation is not, in fact, the responsible party. The case of Pearce Konold, described in this court's earlier opinion, furnishes a particularly vivid example. *See Dupuy I*, 141 F. Supp. 2d at 1119-1123. Another illustration is provided in Plaintiffs' Further Relief Motion, where, as noted above, DCFS indicated the owner of a day care center over a child's burns, when in fact the owner's daughter was responsible. (Further Relief Motion, at 4; Ex. 1, Ex. 2 .) In such a situation, an indication against a non-responsible party leads to twin evils: an innocent person is falsely accused, and a possible abuser escapes the system. Neither the state's interest in protecting children, nor a child care worker's liberty interest are served by this outcome.

At oral argument, DCFS maintained that the current SACWIS Investigative Summary form prevented this problem because the name of the subject under investigation appears at the top of the form when the investigator fills it out, and a separate form is generated for each subject. DCFS argues that investigators are thus sufficiently aware that the "incident" for which evidence is listed has to involve that particular subject. The court is not persuaded. The fact that a subject's name is at the top of the form does not, in the court's view, sufficiently tie that particular person to the evidence that an incident occurred. The consequences of the indication of a non-responsible party are serious enough to require some language that calls upon investigators to consider specifically whether the incident under investigation is attributable to the subject.[10]

---

[10] The court is not willing, as DCFS suggested at oral argument, to wait for further evidence that the SACWIS form results in indications of non-responsible persons before ordering this change. Indeed, from the very beginning, the court has expressed its concern over the consequences to children of unjust indications. *See Dupuy I*, 141 F. Supp. 2d at 1131 (emphasizing
(continued...)

Nor is the court convinced that adding a few words to the SACWIS form will involve prohibitive expense and a massive retraining of investigators. Defendant initially represented that any change to the Investigative Summary form would cost $100,000. In the May 5 and May 12 hearings, DCFS's Chief Technology Officer, Toni Washington, testified that even a small change, such as the capitalization of a single character, would cost a minimum of $20,000.[11] Defendant further argues that as the result of a change, "the entire population of investigators will be required to be retrained at considerable expense . . . ." (Def.'s I.S. Submission, at 5.) With respect, the court finds Defendant's representations of both the costs of a change and the need for retraining less than credible. All that is required to satisfy the court's concerns is the following change (in italics) to the language in the second box: "List all evidence that suggests an incident did not occur, *or that the alleged perpetrator is not responsible.*" The court cannot accept that the addition of this simple phrase would be prohibitively expensive; indeed, as Plaintiffs point out, it may well be costing Defendant more in attorney's fees to fight any change to the Investigative Summary form than it would cost to make such a change. Moreover, Defendant admits that the federal government would reimburse DCFS for some portion of the cost. Nor should this change involve such extensive retraining; the court suspects that a memo explaining the change might well be sufficient.[12] In any event, as

---

[10](...continued)
that children suffer the loss of a stable environment when a caregiver is unjustly indicated, and that an actual perpetrator is free to continue working in the child care field).

[11]    Plaintiffs' witness, Edward Korus, although personally unfamiliar with SACWIS, estimated that programming changes to the wording on the computer screens would take no more than a few hours of work.

[12]    If DCFS investigators are qualified to conduct sensitive investigations of allegations of abuse and neglect, they ought also to be sufficiently intelligent as to understand a small change in the SACWIS computer screens without extensive retraining.

discussed below, DCFS is planning a comprehensive training rollout in the near future, which can incorporate any changes to the SACWIS form.

The court thus orders that the second box on the SACWIS Investigative Summary form contain the following instruction: "List all evidence that suggests an incident did not occur, or that the alleged perpetrator is not responsible." No further change to the form is required. The court is confident that with this change, the computerized form will help ensure compliance with this court's directive that DCFS investigators adequately consider all exculpatory evidence when making an indicated finding.

