| | | |
|---|---|---|
| **BELINDA DUPUY, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 97 C 4199** |
| | ) | |
| **ERWIN McEWEN, Director, Illinois** | ) | **Judge Rebecca R. Pallmeyer** |
| **Department of Children & Family** | ) | |
| **Services, in his official capacity,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, a class of child care employees, initially filed this action against Defendant, the Director of the Illinois Department of Children and Family Services (DCFS), in 1997. Plaintiffs alleged that DCFS violated their due process rights when it issued "indicated" reports concluding that credible evidence supported allegations charging Plaintiffs with child abuse or neglect. Over the course of the next decade, the case traveled from this court to the Seventh Circuit several times. The substantive litigation having come to an end, Plaintiffs now seek an award of attorneys' fees for time spent on those claims on which they prevailed.

More complete recitations of the facts and procedural history are available elsewhere. *See, e.g.*, *Dupuy v. Samuels*, 141 F. Supp. 2d 1090 (N.D. Ill. 2001). For the purposes of deciding the pending petition for fees, the court focuses on the first of three separate sets of claims that Plaintiffs advanced during the litigation. The initial set of claims ("*Dupuy I*") "challenge[d] the constitutionality of certain DCFS policies and procedures for investigating allegations of child abuse and neglect and for issuing 'indicated' reports." *Id.* at 1092. In 2001, this court issued an opinion finding that certain DCFS policies did deprive Plaintiffs of their constitutional rights. Specifically, the court found that Plaintiffs were deprived of their due process rights by DCFS's failure to consider any exculpatory evidence when indicating a report of abuse or neglect; by failing to provide indicated persons with adequate notice and the opportunity to contest the adverse finding; and by the disclosure of these

procedurally deficient reports to licensing agencies and potential employers. *Id.* at 1134-40. After several months of negotiations between the parties, the court entered a preliminary injunction enforcing the substance of its 2001 opinion by mandating certain changes in DCFS practice. *Dupuy v. McDonald*, No. 97 C 4199, 2003 WL 21557911 (N.D. Ill. July 10, 2003). Both parties appealed that injunction order, but the Seventh Circuit largely affirmed it, extending its reach only by requiring that the amended processes be made available to persons seeking to enter the child-care field, as well. *Dupuy v. Samuels*, 397 F.3d 493, 512 (7th Cir. 2005).

Plaintiffs now seek fees for the *Dupuy I* litigation. Previously, in 2004, this court awarded Plaintiffs interim attorney's fees for their work on *Dupuy I*, but the Seventh Circuit reversed that award on the ground that the claims were not yet finally resolved and Plaintiffs therefore were not "prevailing parties" within the meaning of 42 U.S.C. § 1988. *Dupuy v. Samuels*, 423 F.3d 714, 719 (7th Cir. 2005). In the fee petition now before the court, Plaintiffs initially sought more than $6.1 million in fees and $81,124.51 in costs. After Defendant filed his opposition, Plaintiffs agreed that certain line items were improperly included in their initial petition, and revised their requests downward to $5,892,826.10 in attorney's fees and $65,329.17 in related costs and expenses.[1] Plaintiffs also claim they are entitled to interest on their fee award since the filing of their fee petition in 2007. Defendant objects in large part to these numbers, arguing that Plaintiffs are in fact entitled only to $1,803,590.56 in fees and $12,421.08 for costs and expenses. While the court sustains certain of Defendant's objections, the court nevertheless awards Plaintiffs the majority of the fees they have requested.

---

[1] Specifically, Plaintiffs excluded 177 hours that were spent on *Dupuy II*, a second set of claims in which Plaintiffs were ultimately unsuccessful; 285 hours for clerical work; 102 hours that should have been charged at paralegal rates rather than attorney's rates; and 31 hours of duplicate entries. Plaintiffs also excluded 105 hours from three sets of claims on which this court denied relief; a request for an order enforcing the state court judgment in *Lyon v. DCFS*, 209 Ill. 2d 264, 807 N.E.2d 423 (2004); an issue concerning a DCFS rule on staying appeals; and a claim for additional relief for teachers. These various corrections are reflected in the "Plaintiffs' corrections" line of the Appendix to this opinion.

**DISCUSSION**

I.    **Jurisdiction**

Defendant initially challenges this court's jurisdiction to rule upon Plaintiffs' fee petition.  On March 9, 2007, the court entered an order declaring, "This case is terminated, but the court retains jurisdiction as provided by the parties' stipulation."  (3/9/07 Minute Order [969].)  In support of his argument that jurisdiction is nevertheless lacking, Defendant relies principally upon language in the Seventh Circuit's 2007 opinion affirming this court's dismissal of the *Dupuy II* claims.  *See Dupuy v. McEwen*, 495 F.3d 807 (7th Cir. 2007).  In that opinion, the Seventh Circuit expressed concern that this court was attempting to retain "jurisdiction to enforce the stipulation" despite having dismissed the case with prejudice.  *Id.* at 809.  The Seventh Circuit recognized "that when a suit is dismissed with prejudice, it is gone, and the district court cannot adjudicate disputes arising out of the settlement that led to the dismissal merely by stating that it is retaining jurisdiction."  *Id.*  Defendant argues that in order for this court to reach the fee issue, the court would need to retain jurisdiction over a case it has already dismissed with prejudice, which it cannot do.

Plaintiffs contend that the Seventh Circuit did not clearly hold that the court's retention of jurisdiction in *this* case was improper.  In order to retain jurisdiction over some provision of a settled case while at the same time foreclosing a repeat suit by the plaintiff, the Seventh Circuit suggested an alternative procedure to dismissal with prejudice: "The obvious alternative . . . is for the court to dismiss without prejudice but the parties to include in the settlement a release of the defendant."  *Id.* at 810 (citing *Shapo v. Engle*, 463 F.3d 641, 646 (7th Cir. 2006)).  The Seventh Circuit noted that such a procedure was in fact followed in this case, as the stipulation approved by the court contained a release of the Defendant, "making dismissal with prejudice redundant."  *Dupuy*, 495 F.3d at 810.  Plaintiffs argue that this statement by the Seventh Circuit, that dismissal with prejudice was redundant since the stipulation released from liability for future claims, "meant that this court retained jurisdiction to enforce the Stipulation."  (Pl.'s Protective Mot. [985] at 5-6.)

3

Should the court disagree with this analysis, Plaintiffs have also moved to amend the March 9, 2007 order pursuant to Rule 60(b) to clear up any ambiguity in that order. The Rule permits a court to

> relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; . . . (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable . . . .

FED. R. CIV. P. 60(b). Generally speaking, "relief from a judgment under Rule 60(b) is an extraordinary remedy and is granted only in exceptional circumstances." *Bakery Mach. & Fabrication, Inc. v. Traditional Baking, Inc.*, 570 F.3d 845, 848 (7th Cir. 2009) (citing *Reinsurance Co. of America, Inc. v. Administratia Asiqurarilor de Stat*, 902 F.2d 1275, 1277 (7th Cir. 1990)). In their reply brief, Plaintiffs also argue that they may be entitled to relief under Rule 60(a). That Rule permits the court to correct "a mistake arising from oversight or omission whenever one is found in a judgment [or] order."[2] FED. R. CIV. P. 60(a). This provision is similar to Rule 60(b)(1); as the Seventh Circuit has noted, "[t]here is some overlap between Rule 60(a) and Rule 60(b)(1) for correcting errors . . . of oversight . . . ." *Smith v. Peters*, No. 89-3180, 1991 WL 100822, at *2 (7th Cir. June 10, 1991). "If the flaw lies in the translation of the original meaning to the judgment, then Rule 60(a) allows a correction; if the judgment captures the original meaning but is infected by error, then the parties must seek another source of authority to correct the mistake." *United States v. Griffin*, 782 F.2d 1393, 1396-97 (7th Cir. 1986).