**B.    Rules**

Plaintiffs request that the court order DCFS immediately to promulgate rules and policy directives that embody all the terms of *Dupuy I* relief. At oral argument, Defendant stated that DCFS was waiting for a determination of the "career entrants" issue before issuing such rules, and that upon resolution of that issue, it could submit proposed rules to the Governor's office within 60 days. As discussed above, the court has set forth a definition and procedures for "career entrants." Accordingly, the court orders that DCFS promulgate new rules which encompass all terms of *Dupuy I* injunctive relief, including the July 10 Order and this Order. DCFS shall submit these rules to the Governor's office within 60 days of the date of this Order, and shall provide copies of such rules to Plaintiffs and to the court.

**C.    Training**

Plaintiffs argue that DCFS has not adequately trained its personnel concerning the requirements imposed by this court's rulings. (Pl.'s Reply, at 8-9.) They ask the court to order DCFS to prepare a training program for all investigative staff that explains, among other things, the "more rigorous" evidentiary standard imposed by this court in *Dupuy I* and the July 10 Order. (*Id.*)

28

Plaintiffs ask the court to order Defendant to produce an "actual training schedule," as well as the materials to be used in the training. (Id.) In addition, Plaintiffs ask the court to order attorney training, in light of an instance in which a DCFS attorney exhibited an alarming misunderstanding of this court's orders. (Id. at 2.)

Defendant maintains that extensive training has already occurred. (Def.'s Comp. Submission, at 8-9.) In its submissions, Defendant has identified dates and locations of training sessions for managers and supervisors between January 1, 2004, and June 30, 2004, (id.), and asserts that it has trained 747 investigators statewide as of April 29, 2005. (Statewide Dupuy Investigation Training, Ex. X to Def.'s Comp. Submission.) In addition, Defendant has submitted a training schedule for investigators and training materials, including handouts for trainees and a "trainer's handbook." (Dupuy Investigation Training, Ex. X to Def.'s Comp. Submission.) At oral argument, Defendant asserted that DCFS is planning a more comprehensive training program, but that it is waiting for clarification of the "career entrants" issue before implementing the program.

Plaintiff counters that comprehensive training should have begun months ago, and while the court is pleased to see that DCFS has obviously made a serious effort to train its staff as to the requirements of *Dupuy I* and the July 10 Order, the court shares Plaintiffs' disappointment in the delay. Indeed, according to its own materials, DCFS only began training its investigators on March 15, 2005, nearly two years after the July 10 Order. (Dupuy Investigation training, Total Staff Trained as of 4/29/05, Ex. X to Def.'s Comp. Submission.) Perhaps DCFS was waiting to see whether *Dupuy I* would be overturned on appeal; the investigator training began a month after the Court of Appeals issued its decision. In any event, the "career entrants" issue, the SACWIS form, and several other outstanding issues have been addressed by this Order; there is thus no reason for any further delay in implementation of the comprehensive training program. If the materials relating

to DCFS's recent training effort are an indication, the court is confident that Defendant can provide a similar training schedule and training materials for the comprehensive training that Defendant has promised. Accordingly, the court orders Defendant to submit, within 60 days of the date of this Order, a schedule for comprehensive training and copies of the materials to be used in that training.

The court declines, however, to specifically order attorney training. While the instance related by Plaintiffs is unfortunate, the court is satisfied by Defendant's assertion that the misunderstanding of the attorney in question has been corrected and, absent evidence of further problems, that DCFS attorneys do not require specific additional training as to this court's orders.

## CONCLUSION

For the foregoing reasons, the Further Relief Motion is denied, the Remand Motion (Doc. 640) is granted in part and denied in part, and the Compliance Motion is granted in part and denied in part. As explained above, the court directs Defendant to (1) adopt the definition of "career entrants" set forth above; (2) make changes to the SACWIS computer screens within 60 days; (3) submit proposed rules to the Governor's office within 60 days; and (4) submit a plan for comprehensive training of investigative staff to this court and to Plaintiffs within 60 days, as well as the materials to be used in such training.

ENTER:

Dated: June 9, 2005

REBECCA R. PALLMEYER
United States District Judge