The parties' dispute essentially comes down to this: does the "dismissal with prejudice" trump the court's purported retention of jurisdiction, or does the court's retention of jurisdiction demonstrate that the case was not actually dismissed with prejudice? Given the understanding of

---

[2]     That this argument was raised in the reply brief—meaning Defendant was unable to respond to the argument—does not concern the court in these circumstances, as Rule 60(a) permits the court to grant relief "on its own, with or without notice." FED. R. CIV. P. 60(a).

the parties as well as the court at the time the March 9 order was entered, the court concludes the latter interpretation must be correct. The March 9 order stated that "the court retains jurisdiction as provided by the parties' stipulation." The Stipulation, in turn, expressly preserves Plaintiffs' right to seek fees for *Dupuy I* in this court, and preserves Defendant's right to "contest the extent to which plaintiffs have prevailed and the amount and reasonableness of the attorneys' fees, expenses and costs." (Stipulation ¶ 18.) Other provisions of the Stipulation also contemplate that the court would retain jurisdiction to enforce the terms of the Stipulation. For example, Paragraph 15 of the Stipulation states: "The Court will retain jurisdiction to enforce plaintiffs' right to have in place such Rules, Procedures, notices and other written policies . . . ." The parties appeared to share the court's expectation, expressed in the March 9 order, that the court would retain jurisdiction after the termination of the litigation; specifically, the Stipulation states that, "except as provided in ¶ 15 below, all *DuPuy I* and *III* claims of the plaintiffs shall be dismissed with prejudice." (*Id.* ¶ 14.) The Seventh Circuit found the language of dismissal with prejudice incongruous with retention of jurisdiction, and suggested that one had to give. The language quoted from the Stipulation satisfies the court that the parties intended that the court would retain jurisdiction even after it approved the settlement. As the Seventh Circuit made clear, the parties, as well as this court, imprecisely used the phrase "dismissal with prejudice," particularly as that phrase was "redundant" with the Stipulation's release of Plaintiffs' claims against the Defendant. *See Brandon v. Chicago Bd. of Educ.*, 143 F.3d 293, 295 (7th Cir. 1998) ("Rule 60(b)(1) applies to errors by judicial officers as well as parties." (citing *Wesco Prods. Co. v. Alloy Auto. Co.*, 880 F.2d 981, 984-85 (7th Cir. 1989))).

The court therefore declines to enforce the "dismissal with prejudice" language from the March 9 order at the expense of the language recognizing the court's limited retention of jurisdiction over the Stipulation. Dismissing the case with prejudice and refusing to exercise jurisdiction over the settlement would produce an overly formalistic result that needlessly upsets the parties' settled

expectations at the time they entered into the Stipulation. Both the court and the parties believed then that the court could both dismiss the case with prejudice and retain jurisdiction as outlined in the Stipulation, a belief the court acknowledges has been characterized as "troublesome." *Dupuy*, 495 F.3d at 809. Indeed, the court's oversight authority to monitor compliance with the Stipulation was likely essential to the agreement. Accordingly, both because the court's dismissal with prejudice was redundant of the general release contained in the Stipulation and because a contrary interpretation would disrupt the parties' settled expectations, the court concludes that failing to retain jurisdiction would be inequitable. *Cf. Haagen-Dazs Co., Inc. v. Marina Ice Cream Co., Inc.*, 935 F.2d 542, 543 (2d Cir. 1991) (per curiam) (granting a Rule 60(b) motion because a "consent judgment should reflect the understanding of both parties [but in this case] the final judgment issued by the district court does not reflect" the agreement).

Defendant's objections are unpersuasive. Defendant initially objected to Plaintiffs' Rule 60(b) motion on the ground that the issue was only of hypothetical importance and therefore not ripe for review. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). This argument no longer applies; Defendant has raised the jurisdictional issue as a defense to the fee petition, placing the question squarely before the court. Defendant also claims that Plaintiff improperly disclosed confidential information from settlement discussions in its Rule 60(b) motion, but as the court now decides this question on the basis of the parties' expectations reflected in a publicly-filed document without reference to the confidential materials, this objection, too, is moot; any impropriety on Plaintiffs' part is simply irrelevant to determining whether Rule 60 relief is appropriate.

Finally, Defendant argues that this matter is not appropriate for Rule 60(b), both because it is not an extraordinary circumstance and because the Seventh Circuit foreclosed the possibility of relief. As to the first objection, the court determines that Rule 60(a), which does not require a finding of extraordinary circumstances, is the proper vehicle by which to amend the March 9 order, because "the flaw lies in the translation of the original meaning to the judgment." *Griffin*, 782 F.2d

at 1396-97. This case is analogous to *Blue Cross & Blue Shield Ass'n v. American Express Co.*, 225 F.R.D. 230 (N.D. Ill. 2004). In that case, the district court entered an order similar to this court's March 9 order, which stated both that it was retaining jurisdiction to enforce the settlement and that it was dismissing the claims with prejudice. *Id.* at 231. The plaintiff in *Blue Cross* "simply want[ed] to fix the dismissal order so that it provides what both parties and the Court intended at the time: retention by this Court of jurisdiction to enforce the settlement agreement." *Id.* at 233. The court concluded that amendment pursuant to Rule 60(a) was appropriate because the change sought did not alter the original meaning of the order, but rather "implement[ed] the result intended by the court at the time the order was entered." *Id.* (citing *Kokomo Tube Co. v. Dayton Equipment Servs. Co.*, 123 F.3d 616, 623 (7th Cir. 1997)). Here, too, Plaintiffs' proposed change to the March 9 order better implements the aims of both the parties and the court at the time the order was entered. Contrary to Defendant's second argument, the Seventh Circuit did not foreclose this avenue of relief in its earlier opinion, as it nowhere stated that the court no longer possessed jurisdiction over the case; rather, the appellate court sought to "provide helpful guidance" to this court by noting its concern about the March 9 order, "which purports to retain jurisdiction of a terminated case." *Dupuy*, 495 F.3d at 809.

The court therefore amends the March 9, 2007 order pursuant to Rule 60(a). The March 9, 2007 order is amended to read as follows:

> Motion To Vacate February 26 Dismissal Order (967) is granted. With the final resolution of the three sets of claims asserted in this case (referred to as *Dupuy I*, *Dupuy II*, and *Dupuy III*), a final judgment in the case is hereby entered, and all pending motions are dismissed as moot. This court retains jurisdiction over this case as set forth in the parties' Stipulation (providing for the Stipulation's enforcement), under which Stipulation the *Dupuy I/III* claims of the unnamed class members have been dismissed without prejudice and there has been a release of *Dupuy I/III* claims by the named plaintiffs. The "without prejudice" language in the Stipulation does not permit the parties to reopen issues resolved by the judgment.

With this revision, the court clearly possesses jurisdiction to resolve the present fee dispute, as contemplated by the Stipulation itself, and now by the language of the March 9, 2007 order.

## II. Attorney's Fees

42 U.S.C. § 1988(b) permits courts to award "a reasonable attorney's fee" to the "prevailing party" in a § 1983 action. "Initially, the court must determine the 'lodestar' amount by multiplying the reasonable number of hours expended by a reasonable hourly rate." *Spellan v. Bd. of Educ. for Dist. 111*, 59 F.3d 642, 645 (7th Cir. 1995); *see also Hensley v. Eckerhart*, 461 U.S. 424 (1983). "Once that figure is determined, the court may consider other factors set out in *Hensley*," including whether plaintiffs' fee should be reduced because they were unsuccessful on some of their claims. *Estate of Enoch ex rel. Enoch v. Tienor*, 570 F.3d 821, 823 (7th Cir. 2009). The court cannot, however, "simply 'eyeball the fee request and cut it down by an arbitrary percentage because it seem[s] excessive to the court.'" *Small v. Richard Wolf Med. Instruments Corp.*, 264 F.3d 702, 708 (7th Cir. 2001) (quoting *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 90 F.3d 1307, 1314 (7th Cir. 1996)). Defendant disputes the reasonableness of both the number of hours claimed by Plaintiffs and the rate Plaintiffs charged. As the parties submitting the petition, Plaintiffs have "the burden of justifying the fees requested." *Spellan*, 59 F.3d at 646. The court considers Defendant's various objections to the rate and hours before arriving at a lodestar figure, then considers Defendant's other arguments for reducing the lodestar.

### A. Reasonable Hourly Rate

Defendant first argues that the hourly rates claimed by Plaintiff are unreasonable. To determine the hourly rate for attorney's fees under § 1988, the court considers "the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). The rate at which an attorney actually bills paying clients for similar work is "presumptively appropriate" for calculating the market rate. *Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003) (citing *Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399, 407 (7th Cir. 1999)). The vast majority of the hours spent on *Dupuy I* were spent by the named principals of Lehrer and Redleaf, Robert E. Lehrer (Harvard Law School, 1970) and Diane L. Redleaf (Stanford Law School, 1979). Their 2007 rates, the year in

which this petition was originally filed, were $460 and $415, respectively.  Other attorneys who worked on the case billed their time at rates that ranged from $275/hour to $520/hour; recent law graduates at $230/hour; law clerks at $130-$145/hour; and paralegals and interns between $85/hour and $175/hour.

Plaintiff offers various bases of support for these rates.  First, Plaintiff submitted five declarations from practicing attorneys in Chicago, stating the compensation rates prevailing at their various firms.

- Robert D. Allison, a 1974 Northwestern Law graduate who specializes in complex federal litigation, billed his hours at $475 in 2006; $415 in 2003; and $310 in 1998. Courts have accepted these rates when approving settlements in which Mr. Allison received attorney's fees for his work. (Ex. 2 to Pl.'s Pet.)

- Fay Clayton, a 1978 Chicago-Kent law school graduate, is a litigation partner with Robinson Curley & Clayton, P.C., specializing in complex federal litigation.  Clayton analyzed Lehrer & Redleaf's rates and stated that those rates were "substantially the same as or lower than the rates charged by my firm for work by attorneys of comparable skill and experience," and are comparable to the rates charged "in the Chicago legal community generally."  (Ex. 4 to Pl.'s Pet.)

- Judson H. Miner, a 1967 University of Chicago Law School graduate who concentrates in federal civil rights litigation, also found Lehrer & Redleaf's rates to be "reasonable and well within the range of normal hourly rates charged by attorneys of comparable ability and experience."  (Ex. 5 to Pl.'s Pet.)

- Roger Pascal, a 1965 Harvard Law School graduate who practices in complex and multiparty litigation in Chicago, considered Lehrer & Redleaf's rates "eminently

reasonable" and "well within the range of current hourly rates charged for attorneys, paralegals, and law clerks."[3]  (Ex. 3 to Pl.'s Pet.)

- Robert L. Graham, a 1972 Harvard Law School graduate engaged in a federal litigation practice with Jenner & Block, also testified that fees charged by the attorneys, paralegals, and clerks in this matter were "well within or below the range of current billing rates of legal professionals."  (Ex. 7 to Pl.'s Pet.)

In response to this evidence, Defendant submitted just one affidavit that directly addressed the reasonableness of the rates.  Howard Swibel, a 1975 Harvard Law School alumnus and partner at Arnstein & Lehr LLP with a practice in both transactional law and complex litigation, asserts that the 2007 rates claimed by Plaintiffs are unreasonably high. Furthermore, he notes, in the years between 2005 and 2007, reasonable attorney's fees in civil rights cases rose substantially, suggesting that awarding Plaintiffs attorneys fees at 2007 rates for their work in 2005 and earlier would result in a windfall for Plaintiffs.  (Ex. 3 to Def.'s Resp. ¶¶ 22-23.)  Mr. Swibel did not provide any evidence of rates paid for his own work or that of other attorneys for similar matters.

Plaintiff next points to several cases in which Lehrer and Redleaf were compensated at similar rates.  (Pl.'s.' Ex. 15.)  In *Terry v. Richardson*, No. 97-1196 (C.D. Ill. Mar. 12, 2002), Lehrer was awarded fees at a $325/hour rate for 2000-2001, and Redleaf was awarded fees at a rate of $310/hour.  In *Norman v. McDonald*, No. 89 C 1624 (N.D. Ill. Apr. 13, 2000), the court approved a settlement agreement wherein the DCFS director agreed to compensate Lehrer at $310/hour for her work in 1999 and 2000.[4]  Defendant objects to Plaintiffs' failure to produce evidence that

---

[3]     Clayton, Pascal, and Miner all submitted affidavits along with the 2003 petition for interim fees stating that Plaintiffs' requested rates were reasonable.  They all submitted new affidavits with this petition, reaching the same conclusion regarding the reasonableness of Plaintiffs' 2007 rates.

[4]     Plaintiffs also cite *Bogard v. Adams*, No. 88 C 2414 (N.D. Ill. Aug. 22, 2003), in which they claim that Robert Lehrer was awarded fees at a rate of $375/hour for 2000 through 2003 and
(continued...)

counsel in fact charged the rates they claimed to have charged in 2007. The court agrees that actual paid bills from 2007 would have provided useful support for Plaintiffs' attorneys' claimed hourly rates, but the failure to include such bills is not fatal; indeed, given the public interest nature of Plaintiffs' counsel's practice, such bills may simply not exist. *See People Who Care*, 90 F.3d at 1310. In any event, Plaintiffs have provided ample evidence that the listed rates are comparable to those "charged by lawyers in the community of 'reasonably comparable skill, experience, and reputation.'" *Id.* (quoting *Blum*, 465 U.S. at 895 n.11).

Defendant next challenges Plaintiffs' right to recover fees at 2007 rates for any of their time. The *Dupuy I* matter was more or less resolved in 2005, when the Seventh Circuit affirmed entry of the injunction in that phase of the case. *Dupuy*, 397 F.3d 393. Defendant acknowledges that in some instances, use of current billing rates, rather than historical billing rates, is an appropriate method of ameliorating the delay in payment until the end of the litigation, *see, e.g.*, *Lightfoot v. Walker*, 826 F.2d 516, 523 (7th Cir. 1987), but argues that such an approach is inappropriate here because the delay in recovery of the fees in this case is the result of Plaintiffs' pursuit of unsuccessful claims from 2005 through 2007.[5] The "blame" for the lengthy duration of this litigation, however, has little relevance for determining the appropriate rate. Defendant does not cite any case for the proposition that a plaintiff's unsuccessful pursuit of nonfrivolous issues bars the plaintiff from recovery of current market rates for her fee award.

While Defendant is correct that the vast majority of work on *Dupuy I* was finished in 2005, it does not follow that Plaintiffs must be limited to recovery at 2005 rates. To "compensat[e] for the

---

[4]   (...continued)
Diane Redleaf was awarded fees for $350/hour for the same period. While the opinion from that case attached in Exhibit 15 does award Lehrer and Redleaf fees, their rates are not disclosed.

[5]   Plaintiffs observe that another reason for the delay is Defendant's appeal of the interim fee award granted by this court. That appeal did indeed delay the resolution of this issue, but the court is reluctant to fault Defendant for an appeal on which they prevailed; the Seventh Circuit vacated the interim award. *See Dupuy*, 423 F.3d at 714.

delay in payment of attorney's fees" between the end of the litigation and the present, the Seventh Circuit has authorized two methods: either applying current market rates for the attorney's work, or applying the rates that prevailed at the time the services were rendered and adding interest on that amount to the present. *Smith v. Village of Maywood*, 17 F.3d 219, 221 (7th Cir. 1994). "A court may elect to use either of these two methods—current rates or past rates with interest—as acceptable compensation for the delay in payment of fees." *Id.* Defendant argues that the fee award must be based on counsel's 2005 rates, but does not appear to recognize that interest should then be added. Based on the court's own calculations, applying Plaintiffs' 2003 rates (the court has no information on Plaintiffs' 2005 rates) and adding interest from 2003 to the present (compounded annually) results in a higher total award to Plaintiffs than using the 2007 rates with interest only for 2008 and part of 2009. Accordingly, as Plaintiffs seek 2007 rates (plus interest for the last 19 months), and as those rates are actually in Defendant's best interest, the court will apply the 2007 rates for the attorneys involved in the matter, plus interest for 2008 and part of 2009. *See Lightfoot*, 826 F.2d at 523 (the point of using the current rate is to "approximate the value today of the historic rates charged at the time when the legal services actually were rendered" (citing *Murray v. Weinberger*, 741 F.2d 1423, 1433 (D.C. Cir. 1984))).

Two years have passed since Plaintiffs initially moved for fees, and Plaintiffs seek interest on their fee award to account for the passage of time. The court rejects Defendant's argument that no interest should be awarded—for the same reasons discussed above, the time value of money dictates that a 2009 award based strictly on 2007 rates would undercompensate Plaintiffs. *See In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 571 (7th Cir. 1992) (when the court uses current rates, it "must be sure to make some provision for the interval between the 'current' period and the date the lawyers actually receive their money"). Although 28 U.S.C. § 1961 sets a rate for postjudgment interest, the court turns to federal common law to determine the appropriate rate to apply for prejudgment interest. *Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.*, 874 F.2d

431, 437 (7th Cir. 1989). Plaintiffs contend that the court should use the prime rate, which is the rate banks generally charge to their most creditworthy customers.[6] The Seventh Circuit has endorsed the use of this rate as a "reasonable although rough estimate of the interest rate necessary to compensate plaintiffs not only for the loss of the use of their money but also for the risk of default." *Id.* at 436. Accordingly, this court will award interest on Plaintiffs' fee award at the annual average of the prime rate, compounded annually, for 2008 and seven months and thirteen days in 2009. *Id.* at 1116 (endorsing compounding of prejudgment interest).

## B. Reasonable Hours Expended

District courts "should exclude from this initial fee calculation hours that were not 'reasonably expended.'" *Hensley*, 461 U.S. at 434. Defendants' objections to the amount of hours claimed by Plaintiffs fall into two categories: that the case was frequently overstaffed by experienced attorneys, making their expenditure of time on the matter unreasonable, and that several categories of fees for which Plaintiffs seek compensation are non-compensable.

### 1. Excessive Time

In reviewing Plaintiffs' counsel's time sheets, DCFS argues that Plaintiffs billed for excessive time in 18 separate categories. Defendant argues that a percentage reduction from each of these categories of fees is appropriate, based on some combination of excessive time and limited success on the merits. Defendant offers virtually no argument as to why a particular percentage, ranging from 20% to 75% for various categories of fees, is justified rather than another. The Seventh Circuit has expressly disapproved of such "eyeballing," however. *See Heiar v. Crawford County*, 746 F.2d 1190, 1204 (7th Cir. 1984) (a "judge must do more than eyeball the request and if it seems excessive cut it down by an arbitrary percentage").

---

[6] One could argue (although Defendant does not) that the risk of default is lower when the defendant is a government entity, but the Seventh Circuit has upheld use of the prime rate against a municipality. *See Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir. 1998).

Many of Defendant's objections are unspecific. He argues particular numbers of hours spent on a particular matter are excessive without any specific evidence to support that assertion—not even, for example, a comparison of the time Defendant's attorneys spent on the same issues. In addition, the court notes that Defendant has included in his objections to certain categories of information many line items that are unrelated (or loosely related) to those categories; for instance, the category Defendant labeled "Complaint" includes entries for work on both the original and amended complaints, as well as more tangential matters such as "Research for Brief on Standing" and "Cite check on Mo[tion] to Dismiss Response," as well as communications with individual clients (Def.'s Ex. 8 at 1.) Defendant's brief states that over 800 hours were spent on the complaint, which does appear to be excessive at first. But when reviewing all the separate matters Defendant has included in this category, the court is unpersuaded that 800 hours was an excessive amount of time to spend on the various incarnations of the complaint *along with* the several other motions and responses that somehow or other concerned the complaint.[7] The court has reviewed all of Defendants' objections, but is satisfied, as explained below, that Plaintiffs in fact devoted the time claimed to this work, and that the expenditure of time was generally reasonable.

The main theme underlying most of Defendant's excessive-time objections is that Plaintiffs "overstaffed" the matter and had multiple attorneys duplicating one another's work. *See Copeland v. Marshall*, 641 F.2d 880, 902-03 (D.C. Cir. 1980) (disallowing fees for "duplicative" efforts of attorneys). "Though efficiency can sometimes be increased through collaboration . . . overstaffing cases inefficiently is common, and district courts are therefore encouraged to scrutinize fee petitions for duplicative billing when multiple lawyers seek fees." *Schlacher v. Law Offices of Phillip J. Rotche & Assocs., P.C.*, No. 08-4267, --- F.3d ---, ---, 2009 WL 2357017, at *5 (7th Cir. Aug. 3, 2009) (internal citation omitted). Both parties have submitted affidavits from civil rights

---

[7]       A deduction for other reasons based on time spent on the Complaint is detailed *infra.*

practitioners in Chicago contending that the amount of staffing either was or was not excessive. For several reasons, the court finds Plaintiffs' affidavits more persuasive. In addition to Defendant's failure to provide any rational basis for the percentage reductions he calls for, the court finds that Defendant has generally understated the complexity of this lawsuit. That complexity is reflected in the numerous orders and reported decisions issued by this court and the Seventh Circuit over the last decade. A large amount of senior attorney time was required to shepherd this civil rights action through its complicated course. Reviewing many of the individual time record entries, the court finds that although several attorneys devoted time to the same issue, it is generally clear that they were not duplicating work. Often, one attorney was obviously the draftsman of a court filing, and the other the primary editor—for example, while Gilbert, Lehrer, and Redleaf spent a combined total of approximately 88 hours working on relief after the remand from the Seventh Circuit, the records show that Redleaf was the principal author of the remand relief motion, with Gilbert and Lehrer providing editing. (*See* Def.'s Ex. 18.) The court thus finds the majority of Defendant's objections to duplicated effort unavailing.

Nor is the court persuaded by a related objection: that too many experienced attorneys worked on matters that could have been handled by more junior attorneys. Out of the approximately 15,970 hours Plaintiffs have presented as billable hours in this matter (including paralegal work), over 80% of those hours were performed by attorneys who graduated law school in 1991 or earlier and who charged a minimum of $360. This number becomes somewhat less remarkable, however, when one recognizes that Lehrer and Redleaf alone accounted for approximately 60% of the total hours billed on the matter. The remaining 40% of the hours is equally split between senior attorneys on the one hand, and more junior attorneys and paralegals on the other. While having the two named partners of a firm conduct the majority of work on a case may not always be the ideal allocation of labor, the court concludes that in this case it was permissible. This was a procedurally complicated civil rights class action that needed expert

15

guidance from the outset, from meeting with clients and notifying the class, to numerous substantive hearings, a trial, and an appeal. In the court's view, there was some advantage to having two experienced practitioners working on the case throughout. The court is further satisfied that Plaintiffs are not abusively seeking excessive fees because after Lehrer and Redleaf, only one attorney billed more time than Daniel Romero, a paralegal who billed nearly 1000 hours on *Dupuy I*. Having a paralegal perform a substantial amount of the work on the case rather than a junior attorney who could bill at a higher rate suggests that Plaintiffs were not simply running up the tab, but were in fact staffing the case in a reasonably efficient manner.

Claims of overstaffing in a couple of specific instances do ring true, however. First, Defendant contends that Plaintiffs sent more attorneys than were necessary to a number of court appearances. Specifically, Defendant found that Plaintiffs billed 361 hours for court appearances with more than one attorney present. Defendant proposes reducing Plaintiffs' fee award for these appearances by half, from $152,630 to $76,315. Plaintiffs respond that the case was a complicated one that generated a number of hearings in which argument was required. In addition, Plaintiffs point out that DCFS also often appeared in court with numerous attorneys. The court agrees with Plaintiffs that the mere presence of several attorneys in court is not necessarily problematic, and that having a number of attorneys in court to handle a complicated civil rights matter such as this one may be an appropriate expenditure of resources.

The fact that many lawyers are sometimes needed does not mean many lawyers are always needed, however. The court noted throughout the decade of litigation in this case that several attorneys would frequently appear in court for ordinary status conferences, often dealing with mundane issues such as scheduling. This practice seemed wasteful to the court at the time, and it seems wasteful now. *See Hensley*, 461 U.S. at 434 ("The district court also should exclude from this initial fee calculation hours that were not 'reasonably expended.'") The court has reviewed Plaintiffs' time records and found that approximately 60 hours were billed by attorneys for status

conferences (as designated by the docket report) at which three or more attorneys appeared on Plaintiffs' behalf, at a total of $25,040. Reducing this number by one-third would produce a more reasonable number, based on an average of slightly more than two attorneys per status conference (which allows for the chance that one or two status conferences really did require three attorneys). Accordingly, the court will deduct $8,350 from Plaintiffs' fee award for excessive staffing at status conferences.

Similarly, Defendant points to six occasions when Plaintiffs had five senior attorneys in the courtroom, all of whom billed for their time. The court notes that Defendant was also well-represented by counsel at these hearings, many of which were settlement conferences. Nonetheless, that number of senior attorneys strikes the court as unreasonable, even allowing for the fact that the case was a class action and Plaintiffs' counsel were, as a practical matter, called upon to make a number of decisions on their own. All told, Plaintiffs' attorneys billed $37,639 for these six court appearances at which five attorneys appeared. The court concludes that somewhere between three or four attorneys would have been sufficient, and therefore deducts 30% of that total, or $11,292, from the total award. Defendant also objects to the fees requested for occasions in which four attorneys appeared in the courtroom, but other than for routine status conferences—for which the court has already accounted—most of these times were for trial or for the preliminary injunction hearings, and the court finds the presence of four attorneys at these matters was not unreasonable.

### 2. Non-compensable Activities

#### a. Public Relations

Defendant identified 108.21 hours, totaling $37,048.95 worth of fees, as time spent by Plaintiffs' attorneys on media and legislative efforts. Generally, attorney's fees are awarded only for time spent on the litigation itself. *See Webb v. Bd. of Educ. of Dyer County*, 471 U.S. 234, 242 (1985); *see also Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 176 (4th Cir. 1994) ("The

legitimate goals of litigation are almost always attained in the courtroom, not in the media."). Plaintiffs point out that communications through the media may be compensable when those communications contribute to the litigation, and Plaintiffs contend they used the media to communicate with class members and thus contributed to the goals of the litigation. *See Pollar v. Judson Steel Corp.*, No. C-82-6833-MHP, 1985 WL 312, at *2 (N.D. Cal. May 21, 1985). Plaintiffs argue that Defendant has failed to show that the press conferences were not primarily for communicating with class members, but such an argument ignores the principle that Plaintiffs bear the burden of proving the reasonableness of their fees. *Spellan*, 59 F.3d at 646. Plaintiffs have not even attempted to show that any of these other press conferences were primarily a means to communicate with class members in any meaningful way. Excepting, then, time spent on matters improperly included in this objection,[8] the court concludes that 100.5 hours, totaling $33,696, should be subtracted from Plaintiffs' fee award because those hours concerned out-of-court activity that did not meaningfully contribute to the litigation.

### b.    Redacted Entries

DCFS identifies 30 hours of junior attorney time devoted to redacting materials, arguing that this work is inadequately described. The court disagrees. The entries explain that portions of the materials at issue are being withheld pursuant to Federal Rule of Evidence 408 and attorney-client privilege; were Plaintiffs to provide much more information on the timesheets, they could likely do so only by describing the redacted material. Additionally, the fact that, as the records show, junior attorneys performed the redactions, means that the rates charged are lower than they could have been had senior attorneys performed the work. This objection is therefore overruled.

### c.    Familiarization

---

[8]    For example, Defendant included an item in which Lehrer read letters from class members in this public relations objection, as well as an item in which Redleaf communicated directly with class members. (Def.'s Ex. 31.)

Defendant claims that over 92 hours of time spent by new attorneys familiarizing themselves with the file is excessive and that a private client would not stand for such waste. The court disagrees (with one exception discussed below), for the same reason that it did not accept Defendant's general argument that the case was overstaffed: this litigation extended over many years and entailed a wide variety of issues. *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) (such expenses are compensable because they are "inherent in the process of litigating over time"). Over such a period of time, it is not surprising that new attorneys must be brought in to work on the matter, nor that those attorneys need to spend some time educating themselves on the factual record and legal theories. In this court's view, the time attorneys spend getting up to speed on the case are compensable so long as those attorneys devote a significant portion of time to the case. *See Planned Parenthood of Cent. N.J. v. Attorney General of State of N.J.*, 297 F.3d 253, 271-72 (3d Cir. 2002) (approving "get up to speed" expenses); *Countess Cary v. CHA*, No. 87 C 6998, 1992 WL 91799, at *6 (N.D. Ill. Apr. 29, 1992) (Nordberg, J.) (same). The time spent by Marshall Seeder (who spent a total of 480 hours on the litigation), Andrew Matthews (608 hours), and Amy Zimmerman (952 hours) getting up to speed on the case is therefore compensable.[9]

The court is less persuaded that time spent by law clerks and junior attorneys who performed little work on the case is compensable. Unlike the other attorneys included in this category, there is no indication that the law students continued working on the case for more than a few months. The time they spent reviewing the file therefore generated little value for the litigation and is not compensable. This constitutes a sizable amount of the hours Defendant claimed in this

---

[9] As with other categories, some entries Defendant has included here do not appear to really be time devoted to getting up to speed; Defendant has included, for instance, Jeffrey Gilbert's entries for "Legal research" and "Conf with co-counsel re work to prepare for preliminary injunction hearing." (Def.'s Ex. 30.) The court overrules Defendant's objection with respect to such entries.

exception; indeed, nearly one-third of the hours in this entire category were spent by a single third-year law student reviewing past pleadings and opinions. The court has serious doubts about the overall utility of that time. For the same reasons, the court will not award fees for the time charged by a junior attorney who spent seven hours in 2006 reviewing prior opinions, because that attorney only spent a total of nineteen hours working on the case in total, all of which occurred after resolution of the *Dupuy I* appeal in 2005. The court therefore reduces the fee award by 47.5 hours, or $7,482.50.

### d. Client Communications and Fundraising

Defendant objects to 68.85 hours ($28,634.75) for "fees related to soliciting clients, fund raising, and securing additional counsel." (Def.'s Resp. at 27.) Neither side has cited any authority to support its position, but the court agrees that time Plaintiffs spent arranging for other organizations to help pay the costs of the litigation is not compensable. Plaintiffs have not shown that they would have been unable to proceed in this case had they not made such solicitations, and the court is not satisfied that these efforts were necessary to achieve Plaintiffs' ultimate success in the courtroom. Furthermore, the court notes the irony in forcing Defendant to pay increased legal fees resulting from Plaintiffs' attempt to attain assistance in paying *other* legal fees for which Defendant is now responsible as well.

The court is unpersuaded, however, by Defendant's objections to time spent by Plaintiffs' counsel seeking additional counsel and talking with actual and potential clients, as client interaction and staffing the case are both essential to advocacy and to Plaintiffs' ultimate success in the case. Defendant describes the client communications as "solicitation" of clients, a phrase that has a negative connotation and borders on unethical behavior. *See* MODEL RULES OF PROF'L CONDUCT R. 7.3(a). There is no evidence that Plaintiffs' counsel solicited in the sense contemplated by the Model Rules, however. Interviewing class members to determine who among them has the most compelling or illustrative facts for purposes of the class action is not improper. Accordingly, upon

the court's own review, the court concludes that 12.1 hours, worth $4,706, should be excluded from the fee award.

### e. Duplicate Entries

Defendant identified 31.08 hours of duplicated entries and calls for the reduction of $12,626.80 as a result. To their credit, Plaintiffs identified additional hours that were also mistakenly duplicated and increased the deduction for this entry to $16,444.80. This amount is accounted for in the "Plaintiffs' corrections" line in the Appendix.

### f. Opposition to Intervention

Defendant next seeks to exclude 124 hours ($64,860.80) Plaintiffs spent opposing the intervention of the Cook County Public Guardian. In the Title VII context, a "defendant's fee liability does not presumptively extend to cover the fees incurred by plaintiffs in litigating third party interests"; instead, the fee request must be evaluated "under the terms of the statute" to determine whether Defendants must pay those fees. *Bigby v. City of Chicago*, 927 F.2d 1426, 1428-29 (7th Cir. 1991). The statute at issue here allows a court to award "a reasonable attorney's fee" to "the prevailing party." 42 U.S.C. § 1988. In a similar situation, the Fourth Circuit precluded the prevailing plaintiff from recovering fees from the defendant for litigating an intervention issue, noting that requiring the plaintiff to bear the costs of opposing intervention "would not destroy the incentive to bring civil rights claims" so long as plaintiffs remain entitled to fees from the defendant for the primary litigation. *Rum Creek*, 31 F.3d at 177 (citing *Indep. Federation of Flight Attendants v. Zipes*, 491 U.S. 754 (1989) (holding that unsuccessful *intervenors* are not required to pay fees under Title VII)). As Plaintiffs appear to acknowledge, Defendant took no position on the intervention motion; the court concludes that, in these circumstances, it would be inequitable for Defendant to have to pay for Plaintiffs' decision to litigate an issue as to which Defendant was indifferent. Plaintiffs are still receiving a substantial fee award from Defendant, which suggests disallowance of this provision of the fee would not deter Plaintiffs from bringing a similar suit in the

future. The court disallows this aspect of the fee petition and reduces Plaintiffs' requested fee by the full $64,860.80.

### g. Clerical Time

Defendant contends that nearly 500 hours of time claimed by Plaintiffs in their original petition was non-compensable as attorney time because many of the tasks counsel performed were clerical. Plaintiffs agreed that 287 hours should be disallowed, and decreased their fee request by $66,210. Of the remaining 210 hours targeted by Defendant, Plaintiffs claim that 110 of those hours are properly counted as attorney work time, and 100 of the hours should be compensable at paralegal rates. Accounting for the change from attorney rates to paralegal rates, Plaintiffs agreed to a reduction of $74,095.50 (including the $66,210 reduction for strictly clerical work). This reduction is noted in the "Plaintiffs' corrections" line in the Appendix. After reviewing these corrections, the court agrees that Plaintiffs have made appropriate reductions, and the entries they continue to claim attorney time for—such as "proofing" briefs—is appropriately labeled as attorney time. The court therefore declines to make any further decreases to Plaintiffs' requested fee.

### h. Law Clerk Fees

DCFS asserts, without citation, that the time law clerks spent at depositions and in court was "clearly duplicative" and not compensable. Law clerk time is compensable as a general matter, however. *See Missouri v. Jenkins*, 491 U.S. 274, 285 (1989). Furthermore, the use of law clerks in lieu of another attorney is actually a more economical choice. *See Nickola v. Barnhart*, No. 03-C-622-C, 2004 WL 2713075, at *1 (W.D. Wis. Nov. 24, 2004) ("To the extent there was some duplication of effort . . . it was offset by the lower rate charged by the law clerks.") This objection is overruled.

### i. Fees Related to Counsel's Testimony

Plaintiffs' counsel testified at trial to provide foundational support for certain summary exhibits whose admission Defendant opposed. Defendant contends that this time should be

disallowed because counsel was acting as a witness, notwithstanding that the exhibits Plaintiffs sought to introduce through this testimony were ultimately admitted. Plaintiffs voluntarily agreed to eliminate the fee charged by Ms. Redleaf for her preparations, because they did not result in admissible testimony, as well as the time Mr. Romero spent waiting to testify, but maintains that the rest of the time—consisting mostly of Mr. Lehrer's preparations and actual testimony—is compensable as attorney time. The court agrees, as the foundational testimony counsel provided was essential to counsel's prosecution of the case. Defendant has not suggested that Plaintiffs could have introduced the evidence through any more efficient means, so the testimony is more properly understood as the attorneys' presentation of trial evidence, which is compensable. The court therefore declines to reduce the requested fee award below Plaintiffs' voluntary reductions.

### j. Non-Contemporaneous Entries

For four weeks in April 1999, Plaintiffs' paralegal, Mr. Romero, billed exactly 35 hours per week as "trial prep." Defendant appears to object to this both as non-contemporaneous and as vague. The court is concerned about weekly billing (as opposed to daily), but is even more concerned by the vague entry of "trial prep." Courts should "expect more documentary evidence . . . than [a] sketchy itemization" of block-billed time. *Cauley v. Wilson*, 754 F.2d 769, 772 (7th Cir. 1985); *see also Harper v. City of Chicago Heights*, No. 87 C 5112, 2002 WL 31010819, at *3 (N.D. Ill. Sept. 6, 2002) ("What is important is that the records be adequate and detailed[,] not contemporaneous."). There is no reason to doubt that the paralegal in question was in fact working on trial preparation that month, but the vague entry of "trial prep" opens the door for errors in memory and faulty estimates Romero might have made in his own favor. *Id.* Plaintiffs appropriately bear the risk of such mistakes. *Harper*, 2002 WL 31010819, at *3 (reducing compensable hours by 10%). Accordingly, the court will deduct a total of 70 hours from Plaintiffs' petition, meaning Mr. Romero will receive credit for half of the time he claimed for trial preparation in those four weeks. While this is an admittedly imperfect solution, the court concludes that it appropriately balances

compensating Plaintiffs for work that was actually done with requiring Defendant to pay for mistakes in memory as to exactly how much work was done. Plaintiffs' fee petition is accordingly reduced by $9,100.

### k.    Individual Cases

Finally, DCFS claims that over 1,400 hours billed by Plaintiffs counsel, totaling $474,346, is not compensable because it concerns time spent on individual cases in state administrative hearings and state courts. Plaintiffs first contend that Defendant mislabeled nearly 500 hours that were actually spent on proceedings in this court, and that only 929 hours are billed for state proceedings. Upon review, the court agrees with Plaintiffs and focuses solely upon the remaining 929 hours ($309,281.70) indisputably spent on state matters to determine whether the fee should include such work.

The question here is whether the state administrative proceedings in this case constitute an "action or proceeding to enforce a provision of . . . [§] 1983." 42 U.S.C. § 1988. In *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54 (1980), the Court held that attorneys could recover fees for engaging in mandatory state employment discrimination proceedings because those proceedings effectuate the ends of Title VII of the Civil Rights Act of 1964. *Id.* at 61, 66. In the § 1983 context specifically, however, the Court held that a school teacher's state tenure rights hearing was not a proceeding to enforce § 1983. *Webb*, 471 U.S. at 241. "Because § 1983 stands 'as an independent avenue of relief' and petitioner 'could go straight to court to assert it,' . . . the School Board proceedings in this case simply do not have the same integral function under § 1983 that state administrative proceedings have under Title VII." *Id.* (quoting *Smith v. Robinson*, 468 U.S. 992, 1011 n.14 (1984), *superseded on other grounds by* 20 U.S.C. § 1415).

Following *Webb*, the Court enunciated a more general rule for administrative proceedings. "[T]ime spent pursuing optional administrative proceedings [is compensable if the work is] 'useful and of a type ordinarily necessary' to secure the final result obtained from the litigation. Application

of this standard is left to the discretion of the district court." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 561 (1986) (quoting *Webb,* 471 U.S. at 243). Participation in the state administrative proceedings here was undoubtedly useful for Plaintiffs' counsel, as they obtained direct knowledge of the processes, were able to develop these cases from a preliminary stage, and had immediate access to evidence that supported claims that members of the class should not have been "indicated." The necessity of that work is another matter. In successfully arguing that this court should only consider 929 hours as time devoted to administrative cases, Plaintiffs pointed out that Plaintiffs' counsel did not represent all of their clients in state administrative proceedings. (Pl.'s Reply at 57.) While this certainly shows that time spent with those clients concerned matters before this court rather than in state proceedings, it also suggests that the time Plaintiffs spent in state proceedings with other clients was not in fact *necessary* to bring this claim.

In most civil rights cases, the evidence of the civil rights violation is generated without any attorney involvement. Here, Plaintiffs' attorneys seek expenses for their active involvement in state proceedings in which their clients were often cleared of the charges DCFS improperly found "indicated." Unlike in the Title VII context, in which administrative procedures seek to effectuate the ends of Titile VII itself, the participation of Plaintiffs' attorneys in the state procedures here were not meant to "enforce" § 1983 within the meaning of § 1988. While there may be times when an attorney is entitled to recover for her active participation in a state proceeding that is factually related to a federal civil rights action, the court is satisfied that this is not such a case. At the very least, the existence of class members who were not represented by Plaintiffs' counsel during the state administrative proceedings demonstrates that the time the attorneys spent in those proceedings was not "of a type ordinarily necessary" to prevail in this court. *Delaware Valley*, 478 U.S. at 561. The court therefore reduces Plaintiffs' award by $309,281.70.

## C.     Other Objections

Having determined the lodestar figure (the reasonable rate determined in Part A multiplied by the reasonable hours expended determined in Part B), the court must address "other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.'" *Hensley*, 461 U.S. at 434.

### 1. Results Obtained

Defendant argues that Plaintiffs' fee award should be reduced because they obtained only limited success for their *Dupuy I* claims. If "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Id.* at 436. While "there is no precise rule or formula" for determining what constitutes a partial or limited success, the court should consider two questions. *Id.* "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" *Id.* at 434.

Consideration of the first question requires the court to ignore fees arising from unsuccessful claims and to treat those claims "as if they had been raised in separate lawsuits." *Id.* at 435. Here, as noted above, Plaintiffs dropped their claim for fees concerning certain *Dupuy I* matters, including their request for *Lyon* relief, DCFS's rule regarding stays, and additional relief for teachers. In addition, Plaintiffs are clearly not entitled to fees for litigation from *Dupuy II* or *Dupuy III*, as Plaintiff was unsuccessful on those claims. Although Defendant does not specifically make this argument, the court notes that a significant portion of the time spent on the Complaint was necessarily spent on *Dupuy II* and *Dupuy III*, as all claims were presented in the single complaint. The attorneys did not categorize their time when working on the complaint down to the detail of what specific set of claims they were working on, nor is such detailed billing required. The court is nevertheless persuaded that a significant portion of the time spent on the complaint must have been spent on these issues in *Dupuy II* and *Dupuy III* that were ultimately unsuccessful. Upon review, the court

concludes that deducting 200 hours (approximately one-fourth of the total request for time spent on the complaint) from the claimed fees—100 each from Lehrer and Redleaf, who handled the vast majority of the complaint writing—is appropriate. The court accordingly subtracts $87,500 from Plaintiffs' fees. These claims can be treated as separate and distinct from the claims on which Plaintiffs did prevail in *Dupuy I*.

In addition, Plaintiffs did not substantially prevail on appeal. Plaintiffs sought an expansion of the injunction entered by this court, including elimination of the "credible evidence" standard altogether, inclusion of foster parents in the expedited relief, and broader rights in the "pre-deprivation process." *Dupuy*, 397 F.3d at 502. While Plaintiffs did not succeed on these claims, they did succeed in resisting Defendant's attempt to alter the thirty-five day expedited appeal process ordered in the injunction and in extending the injunction to cover career entrants into the child-care field. *Id.* at 509, 512. In their initial fee petition, Plaintiffs slashed their claimed hours on the *Dupuy I* appeal by 60%. Defendant argues that 75% is a more appropriate amount, but neglects to mention that Plaintiffs prevailed on the thirty-five day appeal issue. Admittedly, that issue was not a major issue on the appeal, but the court is satisfied that it is worth 15% (the difference between Defendant's proposed 75% reduction and Plaintiffs' proposed 60% reduction) of the hours Plaintiffs' counsel spent on the appeal. The court therefore declines to alter Plaintiffs' voluntary 60% reduction of their fees spent on the appeal of *Dupuy I*.

After separating out these claims, the court must consider whether Plaintiffs achieved a level of success on their remaining *Dupuy I* claims to support a fee award for the hours spent on the matter. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley*, 461 U.S. at 435. Plaintiffs and Defendant dispute the degree to which Plaintiffs delivered success in *Dupuy I*. This court identified three "core" DCFS policies challenged in *Dupuy I*: the Indicated Report Decision-Making Policies; the Notice and Hearing Policies; and the Disclosure and Use Policies. The injunction ultimately entered by the court

granted Plaintiffs substantial relief from each of these policies. *Dupuy*, 2003 WL 21557911, at *3-10; *see also Dupuy*, 141 F. Supp. 2d at 1134-40. Defendant argues that Plaintiffs did not really prevail on the Indicated Report Decision-Making Policies issue because the court retained the "credible evidence" standard, but this argument misunderstands the court's holding. While finding no authority for changing the vocabulary, the injunction entered by the court fundamentally changed the meaning of the "credible evidence" standard. *Cf. Dupuy*, 397 F.3d at 506 ("Other than bureaucratic intransigence, it is difficult to identify any reason for DCFS' determination not to abandon the term."). Defendant also suggests that changes to the standard were the result of Defendant's own decision. The court has previously rejected this argument, noting that the credible evidence change, among other changes, was put "in place over Defendant's initial objection and therefore cannot be characterized as 'voluntary.'" (10/21/04 Minute Order [584] at 5.)

Defendant argues that other changes sought by Plaintiffs were voluntarily implemented by DCFS and that Plaintiffs therefore are not entitled to fees for their insistence on trying issues that had been effectively resolved. According to Defendant, Plaintiffs achieved no meaningful success regarding the Notice and Hearing Policies because the parties reached an agreement in 1999 regarding the appropriate time frame for appeals. The court nevertheless granted Plaintiffs' request for a preliminary injunction on this issue, noting an absence of evidence that any improvement in the appeals process had yet occurred as a result of the change. *See Dupuy*, 141 F. Supp. 2d at 1139. The court's concern regarding "inexcusable delays" and its subsequently issued injunction on this issue belies Defendant's insistence that Plaintiffs did not prevail on this issue. *Id.* at 1138.

Many of Defendant's arguments were previously considered and rejected by this court when it granted an interim award of attorney's fees. (10/21/04 Minute Order [584].) Although that award was overturned on appeal, the Seventh Circuit disputed Plaintiffs' prevailing party status only on the grounds that the issues lacked final resolution, not on the basis that Plaintiffs did not actually prevail (to that point) on the issues. *See Dupuy*, 423 F.3d at 722-23. Plaintiffs succeeded on

28

substantially all of their "core" claims in *Dupuy I* and are therefore entitled to the full amount of attorney's fees reasonably expended for that case. Defendant cites *Gratz v. Bollinger*, 353 F. Supp. 2d 929 (E.D. Mich. 2005) as an example of a court's limiting a fee award based on limited success, but the facts in *Gratz* differ markedly from those in this case. In *Gratz*, the primary goal of the plaintiffs was to "invalidate the consideration of an applicant's race in college admissions," a goal which was not achieved before the United States Supreme Court. *Id.* at 938; *see also Gratz v. Bollinger*, 539 U.S. 244 (2003). Plaintiffs succeeded only on the narrower claim that the use of race by the University of Michigan's admissions officers was not sufficiently narrowly tailored. *Gratz*, 353 F. Supp. 2d at 938. Plaintiffs here, by contrast, succeeded on all of their "core" issues, as this court entered a preliminary injunction—affirmed by the Seventh Circuit—changing the evidentiary standard by which indicated reports are made and directing certain changes in the appeals process and schedule. The court will not limit the fee award "simply because the plaintiff[s] failed to prevail on every contention raised in the lawsuit. . . . The result is what matters." *Hensley*, 461 U.S. at 435.

### 2.    Vague and Block-Billed Time

Defendant argues for the exclusion of $232,336 from Plaintiffs' fee request for entries that are "vague" and "block-billed." Having reviewed the entries, the court disagrees that they are as vague as Defendant argues. For example, a single one-hour entry for Redleaf to which Defendant objects reads as follows: "Three calls to Barb re lack of agreement, discussion of next steps re: discovery and ways of moving case." (Def.'s Ex. 27.) This entry specifies the number of phone calls made, who was called, and the content of the discussions. They are, however, at least in some sense an example of "block-billing" (assuming that Redleaf did not make these three calls one immediately after another)—that is, the practice of lumping several different activities into one line item. "There is nothing inherently wrong with [combining multiple tasks into one entry], however . . . ." *Mostly Memories, Inc. v. For Your Ease Only, Inc.*, 594 F. Supp. 2d 931, 936 (N.D. Ill. 2009); *see also Farfaras v. Citizens Bank & Trust of Chicago*, 433 F.3d 558, 569 (7th Cir. 2006) ("Although

29

'block billing' does not provide the best possible description of attorneys' fees, it is not a prohibited practice."). The appropriate question, then, is whether the entries are detailed enough to allow the opposing party and the court to determine that the time billed accurately reflects the time spent on the case. *See Top Tobacco, L.P. v. North Atl. Operating Co., Inc.*, No. 06 C 950, 2007 WL 2688452, at *4 (N.D. Ill. Sept. 6, 2007) (block billing not surprising "in a case this large and complex, where attorneys perform multiple tasks on any given day"). As noted, the court concludes that the entries are not too vague and sees no need to reduce Plaintiffs' fee based solely on the lumping together of some related activities on the attorneys' time sheets.

### 3. *Johnson* Factors

Defendant also argues that the factors outlined in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), dictate that Plaintiffs' fee should be reduced 20%. The Court in *Hensley* recognized that courts "may consider" the *Johnson* factors, but also noted "that many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate."[10] *Hensley*, 461 U.S. at 434 n.9. Thus, the court has discretion to take into account the *Johnson* factors only if it concludes that the factor involved is not otherwise accounted for in the lodestar determination. *See Eddleman v. Switchcraft, Inc.*, 965 F.2d 422, 425 (7th Cir. 1992).

A number of the *Johnson* factors that Defendant claims warrant a reduction have already

---

[10]     The factors are:

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*People Who Care*, 90 F.3d at 1310 n.1 (citing *Johnson*, 488 F.2d at 717-19).

30

been considered, either in the court's lodestar determination or subsequently. For example, Defendant argues that Plaintiffs did not prevail on a significant number of issues, but that argument has already been addressed by the court. Defendant also suggests that the fee should be reduced because the case was desirable and would have been brought by other attorneys, decreasing the social utility in incentivizing attorneys to bring the case by the promise of attorney's fees. While the court is skeptical that this factor alone could ever warrant a reduction in the fee award, the court also disputes Defendant's premise—far from being a desirable case, this was a complex civil rights action on behalf of an arguably unsympathetic class: persons accused of child neglect and abuse. The case required a large investment of resources with no guarantee of success, and the award of fees ultimately was more than a decade down the road at the time the suit was initiated. In short, this was not the glamorous civil rights case that Defendant suggests.

Given the extensive consideration the court has given in the preceding pages to the appropriate calculation of the lodestar amount, the court concludes that consideration "of the *Johnson* factors is of little value" and does not warrant any further adjustments to the lodestar amount. *O'Sullivan v. City of Chicago*, 484 F. Supp. 2d 829, 840 (N.D. Ill. 2007).

### III. Costs

Plaintiffs request $65,329.17 in costs. Unlike the fee determination, in which Plaintiffs bear the burden of establishing the reasonableness of the fees sought, Federal Rule of Civil Procedure 54(d) creates a "strong presumption" that the prevailing party will recover costs. *Weeks v. Samsung Heavy Indus. Co., Ltd.*, 126 F.3d 926, 945 (7th Cir. 1997). That presumption "is difficult to overcome, and the district court's discretion is narrowly confined—the court must award costs unless it states good reasons for denying them." *Id.* Defendant concedes that most of the costs sought by Plaintiffs are of a type that is ordinarily compensable pursuant to Rule 54(d) and 28 U.S.C. § 1920. Defendant nevertheless objects to nearly all of Plaintiffs' bill of costs as either vague or excessive. The complaints as to excessiveness are relatively trivial and unpersuasive.

For example, one line item is labeled "Kinko's-Plaintiffs interrogatory requesting defendants to identify witnesses (.10 per page) 10 pages," for which Plaintiffs seek recovery of $1.00. Defendant objects to that line item as "excessive," and argues that only $.85 was recoverable for this copying (apparently at the rate of 8.5 cents per page). Ten cents per copy is not excessive. *See, e.g.*, *Smith v. Augustine*, No. 07 C 81, 2009 WL 1748235, at *5 (N.D. Ill. June 18, 2009) (approving 13 cents per page); *Harkins v. Riverboat Servs., Inc.*, 286 F. Supp. 2d 976, 982 (N.D. Ill. 2003) (copy charges between $0.10 and 0.20 per page are reasonable); *Shanklin Corp. v. Am. Packaging Machinery, Inc.*, No. 95 C 1617, 2006 WL 2054382, at *4 (N.D. Ill. July 18, 2006) (same). Other "excessive" objections were similarly unhelpful.

Defendant's objection to several line items as "vague" carries more weight. Most notably, the "Copying and Document Charges" category and the "Computer Research" category contain a number of vague references, often little more than a date and a price associated with that date. In total, Defendant argues that nearly all of the $21,289.54 should be excluded from the "Copying and Document Charges" and all of the $16,501.37 for "Computer Research" should be excluded from the allowable costs. In response, Plaintiffs point out that they are not "required to submit a bill of costs containing a description so detailed as to make it impossible economically to recover . . . costs." *Northbrook Excess & Surplus Ins. Co. v. Proctor & Gamble Co.*, 924 F.2d 633, 643 (7th Cir. 1991). In *Northbrook Excess*, the court upheld the district court's award of more than $50,000 in photocopying costs, concluding such a bill was not excessive "in the context of a six-year paper war." *Id.* Here, where the litigation took place more than a decade later and the photocopying bill was less than half that of *Northbrook Excess* over a similar period of time, the court is satisfied that the claimed costs are reasonable. This conclusion is bolstered by the fact that some of the line entries do disclose the price per copy, and by the court's confidence that 10 cents per copy is not an unreasonable amount. *See Harkins*, 286 F. Supp. 2d at 982.

Turning to the question of computer research, the court first notes that the Seventh Circuit

has expressed a general preference that computer research be considered as part of attorney's fees rather than costs. *See Haroco, Inc. v. American Nat. Bank & Trust Co. of Chicago*, 38 F.3d 1429, 1440 (7th Cir. 1994) ("computer research costs 'are more akin to awards under attorney's fees provisions than under costs'" (quoting *McIlveen v. Stone Container Corp.*, 910 F.2d 1581, 1584 (7th Cir. 1990))). Because Plaintiffs here are entitled to recover both fees and costs, this distinction makes less difference than it might in other cases. The distinction is not entirely irrelevant, however, as Plaintiffs bear the burden of establishing their entitlement to fees, while there is a general presumption that they will recover costs. *Compare Spellan*, 59 F.3d at 646 ("The party submitting the [fee] petition has, of course, the burden of justifying the fees requested in the petition.") *with Weeks*, 126 F.3d at 945 (there is "a strong presumption that the prevailing party will recover costs"). Whether the computerized research fees are considered costs or attorney's fees, the court concludes that they are not documented adequately enough to allow recovery. Most of the entries read simply as "Lexis-Nexis" or "Westlaw online legal research charges," and provide a date. (Pl.'s.' Exs. 10, 14.) Plaintiffs suggest that DCFS and this court can correlate these charges to the work that was performed simply by comparing the date for the research charge with what the attorneys were working on that day. While Plaintiffs are not required to submit a highly detailed list of costs, *see Northbrook Excess*, 924 F.2d at 643, neither are this court or Defendant's counsel responsible for combing through these various ledger entries and making educated guesses as to what legal research was performed on various dates, and whether the amount charged for that research is reasonable. As with this court's concern expressed above regarding vague time billing entries, Plaintiffs bear the risk that these vague entries are actually in reference to work performed on other cases or on issues as to which Plaintiffs did not prevail and for which Defendant should not be required to pay. *See Cintas Corp. v. Perry*, 494 F. Supp. 2d 907, 909 (N.D. Ill. 2007) (denying computer research costs as "insufficiently detailed" in the absence of "invoices or information regarding the rates charged"); *Williams v. Community High School Dist.*

*218*, No. 04 C 5279, 2006 WL 681045, at *2 (N.D. Ill. Mar. 13, 2006) (denying computer research costs due to failure to identify "what these costs pertain to").  The court therefore disallows the $16,501.37 claimed by Plaintiffs for computer research.

The court has reviewed Defendant's other objections that costs are inadequately documented and concludes that the documentation Plaintiffs provided to Defendant and this court for such expenses as ordering deposition transcripts is adequate and that the costs are otherwise reasonable.  The court therefore awards Plaintiffs $48,827.80 for costs.[11]

## CONCLUSION

Plaintiffs' Motion to Amend/Correct Final Judgment Order [985] is granted as outlined *supra* in Part I.  Plaintiffs' Amended Consolidated Petition for Attorney's Fees and Expenses [992] is granted.  Plaintiff is hereby awarded $5,737,401.83 in fees, including interest, and $65,329.17 in costs.

ENTER:

Dated: August 13, 2009

_____
REBECCA R. PALLMEYER
United States District Judge

---

[11]     Although Plaintiffs specifically argued in favor of interest on the fee award, Plaintiffs have not requested interest on their costs.

**Fees**

| | | |
|---|---:|---:|
| Plaintiffs' claimed amount | | $6,104,691.00 |

<u>Adjustments</u>

| | | |
|---|---:|---:|
| Plaintiffs' corrections | $211,864.90 | |
| Excessive staffing at status conferences | 8,350.00 | |
| Excessive staffing: 5 attorneys | 11,292.00 | |
| Public relations | 33,696.00 | |
| Familiarization | 7,482.50 | |
| Fundraising | 4,706.00 | |
| Opposition to intervention | 64,860.80 | |
| "Trial Prep" hours | 9,100.00 | |
| Individual cases | 309,281.70 | |
| Complaint | 87,500.00 | |
| | | |
| Attorneys' Fees, pre-interest | | $5,356,557.10 |
| | | |
| 2008 Interest (Prime Rate 5%) | $267,827.86 | |
| 2009 Interest (Prime Rate 3.25%) | $113,016.88 | |
| | | |
| Attorneys' Fees, net of adjustments | | **$5,737,401.83** |

**Costs**

| | | |
|---|---:|---:|
| Plaintiffs' claimed amount | | $65,329.17 |

<u>Adjustments</u>

| | | |
|---|---:|---:|
| Computer research | $16,501.37 | |
| | | |
| Costs, net of adjustments | | **$48,827.80** |
| | | |
| **TOTAL** | | **$5,786,229.63** |

---

[12] For a summary of Plaintiffs' claimed amount per person, see Exhibit 1 to Plaintiffs' Fee Petition.